# U. S. District Court
## Western District of Arkansas (Fayetteville)
## CIVIL DOCKET FOR CASE #: <u>5:20−cv−05193−TLB</u>

Arkansas United et al v. Thurston et al

Assigned to: Honorable Timothy L. Brooks

Case in other court: 8th Circuit Court of Appeals, 22−02918

Cause: 42:1981 Civil Rights

Date Filed: 11/02/2020

Date Terminated: 09/07/2022

Jury Demand: Defendant

Nature of Suit: 441 Civil Rights: Voting

Jurisdiction: Federal Question

**Plaintiff**

**Arkansas United**                                represented by  **Lawrence Anthony Walker**
John W. Walker P.A.
1723 Broadway
Little Rock, AR 72206
(501) 374−3758
Fax: (501) 374−4187
Email: <u>tonywalkeratty@gmail.com</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nina Perales**
Mexican American Legal Defense and ED.
F
110 Broadway, Suite 300
San Antonio, TX 78205
210−224−5476
Fax: 210−224−5382
Email: <u>nperales@maldef.org</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Francisco Fernandez del Castillo**
Mexican American Legal Defense &
Education Fund
11 E. Adams Street #700
Chicago, IL 60615
219−407−2092
Email: <u>ffernandez−delcastillo@maldef.org</u>
*ATTORNEY TO BE NOTICED*

**Griselda Vega Vega Samuel**
Maldef
IL
11 East Adams
Suite 700
Chicago, IL 60603
312−427−0701
Email: <u>gvegasamuel@maldef.org</u>

*ATTORNEY TO BE NOTICED*

**Susana Sandoval Vargas**
Maldef
11 E Adams Street
Suite 700
Chicago, IL 60603
312–427–0701
Email: ssandovalvargas@maldef.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**L. Mireya Reith**                    represented by    **Lawrence Anthony Walker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nina Perales**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Francisco Fernandez del Castillo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Griselda Vega Vega Samuel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Susana Sandoval Vargas**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**John Thurston**                    represented by    **Michael A. Cantrell**
*in his official capacity as the Secretary of*    Arkansas Attorney General's Office
*State of Arkansas*    323 Center Street
Suite 200
Little Rock, AR 72201
(501) 682–2401
Fax: (501) 682–2591
Email: Michael.Cantrell@ArkansasAG.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas J. Bronni**
Arkansas Attorney General's Office
323 Center Street

Suite 200
Little Rock, AR 72201
(501) 682–6302
Email: nicholas.bronni@arkansasag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Mosley**
Jason Owens Law Firm, P.A.
1312 W. Oak Street
Conway, AR 72034
501–764–4334
Fax: 501–764–9173
Email: mosley@jowenslawfirm.com
*TERMINATED: 02/07/2022*

**Vincent M. Wagner**
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176
571–707–4655
Email: vwagner@adflegal.org
*TERMINATED: 02/15/2022*

**Defendant**

| | | |
|---|---|---|
| **Sharon Brooks**<br>*in their official capacities as members of the Arkansas State Board of Election Commissioners* | represented by | **Michael A. Cantrell**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Nicholas J. Bronni**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Michael A. Mosley**<br>(See above for address)<br>*TERMINATED: 02/07/2022*<br><br>**Vincent M. Wagner**<br>(See above for address)<br>*TERMINATED: 02/15/2022* |

**Defendant**

| | | |
|---|---|---|
| **Bilenda Harris–Ritter**<br>*in their official capacities as members of the Arkansas State Board of Election Commissioners* | represented by | **Michael A. Cantrell**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Nicholas J. Bronni**<br>(See above for address) |

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Mosley**
(See above for address)
*TERMINATED: 02/07/2022*

**Vincent M. Wagner**
(See above for address)
*TERMINATED: 02/15/2022*

**Defendant**

**William Luther**
*in their official capacities as members of the Arkansas State Board of Election Commissioners*

represented by **Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas J. Bronni**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Mosley**
(See above for address)
*TERMINATED: 02/07/2022*

**Vincent M. Wagner**
(See above for address)
*TERMINATED: 02/15/2022*

**Defendant**

**Charles Roberts**
*in their official capacities as members of the Arkansas State Board of Election Commissioners*

represented by **Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas J. Bronni**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Mosley**
(See above for address)
*TERMINATED: 02/07/2022*

**Vincent M. Wagner**
(See above for address)
*TERMINATED: 02/15/2022*

**Defendant**

represented by

**James Sharp**
*in their official capacities as members of the Arkansas State Board of Election Commissioners*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas J. Bronni**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Mosley**
(See above for address)
*TERMINATED: 02/07/2022*

**Vincent M. Wagner**
(See above for address)
*TERMINATED: 02/15/2022*

**Defendant**

**J. Harmon Smith**
*in their official capacities as members of the Arkansas State Board of Election Commissioners*

represented by **Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Mosley**
(See above for address)
*TERMINATED: 02/07/2022*
*LEAD ATTORNEY*

**Nicholas J. Bronni**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Vincent M. Wagner**
(See above for address)
*TERMINATED: 02/15/2022*

**Defendant**

**Renee Oelschlaeger**
*in their official capacities as members of the Washington County Election Commission*

represented by **Brian R. Lester**
Washington County, Arkansas
280 N. College Ave.
Suite 501
Fayetteville, AR 72701
479–973–8415
Fax: 479–444–6939
Email: blester@washingtoncountyar.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bill Ackerman**
*in their official capacities as members of*
*the Washington County Election*
*Commission*

represented by **Brian R. Lester**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Max Deitchler**
*in their official capacities as members of*
*the Washington County Election*
*Commission*

represented by **Brian R. Lester**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jennifer Price**
*in their official capacities as members of*
*the Washington County Election*
*Commission*

represented by **Brian R. Lester**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Russell Anzalone**
*in their official capacities as members of*
*the Benton County Election Commission*

represented by **George Ray Spence**
Clark and Spence Law Firm
121 S. Main Street
Bentonville, AR 72712
(479) 273–2777
Email: george@clarkandspence.com
*TERMINATED: 01/15/2021*
*LEAD ATTORNEY*

**Jason E. Owens**
Jason Owens Law Firm, P.A.
1312 W. Oak Street

Conway, AR 72034
501–764–4334
Email: owens@jowenslawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brooklyn Parker**
Jason Owens Law Firm, P.A.
1312 W. Oak Street
Conway, AR 72034
501–764–4334
Email: parker@jowenslawfirm.com
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

| **Robbyn Tumey**<br>*in their official capacities as members of*<br>*the Benton County Election Commission* | represented by | **George Ray Spence**<br>(See above for address)<br>*TERMINATED: 01/15/2021*<br>*LEAD ATTORNEY* |

**Jason E. Owens**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brooklyn Parker**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

| **Harlan Stee**<br>*in their official capacities as members of*<br>*the Benton County Election Commission* | represented by | **George Ray Spence**<br>(See above for address)<br>*TERMINATED: 01/15/2021*<br>*LEAD ATTORNEY* |

**Jason E. Owens**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brooklyn Parker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**David Damron**
*in their capacities as members of the*
*Sebastian County Election*

represented by **Charles Daniel Shue , Jr.**
Charles Daniel Shue, JR.
901 South B Street
Ste 209
Fort Smith, AR 72901
479–783–8976
Email: dshue@co.sebastian.ar.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason E. Owens**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brooklyn Parker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Luis Andrade**
*in their capacities as members of the*
*Sebastian County Election*

represented by **Charles Daniel Shue , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason E. Owens**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brooklyn Parker**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Defendant**

**Lee Webb**
*in their capacities as members of the*
*Sebastian County Election*

represented by **Charles Daniel Shue , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason E. Owens**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brooklyn Parker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Meghan Hassler**
*in their capacities as members of the*
*Sebastian County Election*

represented by **Charles Daniel Shue , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason E. Owens**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Cantrell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brooklyn Parker**
(See above for address)
*ATTORNEY TO BE NOTICED*

Email All Attorneys (Primary Address)
Email All Attorneys (Primary and Secondary Address)

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 11/02/2020 | 1 | | CIVIL COVER SHEET for case initiated by Arkansas United, Mireya Reith. Please proceed with filing your case initiating document(s). <br><br> If the case initiating documents are not filed by Close of Business the next |

| | | | |
|---|---|---|---|
| | | | <span style="color:red">business day your case may be terminated.</span> (lgd) (Entered: 11/02/2020) |
| 11/02/2020 | 2 | | COMPLAINT with Jury Demand against All Plaintiffs ( Filing fee $ 400 receipt number CARWDC–2263621), filed by Arkansas United.(Walker, Lawrence) (Entered: 11/02/2020) |
| 11/02/2020 | 3 | | MOTION to Amend/Correct , MOTION for Temporary Restraining Order by Arkansas United. (Walker, Lawrence) (Entered: 11/02/2020) |
| 11/02/2020 | 4 | | MEMORANDUM BRIEF in Support of 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order by Arkansas United. (Attachments: # 1 DECLARATION OF L. MIREYA REITH)(Walker, Lawrence) (Entered: 11/02/2020) |
| 11/02/2020 | 5 | | MOTION for Attorney to Appear Pro Hac Vice (PHV Application fee paid $ 100; receipt number AARWDC–2263684) by Arkansas United. (Attachments: # 1 Affidavit)(Walker, Lawrence) (Entered: 11/02/2020) |
| 11/02/2020 | 6 | | MOTION for Attorney to Appear Pro Hac Vice (PHV Application fee paid $ 100; receipt number AARWDC–2263686) by Arkansas United. (Attachments: # 1 Affidavit)(Walker, Lawrence) (Entered: 11/02/2020) |
| 11/02/2020 | 7 | | MOTION for Attorney to Appear Pro Hac Vice (PHV Application fee paid $ 100; receipt number AARWDC–2263688) by Arkansas United. (Attachments: # 1 Affidavit)(Walker, Lawrence) (Entered: 11/02/2020) |
| 11/03/2020 | 8 | | **TEXT ONLY ORDER granting 5 Motion to Appear Pro Hac Vice. Nina Perales is directed to immediately register for Pro Hac Vice filer access through PACER and enter her appearance in this matter. Signed by Honorable P. K. Holmes III on November 3, 2020. (jas) (Entered: 11/03/2020)** |
| 11/03/2020 | 9 | | **TEXT ONLY ORDER granting 6 Motion to Appear Pro Hac Vice. Griselda Vega Samuel is directed to immediately register for Pro Hac Vice filer access through PACER and enter her appearance in this matter. Signed by Honorable P. K. Holmes III on November 3, 2020. (jas) (Entered: 11/03/2020)** |
| 11/03/2020 | 10 | | **TEXT ONLY ORDER granting 7 Motion to Appear Pro Hac Vice. Francisco Fernandez–del Castillo is directed to immediately register for Pro Hac Vice filer access through PACER and enter his appearance in this matter. Signed by Honorable P. K. Holmes III on November 3, 2020. (jas) (Entered: 11/03/2020)** |
| 11/03/2020 | | | TEXT ONLY MEMO OF REASSIGNMENT. Case reassigned to Honorable Timothy L. Brooks. Honorable P. K. Holmes III no longer assigned to the case. (lw) (Entered: 11/03/2020) |
| 11/03/2020 | 11 | | NOTICE of Appearance by Michael A. Cantrell on behalf of Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Cantrell, Michael) (Entered: 11/03/2020) |
| 11/03/2020 | 12 | | RESPONSE IN OPPOSITION TO Motion re 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order filed by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Cantrell, Michael) (Entered: 11/03/2020) |

| 11/03/2020 | 13 | | NOTICE of Appearance by Nicholas Bronni on behalf of Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Bronni, Nicholas) (Entered: 11/03/2020) |
|---|---|---|---|
| 11/03/2020 | 14 | | NOTICE of Appearance by Vincent M. Wagner on behalf of Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Wagner, Vincent) (Entered: 11/03/2020) |
| 11/03/2020 | 15 | | Magistrate Notice/Consent Form furnished. (lgd) (Entered: 11/03/2020) |
| 11/03/2020 | 16 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.**<br><br>Summons Requested as to B. Ackerman for service of the following document: 2 Complaint, 4 Memorandum Brief in Support, 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order . (Walker, Lawrence) (Entered: 11/03/2020) |
| 11/03/2020 | 17 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.**<br><br>Summons Requested as to Harlan Stee for service of the following document: 2 Complaint, 4 Memorandum Brief in Support, 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order . (Walker, Lawrence) (Entered: 11/03/2020) |
| 11/03/2020 | 18 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.**<br><br>Summons Requested as to James Sharp for service of the following document: 2 Complaint, 4 Memorandum Brief in Support, 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order . (Walker, Lawrence) (Entered: 11/03/2020) |
| 11/03/2020 | 19 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.**<br><br>Summons Requested as to Luis Andrade for service of the following document: 2 Complaint, 4 Memorandum Brief in Support, 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order . (Walker, Lawrence) (Entered: 11/03/2020) |
| 11/03/2020 | 20 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.**<br><br>Summons Requested as to Renee Oelschlaeger for service of the following document: 2 Complaint, 4 Memorandum Brief in Support, 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order . (Walker, Lawrence) (Entered: 11/03/2020) |
| 11/03/2020 | 21 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.**<br><br>Summons Requested as to Robbyn Tumey for service of the following document: 2 Complaint, 4 Memorandum Brief in Support, 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order . (Walker, Lawrence) (Entered: 11/03/2020) |
| 11/03/2020 | 22 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.** |

| | | | |
|---|---|---|---|
| | | | Summons Requested as to Bilenda Harris–Ritter for service of the following document: 2 Complaint, 4 Memorandum Brief in Support, 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order . (Walker, Lawrence) (Entered: 11/03/2020) |
| 11/03/2020 | 23 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.**<br><br>Summons Requested as to Charles Roberts for service of the following document: 2 Complaint, 4 Memorandum Brief in Support, 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order . (Walker, Lawrence) (Entered: 11/03/2020) |
| 11/03/2020 | 24 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.**<br><br>Summons Requested as to David Damron for service of the following document: 2 Complaint, 4 Memorandum Brief in Support, 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order . (Walker, Lawrence) (Entered: 11/03/2020) |
| 11/03/2020 | 25 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.**<br><br>Summons Requested as to J. Harmon Smith for service of the following document: 2 Complaint, 4 Memorandum Brief in Support, 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order . (Walker, Lawrence) (Entered: 11/03/2020) |
| 11/03/2020 | 26 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.**<br><br>Summons Requested as to Jennifer Price for service of the following document: 2 Complaint, 4 Memorandum Brief in Support, 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order . (Walker, Lawrence) (Entered: 11/03/2020) |
| 11/03/2020 | 27 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.**<br><br>Summons Requested as to John Thurston for service of the following document: 2 Complaint, 4 Memorandum Brief in Support, 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order . (Walker, Lawrence) (Entered: 11/03/2020) |
| 11/03/2020 | 28 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.**<br><br>Summons Requested as to Lee Webb for service of the following document: 2 Complaint, 4 Memorandum Brief in Support, 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order . (Walker, Lawrence) (Entered: 11/03/2020) |
| 11/03/2020 | 29 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.**<br><br>Summons Requested as to Max Deitchler for service of the following document: 2 Complaint, 4 Memorandum Brief in Support, 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order . (Walker, Lawrence) (Entered: 11/03/2020) |
| 11/03/2020 | 30 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.** |

| | | | |
|---|---|---|---|
| | | | Summons Requested as to Meghan Hassler for service of the following document: 2 Complaint, 4 Memorandum Brief in Support, 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order . (Walker, Lawrence) (Entered: 11/03/2020) |
| 11/03/2020 | 31 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.** <br><br> Summons Requested as to Russell Anzalone for service of the following document: 2 Complaint, 4 Memorandum Brief in Support, 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order . (Walker, Lawrence) (Entered: 11/03/2020) |
| 11/03/2020 | 32 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.** <br><br> Summons Requested as to Sharon Brooks for service of the following document: 2 Complaint, 4 Memorandum Brief in Support, 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order . (Walker, Lawrence) (Entered: 11/03/2020) |
| 11/03/2020 | 33 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.** <br><br> Summons Requested as to William Luther for service of the following document: 2 Complaint, 4 Memorandum Brief in Support, 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order . (Walker, Lawrence) (Entered: 11/03/2020) |
| 11/03/2020 | 34 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS AND CASE PARTICIPANTS.** <br><br> Summons Issued as to All Defendants and returned to attorney or plaintiff for service. <br><br> **YOU MUST PRINT THIS ISSUED SUMMONS, WHICH IS THE MAIN DOCUMENT. PAPER COPIES WILL <u>NOT</u> BE MAILED.** <br><br> (src) (Entered: 11/03/2020) |
| 11/03/2020 | 35 | | **MEMORANDUM OPINION and ORDER denying 3 Motion for Temporary Restraining Order and/or Preliminary Injunction. Signed by Honorable Timothy L. Brooks on November 3, 2020. (src) (Entered: 11/03/2020)** |
| 11/05/2020 | 36 | | NOTICE of Appearance by Nina Perales on behalf of All Plaintiffs. (Perales, Nina) (Entered: 11/05/2020) |
| 11/05/2020 | 37 | | NOTICE of Appearance by Griselda Vega Vega Samuel on behalf of Arkansas United, Mireya Reith. (Vega Samuel, Griselda) (Entered: 11/05/2020) |
| 11/05/2020 | 38 | | NOTICE of Appearance by Francisco Fernandez del Castillo on behalf of Arkansas United, Mireya Reith. (Fernandez del Castillo, Francisco) (Entered: 11/05/2020) |
| 11/12/2020 | 39 | | AFFIDAVIT of Service for summons, complaint, motion for TRO, and brief in support of TRO, filed by Arkansas United, Mireya Reith. Bilenda |

| | | | |
|---|---|---|---|
| | | | Harris–Ritter served on 11/3/2020, answer due 11/24/2020. (Vega Samuel, Griselda) (Entered: 11/12/2020) |
| 11/12/2020 | 40 | | AFFIDAVIT of Service for summons, complaint, motion for TRO, and brief in support of TRO, filed by Arkansas United, Mireya Reith. Charles Roberts served on 11/3/2020, answer due 11/24/2020. (Vega Samuel, Griselda) (Entered: 11/12/2020) |
| 11/12/2020 | 41 | | AFFIDAVIT of Service for summons, complaint, motion for TRO, and brief in support of TRO, filed by Arkansas United, Mireya Reith. James Sharp served on 11/3/2020, answer due 11/24/2020. (Vega Samuel, Griselda) (Entered: 11/12/2020) |
| 11/12/2020 | 42 | | AFFIDAVIT of Service for summons, complaint, motion for TRO, and brief in support of TRO, filed by Arkansas United, Mireya Reith. Sharon Brooks served on 11/3/2020, answer due 11/24/2020. (Vega Samuel, Griselda) (Entered: 11/12/2020) |
| 11/12/2020 | 43 | | AFFIDAVIT of Service for summons, complaint, motion for TRO, and brief in support of TRO, filed by Arkansas United, Mireya Reith. William Luther served on 11/3/2020, answer due 11/24/2020. (Vega Samuel, Griselda) (Entered: 11/12/2020) |
| 11/12/2020 | 44 | | AFFIDAVIT of Service for summons, complaint, motion for TRO, and brief in support of TRO, filed by Arkansas United, Mireya Reith. J. Harmon Smith served on 11/3/2020, answer due 11/24/2020. (Vega Samuel, Griselda) (Entered: 11/12/2020) |
| 11/12/2020 | 45 | | AFFIDAVIT of Service for summons, complaint, motion for TRO, and brief in support of TRO, filed by Arkansas United, Mireya Reith. John Thurston served on 11/3/2020, answer due 11/24/2020. (Vega Samuel, Griselda) (Entered: 11/12/2020) |
| 11/12/2020 | 46 | | AFFIDAVIT of Service for summons, complaint, motion for TRO, and brief in support of TRO, filed by Arkansas United, Mireya Reith. Robbyn Tumey served on 11/3/2020, answer due 11/24/2020. (Vega Samuel, Griselda) (Entered: 11/12/2020) |
| 11/12/2020 | 47 | | AFFIDAVIT of Service for summons, complaint, motion for TRO, and brief in support of TRO, filed by Arkansas United, Mireya Reith. Russell Anzalone served on 11/3/2020, answer due 11/24/2020. (Vega Samuel, Griselda) (Entered: 11/12/2020) |
| 11/12/2020 | 48 | | AFFIDAVIT of Service for summons, complaint, motion for TRO, and brief in support of TRO, filed by Arkansas United, Mireya Reith. Harlan Stee served on 11/3/2020, answer due 11/24/2020. (Vega Samuel, Griselda) (Entered: 11/12/2020) |
| 11/12/2020 | 49 | | AFFIDAVIT of Service for summons, complaint, motion for TRO, and brief in support of TRO, filed by Arkansas United, Mireya Reith. Bill Ackerman served on 11/3/2020, answer due 11/24/2020. (Vega Samuel, Griselda) (Entered: 11/12/2020) |
| 11/12/2020 | 50 | | AFFIDAVIT of Service for summons, complaint, motion for TRO, and brief in support of TRO, filed by Arkansas United, Mireya Reith. Jennifer Price served on 11/3/2020, answer due 11/24/2020. (Vega Samuel, Griselda) |

| | | | |
|---|---|---|---|
| | | | (Entered: 11/12/2020) |
| 11/12/2020 | 51 | | AFFIDAVIT of Service for summons, complaint, motion for TRO, and brief in support of TRO, filed by Arkansas United, Mireya Reith. Max Deitchler served on 11/3/2020, answer due 11/24/2020. (Vega Samuel, Griselda) (Entered: 11/12/2020) |
| 11/12/2020 | 52 | | AFFIDAVIT of Service for summons, complaint, motion for TRO, and brief in support of TRO, filed by Arkansas United, Mireya Reith. Renee Oelschlaeger served on 11/3/2020, answer due 11/24/2020. (Vega Samuel, Griselda) (Entered: 11/12/2020) |
| 11/12/2020 | 53 | | AFFIDAVIT of Service for summons, complaint, motion for TRO, and brief in support of TRO, filed by Arkansas United, Mireya Reith. Luis Andrade served on 11/4/2020, answer due 11/25/2020. (Vega Samuel, Griselda) (Entered: 11/12/2020) |
| 11/12/2020 | 54 | | AFFIDAVIT of Service for summons, complaint, motion for TRO, and brief in support of TRO, filed by Mireya Reith. David Damron served on 11/4/2020, answer due 11/25/2020. (Vega Samuel, Griselda) (Entered: 11/12/2020) |
| 11/12/2020 | 55 | | AFFIDAVIT of Service for summons, complaint, motion for TRO, and brief in support of TRO, filed by Arkansas United, Mireya Reith. Lee Webb served on 11/4/2020, answer due 11/25/2020. (Vega Samuel, Griselda) (Entered: 11/12/2020) |
| 11/12/2020 | 56 | | AFFIDAVIT of Service for summons, complaint, motion for TRO, and brief in support of TRO, filed by Arkansas United, Mireya Reith. Meghan Hassler served on 11/4/2020, answer due 11/25/2020. (Vega Samuel, Griselda) (Entered: 11/12/2020) |
| 11/18/2020 | 57 | | MOTION to Dismiss for Failure to State a Claim , MOTION to Dismiss for Lack of Jurisdiction , MOTION to Dismiss Party by Luis Andrade, David Damron, Meghan Hassler, Lee Webb. (Shue, Charles) (Entered: 11/18/2020) |
| 11/18/2020 | 58 | | MEMORANDUM BRIEF in Support of 57 MOTION to Dismiss for Failure to State a Claim MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss Party by Luis Andrade, David Damron, Meghan Hassler, Lee Webb. (Shue, Charles) (Entered: 11/18/2020) |
| 11/20/2020 | 59 | | MOTION to Dismiss for Failure to State a Claim by Russell Anzalone, Harlan Stee, Robbyn Tumey. (Spence, George) (Entered: 11/20/2020) |
| 11/20/2020 | 60 | | MEMORANDUM BRIEF in Support of 59 MOTION to Dismiss for Failure to State a Claim by Russell Anzalone, Harlan Stee, Robbyn Tumey. (Spence, George) (Entered: 11/20/2020) |
| 11/24/2020 | 61 | | MOTION to Dismiss for Failure to State a Claim by Bill Ackerman, Max Deitchler, Renee Oelschlaeger, Jennifer Price. (Lester, Brian) (Entered: 11/24/2020) |
| 11/24/2020 | 62 | | MOTION to Dismiss by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Cantrell, Michael) (Entered: 11/24/2020) |
| 11/24/2020 | 63 | | |

| | | | |
|---|---|---|---|
| | | | MEMORANDUM BRIEF in Support of <u>62</u> MOTION to Dismiss by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Cantrell, Michael) (Entered: 11/24/2020) |
| 11/25/2020 | | | TEXT ONLY NOTICE OF DEFICIENCY directed to Bill Ackerman, Max Deitchler, Renee Oelschlaeger, Jennifer Price: A <u>61</u> MOTION to Dismiss for Failure to State a Claim was filed with the Court and appears to contain one or more deficiencies. The document appears to be deficient as follows: The motion is not accompanied by a separate brief in support as required by Local Rule 7.2(a). **You are advised that the filing, while on the record, will not be considered unless and until all deficiencies are remedied.** (src) (Entered: 11/25/2020) |
| 11/25/2020 | <u>64</u> | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.**<br><br>Summons Requested as to David Damron for service of the following document: <u>2</u> Complaint, <u>4</u> Memorandum Brief in Support, <u>1</u> Civil Cover Sheet, <u>3</u> MOTION to Amend/Correct MOTION for Temporary Restraining Order . (Vega Samuel, Griselda) (Entered: 11/25/2020) |
| 11/25/2020 | <u>65</u> | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.**<br><br>Summons Requested as to Luis Andrade for service of the following document: <u>2</u> Complaint, <u>4</u> Memorandum Brief in Support, <u>1</u> Civil Cover Sheet, <u>3</u> MOTION to Amend/Correct MOTION for Temporary Restraining Order . (Vega Samuel, Griselda) (Entered: 11/25/2020) |
| 11/25/2020 | <u>66</u> | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.**<br><br>Summons Requested as to Lee Webb for service of the following document: <u>2</u> Complaint, <u>4</u> Memorandum Brief in Support, <u>1</u> Civil Cover Sheet, <u>3</u> MOTION to Amend/Correct MOTION for Temporary Restraining Order . (Vega Samuel, Griselda) (Entered: 11/25/2020) |
| 11/25/2020 | <u>67</u> | | **THE DOCUMENT IS RESTRICTED TO COURT USERS AND CASE PARTICIPANTS.**<br><br>Summons Issued as to Luis Andrade, David Damron, Lee Webb and returned to attorney or plaintiff for service.<br><br>**YOU MUST PRINT THIS ISSUED SUMMONS, WHICH IS THE MAIN DOCUMENT. PAPER COPIES WILL <u>NOT</u> BE MAILED.**<br><br>(lgd) (Entered: 11/25/2020) |
| 11/30/2020 | <u>68</u> | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.**<br><br>Summons Requested as to Meghan Hassler for service of the following document: <u>2</u> Complaint, <u>4</u> Memorandum Brief in Support, <u>1</u> Civil Cover Sheet, <u>3</u> MOTION to Amend/Correct MOTION for Temporary Restraining Order . (Vega Samuel, Griselda) (Entered: 11/30/2020) |
| 11/30/2020 | <u>69</u> | | **THE DOCUMENT IS RESTRICTED TO COURT USERS AND CASE PARTICIPANTS.** |

| | | | |
|---|---|---|---|
| | | | Summons Issued as to Meghan Hassler and returned to attorney or plaintiff for service.<br><br>**YOU MUST PRINT THIS ISSUED SUMMONS, WHICH IS THE MAIN DOCUMENT. PAPER COPIES WILL <u>NOT</u> BE MAILED.**<br><br>(lgd) (Entered: 11/30/2020) |
| 12/02/2020 | <u>70</u> | | SUMMONS Returned Executed by Arkansas United, Mireya Reith. David Damron served on 11/28/2020, answer due 12/21/2020. (Vega Samuel, Griselda) (Entered: 12/02/2020) |
| 12/02/2020 | <u>71</u> | | SUMMONS Returned Executed by Arkansas United, Mireya Reith. Lee Webb served on 12/1/2020, answer due 12/22/2020. (Vega Samuel, Griselda) (Entered: 12/02/2020) |
| 12/02/2020 | <u>72</u> | | SUMMONS Returned Executed by Arkansas United, Mireya Reith. Meghan Hassler served on 12/1/2020, answer due 12/22/2020. (Vega Samuel, Griselda) (Entered: 12/02/2020) |
| 12/02/2020 | <u>73</u> | | SUMMONS Returned Executed by Arkansas United, Mireya Reith. Luis Andrade served on 12/1/2020, answer due 12/22/2020. (Vega Samuel, Griselda) (Entered: 12/02/2020) |
| 12/03/2020 | <u>74</u> | | RESPONSE IN OPPOSITION TO Motion re <u>57</u> MOTION to Dismiss for Failure to State a Claim MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss Party filed by Arkansas United, Mireya Reith. (Vega Samuel, Griselda) (Entered: 12/03/2020) |
| 12/03/2020 | <u>75</u> | | **INITIAL SCHEDULING ORDER: Case Management Hearing set for 2/9/2021 01:30 PM in Fayetteville –– 5th flr (Rm 509) before Honorable Timothy L. Brooks. Rule 26 Meeting Report due by 1/13/2021. Signed by Honorable Timothy L. Brooks on December 3, 2020. (slc) (lgd). (Entered: 12/03/2020)** |
| 12/03/2020 | <u>76</u> | | MEMORANDUM BRIEF in Support of <u>61</u> MOTION to Dismiss for Failure to State a Claim by Bill Ackerman, Max Deitchler, Renee Oelschlaeger, Jennifer Price. (Lester, Brian) (Entered: 12/03/2020) |
| 12/04/2020 | <u>77</u> | | RESPONSE IN OPPOSITION TO Motion re <u>59</u> MOTION to Dismiss for Failure to State a Claim filed by Arkansas United, Mireya Reith. (Vega Samuel, Griselda) (Entered: 12/04/2020) |
| 12/08/2020 | <u>78</u> | | NOTICE of Appearance by Michael A. Mosley on behalf of Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Mosley, Michael) (Entered: 12/08/2020) |
| 12/08/2020 | <u>79</u> | | AMENDED COMPLAINT as to <u>2</u> Complaint against Bill Ackerman, Luis Andrade, Russell Anzalone, Sharon Brooks, David Damron, Max Deitchler, Bilenda Harris–Ritter, Meghan Hassler, William Luther, Renee Oelschlaeger, Jennifer Price, Charles Roberts, James Sharp, J. Harmon Smith, Harlan Stee, John Thurston, Robbyn Tumey, Lee Webb , filed by Arkansas United, Mireya Reith. Related document: <u>2</u> Complaint filed by Arkansas United.(Vega Samuel, Griselda) (Entered: 12/08/2020) |
| 12/11/2020 | <u>80</u> | | |

| | | | |
|---|---|---|---|
| | | | MOTION to Stay *Discovery* by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Mosley, Michael) (Entered: 12/11/2020) |
| 12/14/2020 | 81 | | **TEXT ONLY ORDER. The Court dismisses as moot 57 59 61 62 Motions to Dismiss in light of Plaintiffs' Amended Complaint. The Court grants in part and denies in part 80 Motion to Stay and modifies 75 Initial Scheduling Order as follows. The parties are directed to hold a Rule 26(f) Conference no later than January 8, 2021 and file a Rule 26(f) Report following the Court's form on or before January 22. However, all parties may wait to exchange initial disclosures and begin discovery until after the case management hearing, which remains set for February 9, 2021. Signed by Honorable Timothy L. Brooks on December 14, 2020. (elg) (Entered: 12/14/2020)** |
| 12/17/2020 | 82 | | MOTION to Dismiss by Luis Andrade, David Damron, Meghan Hassler, Lee Webb. (Owens, Jason) (Entered: 12/17/2020) |
| 12/17/2020 | 83 | | MEMORANDUM BRIEF in Support of 82 MOTION to Dismiss by Luis Andrade, David Damron, Meghan Hassler, Lee Webb. (Owens, Jason) (Entered: 12/17/2020) |
| 12/21/2020 | 84 | | MOTION to Dismiss by Russell Anzalone, Harlan Stee, Robbyn Tumey. (Owens, Jason) (Entered: 12/21/2020) |
| 12/21/2020 | 85 | | MEMORANDUM BRIEF in Support of 84 MOTION to Dismiss by Russell Anzalone, Harlan Stee, Robbyn Tumey. (Owens, Jason) (Entered: 12/21/2020) |
| 12/22/2020 | 86 | | MOTION to Dismiss *First Amended Complaint; or Alternatively, to Stay Discovery and Certify Interlocutory Appeal* by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Cantrell, Michael) (Entered: 12/22/2020) |
| 12/22/2020 | 87 | | MEMORANDUM BRIEF in Support *of Motion to Dismiss; or Alternatively to Stay Discovery and Certify Interlocutory Appeal* by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Cantrell, Michael) (Entered: 12/22/2020) |
| 12/23/2020 | 88 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.**<br><br>Summons Requested as to Harlan Stee for service of the following document: 2 Complaint, 4 Memorandum Brief in Support, 77 Response to Motion, 1 Civil Cover Sheet, 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order , 74 Response to Motion, 79 Amended Complaint,. (Vega Samuel, Griselda) (Entered: 12/23/2020) |
| 12/23/2020 | 89 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.**<br><br>Summons Requested as to Russell Anzalone for service of the following document: 2 Complaint, 4 Memorandum Brief in Support, 77 Response to Motion, 1 Civil Cover Sheet, 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order , 74 Response to Motion, 79 Amended Complaint,. (Vega Samuel, Griselda) (Entered: 12/23/2020) |
| 12/23/2020 | 90 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS.** |

| | | | |
|---|---|---|---|
| | | | Summons Requested as to Robbyn Tumey for service of the following document: 2 Complaint, 4 Memorandum Brief in Support, 77 Response to Motion, 1 Civil Cover Sheet, 3 MOTION to Amend/Correct MOTION for Temporary Restraining Order , 74 Response to Motion, 79 Amended Complaint,. (Vega Samuel, Griselda) (Entered: 12/23/2020) |
| 12/23/2020 | 91 | | **THE DOCUMENT IS RESTRICTED TO COURT USERS AND CASE PARTICIPANTS.**<br><br>Summons Issued as to Russell Anzalone, Harlan Stee, Robbyn Tumey and returned to attorney or plaintiff for service.<br><br>**YOU MUST PRINT THIS ISSUED SUMMONS, WHICH IS THE MAIN DOCUMENT. PAPER COPIES WILL NOT BE MAILED.**<br><br>(src) (Entered: 12/23/2020) |
| 12/31/2020 | 92 | | SUMMONS Returned Executed by Arkansas United, L. Mireya Reith. Harlan Stee served on 12/26/2020, answer due 1/19/2021. (Vega Samuel, Griselda) (Entered: 12/31/2020) |
| 12/31/2020 | 93 | | SUMMONS Returned Executed by Arkansas United, L. Mireya Reith. Russell Anzalone served on 12/26/2020, answer due 1/19/2021. (Vega Samuel, Griselda) (Entered: 12/31/2020) |
| 12/31/2020 | 94 | | SUMMONS Returned Executed by Arkansas United, L. Mireya Reith. Robbyn Tumey served on 12/26/2020, answer due 1/19/2021. (Vega Samuel, Griselda) (Entered: 12/31/2020) |
| 12/31/2020 | 95 | | RESPONSE IN OPPOSITION TO Motion re 82 MOTION to Dismiss filed by Arkansas United, L. Mireya Reith. (Vega Samuel, Griselda) (Entered: 12/31/2020) |
| 01/04/2021 | 96 | | RESPONSE IN OPPOSITION TO Motion re 84 MOTION to Dismiss filed by Arkansas United, L. Mireya Reith. (Vega Samuel, Griselda) (Entered: 01/04/2021) |
| 01/05/2021 | 97 | | RESPONSE IN OPPOSITION TO Motion re 86 MOTION to Dismiss *First Amended Complaint; or Alternatively, to Stay Discovery and Certify Interlocutory Appeal* filed by Arkansas United, L. Mireya Reith. (Vega Samuel, Griselda) (Entered: 01/06/2021) |
| 01/15/2021 | 98 | | MOTION of George Spence to Withdraw as Attorney by Russell Anzalone, Harlan Stee, Robbyn Tumey. (Spence, George) (Entered: 01/15/2021) |
| 01/15/2021 | 99 | | **TEXT ONLY ORDER GRANTING 98 Motion to Withdraw as Attorney. Attorney George Ray Spence withdrawn, and the Clerk of Court is directed to remove his name from the list of attorneys who receive Notices of Electronic Filing in this case. Signed by Honorable Timothy L. Brooks on January 15, 2021. (slc) (Entered: 01/15/2021)** |
| 01/21/2021 | 100 | | Corporate Disclosure Statement by Arkansas United, L. Mireya Reith. (Vega Samuel, Griselda) (Entered: 01/21/2021) |
| 01/22/2021 | 101 | | JOINT REPORT of Rule 26(f) Planning Meeting by Arkansas United, L. Mireya Reith. (Vega Samuel, Griselda) (Entered: 01/22/2021) |

| | | | |
|---|---|---|---|
| 02/05/2021 | 102 | | **MEMORANDUM OPINION AND ORDER denying 82 Motion to Dismiss; denying 84 Motion to Dismiss; denying 86 Motion to Dismiss. (See Order for Specifics) Signed by Honorable Timothy L. Brooks on February 5, 2021. (lgd) (Entered: 02/05/2021)** |
| 02/09/2021 | 103 | | TEXT ONLY Minute Entry for proceedings held before Honorable Timothy L. Brooks: Case Management Hearing held on 2/9/2021. (Paula Barden–Court Reporter) (slc) (Entered: 02/09/2021) |
| 02/12/2021 | 104 | | ANSWER to 79 Amended Complaint, by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston.(Mosley, Michael) (Entered: 02/12/2021) |
| 02/16/2021 | 105 | | ANSWER to 79 Amended Complaint, with Jury Demand by Luis Andrade, Russell Anzalone, David Damron, Meghan Hassler, Harlan Stee, Robbyn Tumey, Lee Webb.(Owens, Jason) (Entered: 02/16/2021) |
| 02/16/2021 | 106 | | **CASE MANAGEMENT ORDER: Final Pretrial Conference set for 11/9/2021 09:00 AM in Fayetteville –– 5th flr (Rm 509) before Honorable Timothy L. Brooks. BENCH TRIAL set for 11/15/2021 09:00 AM in Fayetteville –– 5th flr (Rm 509) before Honorable Timothy L. Brooks. Signed by Honorable Timothy L. Brooks on February 16, 2021. (slc) (Entered: 02/16/2021)** |
| 02/18/2021 | 107 | | **ORDER Setting Hearings: Settlement Conference set for 9/28/2021 09:00 AM in Fayetteville – 2nd flr (Rm 210) before Honorable Erin L. Wiedemann.Each party shall provide a concise, confidential settlement statement NO LATER THAN ONE WEEK PRIOR TO THE SCHEDULED CONFERENCE via email to ELWsettle@arwd.uscourts.gov. Signed by Honorable Erin L. Wiedemann on February 18, 2021. (rg) (Entered: 02/18/2021)** |
| 05/10/2021 | 108 | | **TEXT ONLY ORDER (JUDGE CHANGE ONLY): Settlement Conference set for 9/28/2021 09:00 AM in Fayetteville – 2nd flr (Rm 210) before Honorable Christy D. Comstock.Each party shall provide a concise, confidential settlement statement NO LATER THAN ONE WEEK PRIOR TO THE SCHEDULED CONFERENCE via email to CDCsettle@arwd.uscourts.gov. Signed by Honorable Christy D. Comstock on May 10, 2021. (rg) (Entered: 05/10/2021)** |
| 06/26/2021 | 109 | | MOTION to Extend *Discovery and Dispositive Motion Deadlines* by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Mosley, Michael) (Entered: 06/26/2021) |
| 06/28/2021 | 110 | | **TEXT ONLY ORDER granting 109 Motion to Extend. Pursuant to paragraph 5 of the Case Management Order, the parties may agree to conduct discovery beyond the deadline set by the Court. The Court encourages the parties to commit the scope of such agreement to writing. The dispositive motion deadline is extended to 9/7/21. Signed by Honorable Timothy L. Brooks on June 28, 2021. (elg) (Entered: 06/28/2021)** |
| 07/23/2021 | 111 | | MOTION for Attorney Susana Sandoval Vargas to Appear Pro Hac Vice (PHV Application fee paid $ 100; receipt number AARWDC–2430992) by Arkansas United. (Attachments: # 1 Aff Lawrence)(Walker, Lawrence) |

| | | | |
|---|---|---|---|
| | | | (Entered: 07/23/2021) |
| 07/23/2021 | 112 | | **TEXT ONLY ORDER GRANTING 111 Motion to Appear Pro Hac Vice. Susana Sandoval Vargas is directed to immediately register for Pro Hac Vice filer access through PACER and enter her appearance in this matter. Signed by Honorable Timothy L. Brooks on July 23, 2021. (slc) (Entered: 07/23/2021)** |
| 07/26/2021 | 113 | | MOTION to Unseal Document by Bill Ackerman, Max Deitchler, Renee Oelschlaeger, Jennifer Price. (Lester, Brian) (Entered: 07/26/2021) |
| 07/26/2021 | 114 | | MEMORANDUM BRIEF in Support of 113 MOTION to Unseal Document by Bill Ackerman, Max Deitchler, Renee Oelschlaeger, Jennifer Price. (Lester, Brian) (Entered: 07/26/2021) |
| 07/26/2021 | 115 | | **ORDER TO UNSEAL BALLOTS re 113 Joint Motion to Unseal Ballots. Signed by Honorable Timothy L. Brooks on July 26, 2021. (tg) (Entered: 07/26/2021)** |
| 07/27/2021 | 116 | | NOTICE of Appearance by Susana Sandoval Vargas on behalf of Arkansas United, L. Mireya Reith. (Sandoval Vargas, Susana) (Entered: 07/27/2021) |
| 08/06/2021 | 117 | | Joint MOTION for Extension of Time to Complete Discovery by Arkansas United, L. Mireya Reith. (Sandoval Vargas, Susana) (Entered: 08/06/2021) |
| 08/06/2021 | 118 | | **TEXT ONLY ORDER granting 117 Motion for Extension of Time to Complete Discovery and Dispositive Motions. This discovery deadline is extended to 9/7/21, and the dispositive motion deadline is extended to 9/21/21. The Court does not presently contemplate any further extension of these deadlines, and the parties are reminded, pursuant to the case management order, that they may take any discovery they like past the formal deadline if they are in agreement. Signed by Honorable Timothy L. Brooks on August 6, 2021. (ee) (Entered: 08/06/2021)** |
| 08/23/2021 | 119 | | Joint MOTION to Unseal Document *(Ballots)* by Russell Anzalone, Harlan Stee, Robbyn Tumey. (Owens, Jason) (Entered: 08/23/2021) |
| 08/23/2021 | 120 | | MEMORANDUM BRIEF in Support of 119 Joint MOTION to Unseal Document *(Ballots)* by Russell Anzalone, Harlan Stee, Robbyn Tumey. (Owens, Jason) (Entered: 08/23/2021) |
| 08/23/2021 | 121 | | Joint MOTION to Unseal Document *(Ballots)* by Luis Andrade, David Damron, Meghan Hassler, Lee Webb. (Owens, Jason) (Entered: 08/23/2021) |
| 08/23/2021 | 122 | | MEMORANDUM BRIEF in Support of 121 Joint MOTION to Unseal Document *(Ballots)* by Luis Andrade, David Damron, Meghan Hassler, Lee Webb. (Owens, Jason) (Entered: 08/23/2021) |
| 08/24/2021 | 123 | | NOTICE of Appearance by Brooklyn Parker on behalf of Russell Anzalone, Harlan Stee, Robbyn Tumey. (Parker, Brooklyn) (Entered: 08/24/2021) |
| 08/24/2021 | 124 | | NOTICE of Appearance by Brooklyn Parker on behalf of Luis Andrade, David Damron, Meghan Hassler, Lee Webb. (Parker, Brooklyn) (Entered: 08/24/2021) |
| 08/27/2021 | 125 | | Joint MOTION To be Excused from Settlement Conference re 107 Order Setting/Resetting Hearings, by Bill Ackerman, Sharon Brooks, Bilenda |

| | | | |
|---|---|---|---|
| | | | Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Mosley, Michael) (Entered: 08/27/2021) |
| 08/27/2021 | 126 | | **TEXT ONLY ORDER granting 125 Motion to be Excused from Settlement Conference. Signed by Honorable Timothy L. Brooks on August 27, 2021. (glk) (Entered: 08/27/2021)** |
| 08/27/2021 | 127 | | **TEXT ONLY ORDER that the Settlement Conference set for 9/28/2021 9:00 AM is CANCELLED. Signed by Honorable Christy D. Comstock on August 27, 2021. (rg) (Entered: 08/27/2021)** |
| 09/01/2021 | 128 | | MOTION for Extension of Time to File *Defendants' Dispositive Motion* by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Attachments: # 1 Exhibit A–Plaintiffs Supp Disclosures)(Mosley, Michael) (Entered: 09/01/2021) |
| 09/01/2021 | 129 | | **ORDER TO UNSEAL BALLOTS, Granting 119 , 121 , Motions to Unseal. IT IS FURTHER ORDERED that the boxes containing the ballots and other materials from the elections identified above are to be UNSEALED. Signed by Honorable Timothy L. Brooks on September 1, 2021. (lgd) (Entered: 09/01/2021)** |
| 09/03/2021 | 130 | | **TEXT ONLY ORDER denying 128 Motion for Extension of Time to File Defendants' Dispositive Motion. Signed by Honorable Timothy L. Brooks on September 3, 2021. (glk) (Entered: 09/03/2021)** |
| 09/21/2021 | 131 | | MOTION for Summary Judgment by Bill Ackerman, Luis Andrade, Russell Anzalone, David Damron, Max Deitchler, Meghan Hassler, Renee Oelschlaeger, Jennifer Price, Harlan Stee, Robbyn Tumey, Lee Webb. (Owens, Jason) (Entered: 09/21/2021) |
| 09/21/2021 | 132 | | MEMORANDUM BRIEF in Support of 131 MOTION for Summary Judgment by Bill Ackerman, Luis Andrade, Russell Anzalone, David Damron, Max Deitchler, Meghan Hassler, Renee Oelschlaeger, Jennifer Price, Harlan Stee, Robbyn Tumey, Lee Webb. (Owens, Jason) (Entered: 09/21/2021) |
| 09/21/2021 | 133 | | STATEMENT OF FACTS in support of 131 MOTION for Summary Judgment by Bill Ackerman, Luis Andrade, Russell Anzalone, David Damron, Max Deitchler, Meghan Hassler, Renee Oelschlaeger, Jennifer Price, Harlan Stee, Robbyn Tumey, Lee Webb. (Attachments: # 1 Exhibit 1 – Plaintiff's Deposition Transcript)(Owens, Jason) (Entered: 09/21/2021) |
| 09/21/2021 | 134 | | MOTION for Summary Judgment by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Attachments: # 1 Exhibit 1 Deposition of Mireya Reith, # 2 Exhibit 2 Excerpts from Plaintiffs Responses to Interrogatories, # 3 Exhibit 3 Deposition of Araceli Gonzalez, # 4 Exhibit 4 Deposition of Sohary Fonseca, # 5 Exhibit 5 Deposition of Daniel Shults, # 6 Exhibit 6 Deposition of Heather McKim, # 7 Exhibit 7 Deposition Excerpts of Meghan Hassler, # 8 Exhibit 8 Deposition Excerpts of Russell Anzalone)(Cantrell, Michael) (Entered: 09/21/2021) |
| 09/21/2021 | 135 | | MEMORANDUM BRIEF in Support of 134 MOTION for Summary Judgment by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Cantrell, Michael) |

| | | | |
|---|---|---|---|
| | | | (Entered: 09/21/2021) |
| 09/21/2021 | 136 | | STATEMENT OF FACTS in support of 134 MOTION for Summary Judgment by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Cantrell, Michael) (Entered: 09/21/2021) |
| 09/22/2021 | 137 | | MOTION for Summary Judgment by Arkansas United, L. Mireya Reith. (Sandoval Vargas, Susana) (Entered: 09/22/2021) |
| 09/22/2021 | 138 | | MEMORANDUM BRIEF in Support of 137 MOTION for Summary Judgment by Arkansas United, L. Mireya Reith. (Sandoval Vargas, Susana) (Entered: 09/22/2021) |
| 09/22/2021 | 139 | | STATEMENT OF FACTS in support of 137 MOTION for Summary Judgment by Arkansas United, L. Mireya Reith. (Attachments: # 1 Appendix to Plaintiffs motion for summary judgement, # 2 Exhibit 1, # 3 Exhibit 1–2, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 4–1, # 8 Exhibit 4–2, # 9 Exhibit 4–3, # 10 Exhibit 4–4, # 11 Exhibit 5, # 12 Exhibit 6, # 13 Exhibit 7, # 14 Exhibit 8, # 15 Exhibit 8–4, # 16 Exhibit 8–15, # 17 Exhibit 9, # 18 Exhibit 10, # 19 Exhibit 11, # 20 Exhibit 12, # 21 Exhibit 13, # 22 Exhibit 14, # 23 Exhibit 15, # 24 Exhibit 16, # 25 Exhibit 17, # 26 Exhibit 18, # 27 Exhibit 19, # 28 Exhibit 20, # 29 Exhibit 21, # 30 Exhibit 22, # 31 Exhibit 23)(Sandoval Vargas, Susana) (Entered: 09/22/2021) |
| 09/22/2021 | 140 | | MOTION for Leave to *file out of time* by Arkansas United, L. Mireya Reith. (Attachments: # 1 Proposed Order)(Sandoval Vargas, Susana) (Entered: 09/22/2021) |
| 10/04/2021 | 141 | | RESPONSE IN OPPOSITION TO Motion re 140 MOTION for Leave to *file out of time* filed by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Attachments: # 1 Exhibit 1 – Plaintiffs' Initial Disclosures, # 2 Exhibit 2 – Plaintiffs' Supplemental Disclosures, # 3 Exhibit 3 – Sep. 3, 2021 Email, # 4 Exhibit 4 – Fonseca Deposition, # 5 Exhibit 5 – Gonzalez Deposition)(Cantrell, Michael) (Entered: 10/04/2021) |
| 10/04/2021 | 142 | | MOTION for Leave to Exceed Page Limitation by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Attachments: # 1 Exhibit Proposed Amended Brief)(Cantrell, Michael) (Entered: 10/04/2021) |
| 10/04/2021 | 143 | | **TEXT ONLY ORDER granting 142 Motion for Leave to File Excess Pages. The State Defendants' original brief is accepted. For the parties' reference, the page limitations in the Court's Case Management Order apply to all motions. However, the requirement of leave to file a reply brief does not apply to motions for summary judgment, where the movant may file a reply by right under Local Rule 7.2(b). Signed by Honorable Timothy L. Brooks on October 4, 2021.(glk) (Entered: 10/04/2021)** |
| 10/05/2021 | 144 | | RESPONSE IN OPPOSITION TO Motion re 131 MOTION for Summary Judgment filed by Arkansas United, L. Mireya Reith. (Attachments: # 1 Appendix Exhibit List, # 2 Ex. 1, # 3 Ex. 3, # 4 Ex. 4, # 5 Ex. 6, # 6 Ex. 7, # 7 Ex. 8, # 8 Ex. 8–1, # 9 Ex. 11, # 10 Ex. 12, # 11 Ex. 13, # 12 Ex. 14, # 13 Ex. 15, # 14 Ex. 16, # 15 Ex. 17, # 16 Ex. 18, # 17 Ex. 19, # 18 Ex. 20, # 19 Ex. |

| | | | |
|---|---|---|---|
| | | | 21, # <u>20</u> Ex. 22, # <u>21</u> Ex. 23)(Sandoval Vargas, Susana) (Entered: 10/05/2021) |
| 10/05/2021 | <u>145</u> | | STATEMENT OF FACTS in support of <u>144</u> Response to Motion, *in opposition* by Arkansas United, L. Mireya Reith. (Sandoval Vargas, Susana) (Entered: 10/05/2021) |
| 10/05/2021 | <u>146</u> | | RESPONSE IN OPPOSITION TO Motion re <u>134</u> MOTION for Summary Judgment filed by Arkansas United, L. Mireya Reith. (Sandoval Vargas, Susana) (Entered: 10/05/2021) |
| 10/05/2021 | <u>147</u> | | STATEMENT OF FACTS in support of <u>146</u> Response to Motion by Arkansas United, L. Mireya Reith. (Sandoval Vargas, Susana) (Entered: 10/06/2021) |
| 10/06/2021 | <u>148</u> | | APPENDIX by Plaintiffs Arkansas United, L. Mireya Reith re <u>147</u> Statement of Facts, <u>146</u> Response to Motion *Exhibits*. (Attachments: # <u>1</u> Ex. 1, # <u>2</u> Ex. 2, # <u>3</u> Ex. 3, # <u>4</u> Ex. 4, # <u>5</u> Ex. 5, # <u>6</u> Ex. 6, # <u>7</u> Ex. 7, # <u>8</u> Ex. 8, # <u>9</u> Ex. 9, # <u>10</u> Ex. 11, # <u>11</u> Ex. 12, # <u>12</u> Ex. 13, # <u>13</u> Ex. 14, # <u>14</u> Ex. 15, # <u>15</u> Ex. 16, # <u>16</u> Ex. 17, # <u>17</u> Ex. 18, # <u>18</u> Ex. 19, # <u>19</u> Ex. 20, # <u>20</u> Ex. 21, # <u>21</u> Ex. 22, # <u>22</u> Ex. 23, # <u>23</u> Ex. 24, # <u>24</u> Ex. 25)(Sandoval Vargas, Susana) (Entered: 10/06/2021) |
| 10/06/2021 | <u>149</u> | | RESPONSE IN OPPOSITION TO Motion re <u>137</u> MOTION for Summary Judgment filed by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Cantrell, Michael) (Entered: 10/06/2021) |
| 10/06/2021 | <u>150</u> | | RESPONSE by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston re <u>139</u> Statement of Facts,,, *Response to Plaintiffs' Statement of Facts*. (Cantrell, Michael) (Entered: 10/06/2021) |
| 10/06/2021 | <u>151</u> | | RESPONSE IN OPPOSITION TO Motion re <u>137</u> MOTION for Summary Judgment filed by Bill Ackerman, Luis Andrade, Russell Anzalone, David Damron, Max Deitchler, Meghan Hassler, Renee Oelschlaeger, Jennifer Price, Harlan Stee, Robbyn Tumey, Lee Webb. (Owens, Jason) (Entered: 10/06/2021) |
| 10/06/2021 | <u>152</u> | | RESPONSE by Bill Ackerman, Luis Andrade, Russell Anzalone, David Damron, Max Deitchler, Meghan Hassler, Renee Oelschlaeger, Jennifer Price, Harlan Stee, Robbyn Tumey, Lee Webb re <u>139</u> Statement of Facts,,, . (Owens, Jason) (Entered: 10/06/2021) |
| 10/12/2021 | <u>153</u> | | PRETRIAL DISCLOSURE SHEET by Luis Andrade, Russell Anzalone, David Damron, Meghan Hassler, Harlan Stee, Robbyn Tumey, Lee Webb. (Owens, Jason) (Entered: 10/12/2021) |
| 10/12/2021 | <u>154</u> | | PRETRIAL DISCLOSURE SHEET by Sharon Brooks, Bilenda Harris–Ritter, William Luther, James Sharp, J. Harmon Smith, John Thurston. (Mosley, Michael) (Entered: 10/12/2021) |
| 10/12/2021 | <u>155</u> | | REPLY to Response to Motion re <u>134</u> MOTION for Summary Judgment filed by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Cantrell, Michael) (Entered: 10/12/2021) |
| 10/12/2021 | <u>156</u> | | |

| | | | MOTION for Leave to *Reply to Response* by Arkansas United, L. Mireya Reith. (Attachments: # 1 Reply to Response, # 2 Appendix Exhibit List to Reply, # 3 Exhibit Ex. 1, # 4 Exhibit Ex. 2, # 5 Exhibit Ex. 3, # 6 Exhibit Ex. 4, # 7 Exhibit Ex. 5)(Sandoval Vargas, Susana) (Entered: 10/12/2021) |
|---|---|---|---|
| 10/12/2021 | 157 | | **TEXT ONLY ORDER granting 156 Motion for Leave to File Reply. Plaintiffs are directed to file their Reply as a separate docket entry. Signed by Honorable Timothy L. Brooks on October 12, 2021. (glk) (Entered: 10/12/2021)** |
| 10/12/2021 | 158 | | PRETRIAL DISCLOSURE SHEET by Bill Ackerman, Max Deitchler, Renee Oelschlaeger, Jennifer Price. (Lester, Brian) (Entered: 10/12/2021) |
| 10/12/2021 | 159 | | REPLY to Response to Motion re 140 MOTION for Leave to *file out of time* filed by Arkansas United, L. Mireya Reith. (Attachments: # 1 Appendix Exhibit List, # 2 Exhibit Ex. 1, # 3 Exhibit Ex. 2, # 4 Exhibit Ex. 3, # 5 Exhibit Ex. 4, # 6 Exhibit Ex. 5)(Sandoval Vargas, Susana) (Entered: 10/12/2021) |
| 10/12/2021 | 160 | | PRETRIAL DISCLOSURE SHEET by Arkansas United, L. Mireya Reith. (Sandoval Vargas, Susana) (Entered: 10/12/2021) |
| 10/13/2021 | 161 | | REPLY to Response to Motion re 137 MOTION for Summary Judgment filed by Arkansas United, L. Mireya Reith. (Sandoval Vargas, Susana) (Entered: 10/13/2021) |
| 10/13/2021 | 162 | | REPLY to Response to Motion re 137 MOTION for Summary Judgment *to separate county defs.'* filed by Arkansas United, L. Mireya Reith. (Sandoval Vargas, Susana) (Entered: 10/13/2021) |
| 10/15/2021 | 163 | | **TEXT ONLY ORDER granting 140 Motion for Leave to File Out of Time. Plaintiff's Motion for Summary Judgment and accompanying Brief, Statement of Facts, and Exhibits are accepted in full. Signed by Honorable Timothy L. Brooks on October 15, 2021. (glk) (Entered: 10/15/2021)** |
| 10/21/2021 | | | ***PRETRIAL CONFFERENCE (11/9/21), BENCH TRIAL (11/15/21), and all related deadlines TERMINATED. Signed by Honorable Timothy L. Brooks on October 21, 2021. (slc) (Entered: 10/21/2021) |
| 02/04/2022 | 164 | | MOTION of Michael A. Mosley to Withdraw as Attorney by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Mosley, Michael) (Entered: 02/04/2022) |
| 02/07/2022 | 165 | | **TEXT ONLY ORDER GRANTING 164 Motion to Withdraw as Attorney. Attorney MICHAEL A. MOSLEY withdrawn, and the Clerk of Court is directed to remove his name from the list of attorneys who receive Notices of Electronic Filing in this case. Signed by Honorable Timothy L. Brooks on February 7, 2022. (slc) (Entered: 02/07/2022)** |
| 02/14/2022 | 166 | | MOTION of Vincent M. Wagner to Withdraw as Attorney by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Wagner, Vincent) (Entered: 02/14/2022) |
| 02/15/2022 | 167 | | **TEXT ONLY ORDER GRANTING 166 Motion to Withdraw as Attorney. Attorney VINCENT M. WAGNER withdrawn, and the Clerk of Court is directed to remove his name from the list of attorneys who** |

| | | | receive Notices of Electronic Filing in this case. Signed by Honorable Timothy L. Brooks on February 15, 2022. (slc) (Entered: 02/15/2022) |
|---|---|---|---|
| 08/19/2022 | 168 | | **MEMORANDUM OPINION AND ORDER denying 131 Motion for Summary Judgment; denying 134 Motion for Summary Judgment; granting in part and denying in part 137 Motion for Summary Judgment (see Order for specifics). Signed by Honorable Timothy L. Brooks on August 19, 2022. (tg) (Entered: 08/19/2022)** |
| 08/19/2022 | 169 | | **JUDGMENT entered per Memorandum Opinion and Order filed today(See Judgment for Specifics). Signed by Honorable Timothy L. Brooks on August 19, 2022. (lgd) (Entered: 08/19/2022)** |
| 08/30/2022 | 170 | | MOTION for Relief *MOTION TO CLARIFY AND FOR EXPEDITED CONSIDERATION* by Bill Ackerman, Luis Andrade, Russell Anzalone, Sharon Brooks, David Damron, Max Deitchler, Bilenda Harris–Ritter, Meghan Hassler, William Luther, Renee Oelschlaeger, Jennifer Price, Charles Roberts, James Sharp, J. Harmon Smith, Harlan Stee, John Thurston, Robbyn Tumey, Lee Webb. (Attachments: # 1 Exhibit A – Declaration of Daniel Shults)(Cantrell, Michael) (Entered: 08/30/2022) |
| 08/31/2022 | 171 | | **TEXT ONLY ORDER directing Plaintiffs to file any response they wish the Court to consider to the State Defendants' 170 Motion to Clarify no later than September 2, 2022. Signed by Honorable Timothy L. Brooks on August 31, 2022. (glk) (Entered: 08/31/2022)** |
| 09/02/2022 | 172 | | BILL OF COSTS by Arkansas United, L. Mireya Reith in the amount of $13431.43 . Costs to be taxed on 9/16/2022. (Attachments: # 1 Exhibit 1)(Sandoval Vargas, Susana) (Entered: 09/02/2022) |
| 09/02/2022 | 173 | | MOTION for Attorney Fees by Arkansas United, L. Mireya Reith. (Sandoval Vargas, Susana) (Entered: 09/02/2022) |
| 09/03/2022 | 174 | | MEMORANDUM BRIEF in Support of 173 MOTION for Attorney Fees by Arkansas United, L. Mireya Reith. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Sandoval Vargas, Susana) (Entered: 09/03/2022) |
| 09/03/2022 | 175 | | MOTION for Extension of Time to File Response/Reply *to State Defendants' Motion for Clarification* by Arkansas United, L. Mireya Reith. (Sandoval Vargas, Susana) (Entered: 09/03/2022) |
| 09/03/2022 | 176 | | RESPONSE IN OPPOSITION TO Motion re 170 MOTION for Relief *MOTION TO CLARIFY AND FOR EXPEDITED CONSIDERATION* filed by Arkansas United, L. Mireya Reith. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Sandoval Vargas, Susana) (Entered: 09/03/2022) |
| 09/06/2022 | 177 | | **TEXT ONLY ORDER granting 175 Motion for Extension of Time to File Response. Signed by Honorable Timothy L. Brooks on September 6, 2022. (glk) (Entered: 09/06/2022)** |
| 09/07/2022 | 178 | | **ORDER granting 170 MOTION to Clarify. Signed by Honorable Timothy L. Brooks on September 7, 2022. (bjb) (Entered: 09/07/2022)** |
| 09/07/2022 | 179 | | **AMENDED MEMORANDUM OPINION AND ORDER denying County and State Defendants' Motions for Summary Judgment 131 and 134 . Plaintiffs' Motion for Summary Judgment 137 is GRANTED IN PART** |

| | | | |
|---|---|---|---|
| | | | AND DENIED IN PART (see Order for specifics). Signed by Honorable Timothy L. Brooks on September 7, 2022. (bjb) (Entered: 09/07/2022) |
| 09/07/2022 | 180 | | **AMENDED JUDGMENT re 179 AMENDED MEMORANDUM OPINION AND ORDER. Signed by Honorable Timothy L. Brooks on September 7, 2022. (bjb) (Entered: 09/07/2022)** |
| 09/08/2022 | 181 | | NOTICE OF APPEAL as to 180 Judgment, 179 Memorandum Opinion and Order, by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Cantrell, Michael) (Entered: 09/08/2022) |
| 09/08/2022 | 182 | | Emergency MOTION to Stay re 180 Judgment, 179 Memorandum Opinion and Order, by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Cantrell, Michael) (Entered: 09/08/2022) |
| 09/08/2022 | 183 | | MEMORANDUM BRIEF in Support of 182 Emergency MOTION to Stay re 180 Judgment, 179 Memorandum Opinion and Order, by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Cantrell, Michael) (Entered: 09/08/2022) |
| 09/08/2022 | | | Notice of Appeal filing fee paid re 181 Notice of Appeal (atty) : $ 505, receipt number AARWDC–2652777.. (Cantrell, Michael) (Entered: 09/08/2022) |
| 09/08/2022 | 184 | | **TEXT ONLY ORDER DENYING 182 Emergency Motion to Stay Injunction Pending Appeal and for Expedited Consideration. The Court finds a stay of the Court's injunction unwarranted pending the State Defendants' appeal of the Court's judgment. The State Defendants' Motion misrepresents the Court's Order (Doc. 178) granting the State Defendants' Motion to Clarify, misstates the breadth of the Court's injunction and the facts in the record related to enforcement of the six–voter limit, and again fails to recognize that the Court, in addition to enjoining certain parties from enforcing the six–voter limit, also declared the law preempted by the Voting Rights Act. The *Purcell* principle does not favor a stay for reasons previously articulated by the Court, *see* Doc. 179, p. 38 n.16, and no reasonable confusion could result from the State Board of Election Commissioners announcing to county election officials that the Court has declared the six–voter limit invalid under federal law. Moreover, despite the State Defendants rehashing the same arguments that the Court thoroughly rejected in its Amended Memorandum Opinion and Order (Doc. 179), "the underlying merits are entirely clearcut in favor of" the Plaintiffs. *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). The State Defendants may redirect their Motion to the Eighth Circuit. Signed by Honorable Timothy L. Brooks on September 8, 2022. (glk) (Entered: 09/08/2022)** |
| 09/09/2022 | 185 | | NOA SUPPLEMENT FORM re 181 Notice of Appeal (atty) filed by John Thurston, James Sharp, Sharon Brooks, J. Harmon Smith, William Luther, Bilenda Harris–Ritter, Charles Roberts. (src) (Entered: 09/09/2022) |
| 09/12/2022 | 186 | | USCA Case Number 22–2918, 8th Circuit Court of Appeals for 181 Notice of Appeal (atty) filed by John Thurston, James Sharp, Sharon Brooks, J. Harmon Smith, William Luther, Bilenda Harris–Ritter, Charles Roberts. (tg) (Entered: 09/12/2022) |

| 09/12/2022 | 187 | | USCA Scheduling Order as to 181 Notice of Appeal (atty) filed by John Thurston, James Sharp, Sharon Brooks, J. Harmon Smith, William Luther, Bilenda Harris–Ritter, Charles Roberts. Case Appealed to 8th Circuit Court of Appeals Case Number 22–2918. Transcript due by 10/24/2022. (tg) (Entered: 09/12/2022) |
|---|---|---|---|
| 09/13/2022 | 188 | | MOTION to Stay re 173 MOTION for Attorney Fees by Sharon Brooks, Bilenda Harris–Ritter, William Luther, Charles Roberts, James Sharp, J. Harmon Smith, John Thurston. (Cantrell, Michael) (Entered: 09/13/2022) |
| 09/14/2022 | 189 | | **TEXT ONLY ORDER granting in part and denying in part 188 Motion to Stay Briefing and Decision on Attorney's Fees. The Court declines to stay briefing and decision on Plaintiffs' Motion for Attorneys' Fees and Costs because such a stay may lead to piecemeal litigation in the Eighth Circuit in the event any attorneys' fee judgment is appealed. However, the Court does intend to stay the execution of any attorneys' fee judgment pending resolution of the State Defendants' current appeal. The State Defendants' request for an extension of time to respond to Plaintiffs' motion is GRANTED, and their response is due September 28, 2022. Signed by Honorable Timothy L. Brooks on September 14, 2022.(glk) (Entered: 09/14/2022)** |

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**ARKANSAS UNITED
and L. MIREYA REITH**                                                                    **PLAINTIFFS**

**V.**                                        **CASE NO. 5:20-CV-5193**

**JOHN THURSTON, in his official capacity
as the Secretary of State of Arkansas;
SHARON BROOKS, BILENDA HARRIS-RITTER,
WILLIAM LUTHER, CHARLES ROBERTS,
JAMES SHARP, and J. HARMON SMITH,
in their official capacities as members
of the Arkansas State Board of Election Commissioners;
RENEE OELSCHLAEGER, BILL ACKERMAN,
MAX DEITCHLER, and JENNIFER PRICE,
in their official capacities as members
of the Washington County Election Commission;
RUSSELL ANZALONE, ROBBYN TUMEY,
and HARLAN STEE, in their official capacities as members
of the Benton County Election Commission;
DAVID DAMRON, LUIS ANDRADE, and LEE WEBB,
in their official capacities as members of the Sebastian
County Election Commission; and MEGHAN HASSLER, in
her official capacity as Election Coordinator for the
Sebastian County Election Commission**                                  **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 3

II.     BACKGROUND ................................................................................................ 4

    A.     Section 208 of the Voting Rights Act ................................................... 4

    B.     The Challenged Arkansas Statutes .................................................... 6

    C.     Arkansas United and the 2020 Election ............................................. 8

    D.     Procedural History .............................................................................12

III.    LEGAL STANDARD..........................................................................................13

IV.     DISCUSSION ..................................................................................................14

    A.     Section 208's Protections Extend to Limited-English Proficient Voters...............14

    B.     Plaintiffs have Standing......................................................................16

        1.     Arkansas United Suffered an Injury-in-Fact...................................18

        2.     Arkansas United has shown Causation and Redressability ...........25

    C.     This Dispute is Ripe ...........................................................................26

    D.     Sovereign Immunity Does Not Bar Plaintiffs' Suit..............................29

    E.     Preemption .........................................................................................31

        3.     The Six-Voter Limit at § 7-5-310(b)(4)(B) is Preempted by § 208 ..................32

        4.     The Tracking Requirement at § 7-5-310(b)(5) is Not Preempted by § 208 .....37

V.      CONCLUSION..................................................................................................37

## I.   INTRODUCTION

This is a voting rights lawsuit filed by Plaintiffs Arkansas United and L. Mireya Reith against Arkansas Secretary of State John Thurston and the Arkansas State Board of Election Commissioners ("the State Defendants") and the Benton, Sebastian, and Washington County Election Commission members, along with Sebastian County's Election Coordinator ("the County Defendants"). Defendants are all sued in their official capacities. Plaintiffs allege an Arkansas statute that forbids individuals from assisting more than six voters in casting their ballot violates Section 208 of the Voting Rights Act (VRA), a provision of federal law that allows voters who require assistance due to an inability to read or write to have the assistor of the voter's choice.

The parties agree there are no disputes as to the material facts and each move for summary judgment.[1] Plaintiffs argue § 208 of the VRA preempts the challenged provisions of the Arkansas Code as a matter of law, and therefore those provisions must be declared to violate the Supremacy Clause of the United States Constitution and permanently enjoined.[2] The State Defendants argue Plaintiffs lack Article III standing, the State Defendants are immune from suit, § 208 of the VRA does not extend to limited-English proficient (LEP) voters, and, even if it does, the six-voter limit does not conflict

---

[1] The Court terminated the bench trial set for November 15, 2021.

[2] The Court considered Plaintiffs' Motion for Summary Judgment (Doc. 137), Brief and Statement of Facts in support of the Motion (Docs. 138 & 139), the State Defendants' Brief and Statement of Facts in response (Docs. 149 & 150), the County Defendants' Brief and Statement of Facts in response (Docs. 151 & 152), and Plaintiffs' Replies (Docs. 161 & 162).

3

with § 208 of the VRA.[3] The County Defendants argue all claims against them must be dismissed on ripeness grounds.[4]

The Court finds that § 208 of the VRA covers LEP voters, Plaintiffs have standing to challenge Arkansas's voting restrictions, this case is ripe for review, and the State Defendants are not protected from suit by sovereign immunity. The Court further finds Section 208 of the VRA preempts the six-voter limit found at § 7-5-310(b)(4)(B) of the Arkansas Code but does not preempt the assistor-tracking requirement at § 7-5-310(b)(5). Accordingly, and for the reasons stated more fully below, Plaintiffs' Motion for Summary Judgment (Doc. 137) is **GRANTED IN PART AND DENIED IN PART**, and the County and State Defendants' Motions for Summary Judgment (Docs. 131 & 134) are **DENIED**. Plaintiffs are entitled to relief as ordered in Part V of this opinion.

## II.  BACKGROUND

The Court begins with an explanation of the federal and state statutes involved in this case before turning to Plaintiffs' efforts to provide translation assistance to LEP voters during the 2020 General Election.

### A.  Section 208 of the Voting Rights Act

"Congress enacted the Voting Rights Act of 1965 for the broad remedial purpose of ridding the country of racial discrimination in voting." *Chisom v. Roemer*, 501 U.S. 380,

---

[3] The Court considered the State Defendants' Motion for Summary Judgment (Doc. 134), Brief and Statement of Facts in support of the Motion (Docs. 135 & 136), Plaintiffs' Brief and Statement of Facts in response (Docs. 146 & 147), Plaintiffs' Appendix (Doc. 148), and the State Defendants' Reply (Doc. 155).

[4] The Court considered the County Defendants' Motion for Summary Judgment (Doc. 131), Brief and Statement of Facts in support of the Motion (Docs. 132 & 133), and Plaintiffs' Brief and Statement of Facts in response (Docs. 144 & 145).

403 (1991) (cleaned up). The VRA contains several different provisions meant to fulfill this remedial purpose. Section 2 of the VRA forbids any state or political subdivision from implementing voting practices that result in the denial or abridgment of the right of any citizen to vote on account of race or color. Section 3 sets forth judicial remedies to be used by a court when the Attorney General or an aggrieved person institutes a proceeding to enforce the voting guarantees of the Fourteenth or Fifteenth Amendments. Section 4 forbids the adoption of any test or device to deny or abridge the right to vote on the basis of race or color in certain jurisdictions, and § 5 requires those jurisdictions to obtain clearance from the Department of Justice before changing any voting practice.[5]

In 1975, Congress amended the VRA to add § 203, which requires certain jurisdictions to provide translated voting materials. A jurisdiction is covered by § 203 if more than five percent of its voting-age citizens (or 10,000 of its voting-age citizens) are members of a designated language minority group and are "limited-English proficient" and "the illiteracy rate of the citizens in the language minority as a group is higher than the national illiteracy rate." 52 U.S.C. § 10503(b)(2)(A)(i). No jurisdiction in Arkansas is covered by § 203, and therefore no jurisdiction in Arkansas is required to provide translated voting materials.

The VRA provision at issue in this case, § 208, codified at 52 U.S.C. § 10508, was added when Congress reauthorized the VRA in 1982. The provision reads: "Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's

---

[5] The jurisdiction designations in § 4 ("the coverage formula") were found unconstitutional in *Shelby County v. Holder*, 570 U.S. 529, 557 (2013), crippling § 5's preclearance regime.

employer or agent of that employer or officer or agent of the voter's union." Unlike § 203, § 208 applies nationwide.

In enacting § 208, the Report of the Senate Judiciary Committee found that "[c]ertain discrete groups of citizens are unable to exercise their rights to vote without obtaining assistance in voting including aid within the voting booth" and "many such voters may feel apprehensive about casting a ballot in the presence of, or may be misled by, someone other than a person of their own choice." S. Rep. No. 97-417, at 62 (1982). The Senate Report explained that § 208 was necessary "to limit the risks of discrimination against voters in these specified groups and avoid denial or infringement of their right to vote." *Id.*

### B. The Challenged Arkansas Statutes

Plaintiffs argue § 208 preempts §§ 7-5-310(b)(4)(B), 7-5-310(b)(5), 7-1-103(a)(19), and 7-1-103(b)(1) of the Arkansas Code.

Arkansas Code § 7-5-310 sets out Arkansas's rules related to privacy and voter assistance at polling places. Arkansas Code § 7-5-310(b)(4)(A)(i)—which has not been challenged—provides that a voter may be assisted by a person of his or her choice. Added in 2009, § 7-5-310(b)(4)(B) adds the restriction that "[n]o person other than [poll workers] shall assist more than six (6) voters in marking and casting a ballot at an election." Section 7-5-310(b)(5) further provides that "[i]t shall be the duty of the poll workers at the polling site to make and maintain a list of the names and addresses of all persons assisting voters."

To enforce these provisions, § 7-1-103(a)(19)(C) provides that a person who assists a voter "in marking and casting the voter's ballot except as provided in § 7-5-310"

6

may be subject to criminal penalties. Section 7-1-103(b)(1) makes such a violation a Class A misdemeanor.

According to the State Defendants, the purpose of the six-voter limit is to prevent assistors from unduly influencing voters' decisions in the voting booth. *See* Doc. 135, p. 7. In the State Defendants' view, absent the six-voter limit, "busloads of people" could come to the polls and be fraudulently assisted by the same individual. *Id.*

The State Board of Election Commissioners is charged with civil enforcement authority for the State's election laws, including the six-voter limit. The Board's enforcement process is primarily driven by a complaint system. If a complaint facially alleges a state election law violation, the Board investigates the claim and either dismisses the complaint, orders a sanction—a warning letter or fine—or refers the violation to the prosecutor's office for criminal prosecution. *See* Doc. 139-14, pp. 149, 153. During the 2018 election, the Board found probable cause that two individuals had violated the six-voter limit. In the case of Carlon Henderson, he admitted to assisting eight voters, and he agreed to settle the claim against him by accepting a Letter of Caution from the Board. Had Mr. Henderson not agreed to the settlement, he could have faced fines and possible referral for criminal prosecution.

The Board conducts statewide trainings for county election authorities. These trainings include instruction on how to implement the six-voter limit and how to track each voter assistor. The Board also issues a procedure manual for use by county election authorities that covers the same material.

The County Defendants are required by statute to "[e]nsure compliance with all legal requirements relating to the conduct of elections" and "[e]xercise [their] duties

consistent with the training and materials provided by the State Board of Election Commissioners." Ark. Code Ann. §§ 7-4-107(a)(1)–(2). To comply with the six-voter limit and the assistor-tracking requirement, the County Defendants instruct poll workers to keep a list of all voters assisted and the person who assisted them. Each assistor fills out an Assisted Voter Card for each voter they help, filling in their own name and address and the name of the voter they assisted. The card specifies that all persons, other than a poll worker or county clerk, may assist no more than six voters during an election. *See*, *e.g.*, Doc. 148-16. The County Defendants have authority to report any suspected violations of the six-voter limit to either the Board or a prosecutor for criminal enforcement.

### C.  Arkansas United and the 2020 Election

Plaintiffs are Arkansas United, a non-profit organization located in Springdale, Arkansas, and L. Mireya Reith, the founder and executive director of the organization. Founded in 2010, Arkansas United advocates for immigrant populations in the state. Part of the organization's mission is "to ensure that immigrants in Arkansas have the information and resources they need to become full participants in the state's economic, political and social life." (Doc. 4-1, ¶ 2). Arkansas United is funded by grants, donations, and approximately 600 members who pay dues to support the organization's mission. Among other services, the organization assists LEP voters, including both organization members and nonmembers, to translate their ballots at polling places. *See* Doc. 4-1, ¶ 14.[6]

---

[6] The State Defendants contend the only services Arkansas United offers to its members—as opposed to nonmembers—are immigration-related and meant for noncitizens who cannot vote. *See* Doc. 150, p. 7. This misconstrues the deposition testimony and fails to create a genuine dispute of fact. Ms. Reith was asked if "there are any services that are extended to members that are not extended to nonmembers," and

Arkansas United also undertakes non-partisan, get-out-the-vote efforts within the immigrant community. These efforts include phone banking, text messaging, door-to-door canvassing, and providing car rides to the polls. From September 2020 until Election Day, November 3, 2020, Arkansas United staff and volunteers primarily focused on phone banking and answering calls to the organization's Spanish-language hotline to educate voters and encourage participation in the election. Arkansas United received a grant to perform its phone banking. The terms of that grant required Arkansas United to make 115,563 dials in Arkansas from September 1, 2020, through Election Day. Arkansas United receives no outside funding for the interpretation services it offers to voters.

In advance of the 2020 election, Arkansas United trained all its staff and volunteers—16 in total—to assist LEP voters at the polls. The organization's staff at the time included executive director Ms. Reith, legal coordinator Sohary Fonseca, civic engagement coordinator Celina Reyes, and fellow Aracelia Gonzalez.[7]

---

she responded that the organization's legal services are for members but that it grants exceptions to assist nonmembers as well. (Doc. 134-1, pp. 76–77). This does not imply that legal services are the *only* services offered to members, as the State Defendants suggest. It is undisputed that Arkansas United offers both members and nonmembers many services beyond immigration law, including voter outreach and assistance.

The State Defendants go on to suggest—apparently because Arkansas United serves immigrant and minority populations—that all of the organization's 600 dues-paying members must be "noncitizens who are ineligible to vote." (Doc. 155, p. 3). This is a baseless argument completely contradicted by the record.

[7] The State Defendants' briefing asks the Court to not consider Ms. Gonzalez and Ms. Fonseca's declarations (Docs. 139-22 & 139-23) for the reasons stated in the State Defendants' response in opposition (Doc. 141) to Plaintiffs' Motion for Leave to File Out of Time (Doc. 140). After summary-judgment briefing was complete, the Court granted Plaintiffs' Motion for Leave to File Out of Time and declined to strike the two declarations. *See* Doc. 163. Any late disclosure of the declarations was harmless.

In October 2020, Ms. Reith met with her staff and explained that each staff member could assist only six voters per election. Given this limit and anticipating high demand for translation assistance, Arkansas United recruited volunteers specifically to assist voters during the 2020 election. *See* 139-20, ¶ 5; 139-22, ¶ 18. Because of the six-voter limit, the organization determined it would need to deploy additional staff and volunteers for this purpose. Arkansas United also encouraged voters to find alternative assistors, in the form of friends and family, because, given the six-voter limit, the organization would not have the capacity to help every voter who asked for its assistance. *See* 139-20, ¶ 5. Ms. Fonseca used a form to track the number of voters each staff member or volunteer helped to ensure compliance with the six-voter limit.

Some voters requested Arkansas United's interpretation assistance during early voting in the 2020 general election. For example, Ms. Reyes called Susana Terrazas, a registered voter in Springdale, to ask if she and her husband were planning on voting. *See* Doc. 148-6, pp. 4–5. Ms. Terrazas said yes. A few days later, Ms. Terrazas called Ms. Reyes back to ask for help. Ms. Terrazas and her husband had decided they would need help understanding their ballots because, while Ms. Terrazas reads and speaks some English, she is not fluent. Ms. Reyes met Ms. Terrazas and her husband at the polling place, where she translated portions of the ballot from English to Spanish to aid the couple. *See* Doc. 148-7. At least two other voters contacted Arkansas United for translation assistance during early voting. Ms. Gonzalez met them at their respective polling places to assist them.

On Election Day, six Arkansas United staff members and volunteers were phone banking at the organization's office in downtown Springdale. That morning, a poll worker

from the Springdale Civic Center came to the office to ask if the organization could send staff to the Civic Center polling place to assist LEP voters. While there were some bilingual poll workers at the site, there were not enough to keep up with the demand for translation assistance.

Ms. Reith obliged and instructed Ms. Fonseca and Ms. Gonzalez to alternate in shifts at the Civic Center. Ms. Fonseca assisted four voters with translating and understanding their ballot.  For each voter she helped, she filled out an Assisted Voter Card and gave it to a poll worker. In the late afternoon, Ms. Fonseca returned to the office to continue phone banking.

Ms. Gonzalez had originally planned to phone bank all day at the Arkansas United office. Instead, she phone banked for four hours and then went to the Civic Center. Upon arrival, Ms. Gonzalez quickly assisted two voters with translation services. Because Ms. Gonzalez had already assisted two other voters during early voting, she had now helped a total of four voters. Once an Arkansas United staff member or volunteer assisted four voters—and thus were approaching the six-voter limit—the organization instructed them to ask another staff member or volunteer to prepare to takeover for them. *See* Doc. 139-22, ¶ 21. The volunteers recruited by the organization prior to election day were not able to help after all, and Ms. Gonzalez scrambled to find friends and relatives to fill in. *See id.* at ¶ 18. Her sister Margarita Gonzalez and Margarita's friend, Melissa Hernandez, agreed to come assist voters at the Civic Center.

By the time Margarita and Melissa arrived, Ms. Gonzalez had hit the six-voter limit. For each voter she helped, she filled out an Assisted Voter Card and gave it to a poll

worker. Because she could no longer assist voters, she returned to the Arkansas United offices to continue phone banking.

That evening, Ms. Fonseca received a call that an Arkansas United volunteer had assisted four voters and more help was needed. Ms. Fonseca returned to the Civic Center to assist one additional voter, bringing her total to five. Margarita Gonzalez assisted five voters and Melissa Hernandez assisted four. Another Arkansas United volunteer, Jamie Cascante, assisted one voter at the Civic Center on Election Day.

In total, then, Arkansas United's staff and volunteers assisted at least 21 voters during the 2020 election. The majority of voters were assisted in Washington County. A few were assisted in Benton and Sebastian Counties.

The organization ultimately fell well short of its phone-banking goals. The organization completed only 76,166 dials of the 115,563 dials required by the terms of its grant. Arkansas United contends that many more calls would have been completed had it not had to divert resources to ensure its voter assistance program complied with the six-voter limit.

### D. Procedural History

Plaintiffs first filed the original complaint in this matter and a motion for temporary restraining order on the night before Election Day in 2020. The Court denied that motion on Election Day. *See* Doc. 35. While the Court found Plaintiffs demonstrated a likelihood of success on the merits, the balance of the equities weighed strongly against modifying an election rule halfway through Election Day.

Sebastian County, Benton County, and the State Defendants then filed motions to dismiss the Amended Complaint based on inadequate service of process, failure to state

a claim, sovereign immunity, standing, laches, and lack of indispensable parties. The Court denied those motions. *See* Doc. 102.

The Court now turns to issues raised by the cross-motions for summary judgment. The State and County Defendants argue Plaintiffs have failed to show this is a justiciable dispute under Article III's standing and ripeness requirements. The State Defendants also reassert their argument that sovereign immunity bars any suit against them. Plaintiffs seek summary judgment on the merits and ask the Court to declare that the challenged sections of the Arkansas Code are preempted by Section 208 of the VRA and violate the Supremacy Clause of the United States Constitution; enjoin all Defendants from implementing or enforcing the challenged laws; and require Defendants to implement a remedial plan to ensure future compliance with § 208 of the VRA.

### III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l. Bank of Commerce v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir. 1999).

September 9 2022 USCA8 41

"Where the parties file cross-motions for summary judgment," as the parties do here, the Court "view[s] each motion separately, drawing all inferences in favor of the nonmoving party." *Shea v. Millett*, 36 F.4th 1, 6 (1st Cir. 2022) (quoting *Fadili v. Deutsche Bank Nat'l Tr. Co.*, 772 F.3d 951, 953 (1st Cir. 2014)).

## IV. DISCUSSION

### A. Section 208's Protections Extend to Limited-English Proficient Voters

As a preliminary matter, the Court reiterates its prior finding that the voter-assistance protections in § 208 extend to voters with limited-English proficiency. *See* Doc. 102, pp. 10–12.

The plain language of § 208 compels this interpretation. Section 208 provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508. The text does not require the voter's "inability to read or write" be based on a disability rather than lack of education. The plain text encompasses anyone who cannot read or write the language the voting materials are written in. This squarely includes LEP voters, who lack the ability to read their ballot because they cannot read the English language.

The State Defendants' argument that § 208 only protects blind, disabled, and *illiterate* voters is unpersuasive. Even under this reading of the statute, voters who are "literate in the Spanish language but illiterate in English," *Cardona v. Power*, 384 U.S. 672, 675 (1966) (Douglas, J., dissenting), would nevertheless be covered by § 208, at least in a state, like Arkansas, that provides no Spanish-language voting materials.

14

The purpose of § 208 and its legislative history confirm the statute's plain language. *Cf. Wooden v. United States*, 142 S. Ct. 1063, 1072 (2022) (using "[s]tatutory history and purpose to confirm [the Court's] view of [a statute's] meaning"). Congress enacted § 208 to ensure those who required assistance to exercise their right to vote received the assistor of their choice. It would belie this purpose to exclude LEP voters—who cannot "read or write" the language the voting materials are printed in—from the statute's protections. The Senate Report that discussed the addition of § 208 to the VRA recognized that "[c]ertain discrete groups of citizens are unable to exercise their rights to vote without obtaining assistance." S. Rep. No. 97-417, at 62 (1982). It defined these groups as including "those who either do not have a written language or who are unable to read or write sufficiently well to understand the election material and the ballot." *Id.* The Senate Report also described an exception to § 208's employer limitation for "voters who must select assistance in a small community composed largely of language minorities," where voters may have limited options for translation assistance. *Id.* at 64. Congress clearly contemplated that § 208's protections would reach LEP voters.

The Department of Justice has consistently interpreted § 208 the same way, having entered into judicially-enforced consent decrees with jurisdictions that failed to extend § 208's protections to non-English speakers.[8] So have courts, which consistently

---

[8] *See* Consent Decree, Judgment, and Order, *United States v. Fort Bend Cnty.*, No. 4:09-cv-01058 (S.D. Tex. Apr. 13, 2009) (requiring county to allow Spanish-speaking voters with limited English proficiency to be assisted by the person of their choice pursuant to § 208); Memorandum of Agreement, *United States v. Kane Cnty.*, No. 07 C 5451 (N.D. Ill. Nov. 7, 2007) (same); Consent Decree, Judgment, and Order, *United States v. Brazos Cnty.*, No. H-06-2165 (S.D. Tex. June 29, 2006) (same); Consent Decree, *United States v. Orange Cnty.*, No. 6:02-cv-737-ORL-22JGG (M.D. Fla. Oct. 8, 2002) (same); Settlement Agreement, *United States v. City of Philadelphia*, No. 2:06cv4592 (E.D. Pa. June 4, 2007) (requiring city to allow limited-English-proficient Spanish-speaking voters

uphold challenges to state laws by individuals and organizations asserting that § 208 extends to LEP voters. The Fifth Circuit in *OCA-Greater Houston v. Texas* affirmed the district court's grant of summary judgment in favor of plaintiffs alleging § 208 preempted a Texas law that set certain minimum requirements for who could serve as an interpreter at the polls. 867 F.3d 604, 616 (5th Cir. 2017); *see also Priorities USA v. Nessel*, 462 F. Supp. 3d 792, 816 (E.D. Mich. 2020) (finding the plaintiffs adequately pleaded their claim that § 208 preempted a state law placing additional restrictions on who could assist LEP voters); *Nick v. Bethel*, 2008 WL 11456134 (D. Alaska Jul. 30, 2008) (granting preliminary injunction based on a finding that plaintiffs had demonstrated a likelihood of success on their claim that the state violated § 208 when it prevented Alaska Native Yup'ik-speaking voters from having assistance from a person of their choosing); *United States v. Berks Cnty.*, 277 F. Supp. 2d 570 (E.D. Pa. 2003) (holding that denying Spanish-speaking voters assistance by a person of their choice violated § 208).

The text of § 208 is clear that LEP voters receive its protections, and Defendants have failed to identify any authorities to the contrary.

### B.  Plaintiffs have Standing

Under Article III of the United States Constitution, federal courts can only decide actual "Cases" and "Controversies" between two or more parties—the validity of a statute cannot be decided in the abstract. U.S. Const. art. III, § 2, cl. 1. Therefore, to have standing to sue, a plaintiff must show "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of

---

to be assisted by the person of their choice pursuant to § 208); Revised Agreed Settlement Order, *United States v. City of Springfield*, No. 06-301-23-MAP (D. Mass. Sept. 15, 2006) (same).

issues upon which [federal courts] so largely depend[] for illumination of difficult . . . questions." *Baker v. Carr*, 369 U.S. 186, 204 (1962).

At the motion-to-dismiss stage, the Court found Plaintiffs had adequately alleged Article III standing in their Amended Complaint. Now, with discovery complete and the undisputed evidence before it, the Court confirms that Plaintiffs have standing to challenge the six-voter limit and associated statutory provisions.

A plaintiff organization may establish standing in two ways: organizational standing and associational standing.[9] An entity may assert organizational standing when a challenged action or statute directly injures the entity's interests. In such a case, the court "conduct[s] the same inquiry as in the case of an individual," *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982), and the entity must "establish (1) an injury in fact; (2) a causal connection between the injury and the challenged law; and (3) that a favorable decision is likely to redress their injury," *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 749 (8th Cir. 2019) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

An entity that is not directly injured may nevertheless assert associational standing on behalf of its injured members. *See Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.*, 813 F.3d 1124, 1128 (8th Cir. 2016). To establish associational standing, the entity must show: (1) its members would have standing to sue in their own right; (2) the suit seeks to protect interests germane to the organization's purpose; and (3) neither the claim

---

[9] The Court focuses its standing inquiry on Arkansas United, rather than Ms. Reith, because in a multi-plaintiff suit, only one plaintiff need satisfy the constitutional standing requirements. *See Horne v. Flores*, 557 U.S. 433, 446–47 (2009).

asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

The State Defendants argue Plaintiffs lack standing because Plaintiffs are not "aggrieved persons" under the VRA, cannot assert the rights of unknown third-party voters, fail to state a resource-diversion injury, and fail to show associational standing.[10] Plaintiffs respond that they have established both organizational standing—"as an entity 'directly' affected by the challenged voter-assistance restrictions"—and associational standing because its members are voters injured by the challenged statutes. (Doc. 146, p. 13). The Court finds Arkansas United has established organizational standing and, therefore, does not address associational standing.

### 1.  Arkansas United Suffered an Injury-in-Fact

An injury-in-fact is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and quotation marks omitted). An organization may establish injury-in-fact by showing it had to divert some of the organization's resources to counteract the challenged

---

[10] In a footnote, the State Defendants also point out that the six-voter limit applies only to individuals who "*assist* more than six (6) voters in *marking* and *casting* a ballot," § 7-5-310 (b)(4)(B) (emphasis added), and Ms. Reith testified that her staff does not physically mark or cast ballots for voters when they translate ballot language for voters. (Doc. 135, p. 8 n.6). However, the State Defendants have not argued this case is moot because translation is not considered assistance under Arkansas law. In fact, the deposition testimony of the state election officials indicated the six-voter limit applies to translation assistance, and there is no dispute that Arkansas United's staff and volunteers were required to complete Assisted Voter Cards—which state that assistors are subject to the six-voter limit—for providing translation assistance. *See* Docs. 148-8, pp. 106–108; 139-21, p. 17; 148-16. The Court also observes that the plain meaning of "assist[ing]" a voter to "mark[]" their ballot would seem to include translation services. The Court is satisfied that the six-voter limit applies to translation assistance and have been so interpreted and enforced by state and county officials. Therefore, a live controversy exists between the parties.

law. In *Havens Realty*, the Supreme Court held that an organization fighting racial discrimination in housing had standing to challenge a realty company's allegedly discriminatory practices under the Fair Housing Act (FHA). 455 U.S. at 379. The organization alleged the realty company's practices caused it to "to devote significant resources to identify and counteract" those practices. *Id.* The Court found the plaintiffs adequately alleged a resource drain that "perceptibly impaired [the organization's] ability to provide counseling and referral services for low-and moderate-income homeseekers," and, if proved, would constitute a "concrete and demonstrable injury to the organization's activities." *Id.*

In *OCA-Greater Houston*, the Fifth Circuit found organizational standing in a case similar to the one at bar. There, a voting rights organization challenged a Texas law that set certain requirements for who could serve as an interpreter in the voting booth. The court found the challenged law forced the plaintiff organization to "calibrate[] its outreach efforts to spend extra time and money educating its members about the[] Texas provisions and how to avoid their negative effects." *OCA-Greater Houston*, 867 F.3d at 610. For example, the plaintiff's employees and volunteers had to "spend more time on each call (and reach fewer people in the same amount of time)" to explain the requirements of Texas's law to voters. *Id.* This diversion of resources created an injury-in-fact for organizational standing.

The undisputed evidence shows Arkansas United similarly suffered a resource-diversion injury during the 2020 election. The six-voter limit caused Arkansas United to spend time recruiting volunteers to serve as voter assistors. *See* 139-20, ¶ 5; 139-22, ¶ 18. On Election Day, Arkansas United's staff had to spend time coordinating and

tracking their voter assistance efforts and traveling back and forth from their office to the Springdale Civic Center. *See* Docs. 148-11, ¶ 11; 148-13, ¶¶ 21, 26, 28; 148-14, ¶¶ 13, 17. Much of this planning would not have been necessary if a single staff member or volunteer could assist an unlimited number of voters. For example, after Ms. Fonseca had assisted four voters and returned to the office to continue phone banking, a volunteer called and asked that she return to the Civic Center because the volunteer had assisted four voters and was worried she would hit the limit. *See* Doc. 148-14, ¶ 17. Ms. Fonseca returned to the Civic Center and provided translation services to an additional voter. *Id.* As Ms. Gonzalez approached and eventually reached the six-voter limit, she had to spend additional time finding a replacement for herself to assist the line of LEP voters at the Civic Center. *See* Doc. 148-13, ¶¶ 26, 28.

The additional coordination associated with the six-voter limit diverted resources from Arkansas United's phone-banking efforts and contributed, at least in part, to the organization failing to meet the phone-banking goals required by its grant. *See* Docs. 148-11, ¶ 7; Doc. 148-13, ¶ 22. Because Arkansas United intends to continue providing interpretation services at the polls in future elections, this resource-diversion injury will recur.

The State Defendants half-heartedly argue that Arkansas United suffered no resource-diversion injury because the organization "had no formal arrangement with Washington County to provide language assistance at the polls during the 2020 general election" and the organization's phone banking was not "*materially* impeded as a result of Arkansas's six-voter limit." (Doc. 135, p. 16 (emphasis added)). It is irrelevant that Arkansas United did not have a formal arrangement to provide voter assistance. Both its

assistance to LEP voters and phone banking serve the organization's mission to promote civic engagement among Arkansas's immigrant population, and the six-voter limit hindered those efforts.

The issue is not whether Arkansas United's efforts were "materially impeded." It is true Arkansas United would have had staff and volunteers assisting voters regardless of the six-voter limit, and anyone who reached the limit could simply return to phone banking. But the six-voter limit did necessitate additional planning, coordination, and time that could have been spent elsewhere. This easily surpasses the "'perceptible impairment' of an organization's activities [that] is necessary for there to be an 'injury in fact.'" *Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 129 (2d Cir. 2020) (quoting *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011)); *see also OCA-Greater Houston*, 867 F.3d at 612 ("To be sure, OCA's injury was not large. But the injury alleged as an Article III injury-in-fact need not be substantial . . . .").

The State Defendants argue Plaintiffs have suffered no injury because § 3 of the VRA provides for procedures courts must use "[w]henever the Attorney General or an aggrieved person institutes a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment," and Plaintiffs are not "aggrieved persons" under the VRA. 52 U.S.C. § 10302. According to the State Defendants, only a voter who has been denied the assistor of their choice is an "aggrieved person" who may sue to enforce § 208.

Assuming the State Defendants are correct that a plaintiff organization must be an "aggrieved person" under § 3 of the VRA in order to sue under § 208, the term "aggrieved

person" is sufficiently broad to encompass a minority-rights organization suing to enforce § 208's protections.[11]

When assessing a plaintiff's standing to sue under a particular statute, courts "presume that a statute ordinarily provides a cause of action 'only to plaintiffs whose interests fall within the zone of interests protected by the law invoked.'" *Bank of Am. Corp. v. City of Miami.*, 137 S. Ct. 1296, 1302 (2017) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014)). In *Bank of America*, the Supreme Court held that "aggrieved person" under the FHA included the City of Miami, which was suing the defendant bank for "hinder[ing] the City's efforts to create integrated, stable neighborhoods." *Id.* at 1304. The Court observed that the FHA's "aggrieved person" language "reflects a congressional intent to confer standing broadly." *Id.* at 1303.

The State Defendants principally rely on *Roberts v. Wamser*, 883 F.2d 617, 624 (8th Cir. 1989). Michael Roberts was a Black candidate in the Democratic primary for

---

[11] While the judicial procedures prescribed by § 3 may not include an express right of action on their own, they do evince Congress's intent for private parties to be able to sue under the VRA. The Supreme Court has long found—consistent with § 3 and the VRA's remedial purpose—that a right of action exists for private parties to enforce the VRA's various sections. *See Allen v. State Bd. of Elections*, 393 U.S. 544, 556–557 (1969) (holding that private parties may enforce § 5 of the VRA); *Chisom*, 501 U.S. at 404 (allowing private plaintiffs to sue under § 2 of the VRA); *Morse v. Republican Party of Va.*, 517 U.S. 186, 234, 240 (1996) (five justices, in otherwise splintered opinions, held there is a private right of action to enforce § 10 of the VRA); *but see Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 2022 WL 496908, at *15–24 (E.D. Ark. Feb. 17, 2022) (distinguishing well-established precedent and finding there is no private right of action under § 2 of the VRA).

As for § 208, "every court that has considered the issue—and the Attorney General of the United States—agree that private parties may enforce" it. *Fla. State Conf. of NAACP v. Lee*, 576 F. Supp. 3d 974, 990 (N.D. Fla. 2021) (collecting cases). In any event, the State Defendants agree that Plaintiffs have a cause of action under § 208 but dispute that an organization can be an "aggrieved person" that has standing to sue.

President of the Board of Alderman in St. Louis, Missouri. Roberts lost the primary by just 171 votes. Roberts sued the Board of Alderman alleging, in part, "that the Board's use of [a] punch-card voting system resulted in the failure to count a disproportionate number of ballots cast by black voters" and violated Section Two of the VRA. *Id.* at 619–20. The Eighth Circuit held that Roberts did not have standing because he "is not an aggrieved voter suing to protect his right to vote. Nowhere in his complaint (or anywhere else) does Roberts claim that his right to vote has been infringed because of his race. Nor does Roberts allege that he is suing on behalf of persons who are unable to protect their own rights." *Id.* at 621. The court further reasoned that Roberts could not sue under the VRA because "purpose of the Voting Rights Act is to protect minority voters, not to give unsuccessful candidates for state or local office a federal forum in which to challenge elections." *Id.* at 621.

*Roberts* is quite different from the instant case. Roberts was a political candidate— not a nonprofit organization—who was not seeking to protect the rights of voters. The Eighth Circuit's concern that Congress did not intend for failed political candidates to be able to sue under the VRA is not implicated in this case. Here, Arkansas United is effectuating the purpose of the VRA to protect minority voters by challenging a law it alleges infringes on the statutory right of its LEP members, and other LEP voters in Arkansas, to an interpreter of their choice. The record shows LEP voters, exercising their right under § 208, choose Arkansas United and its staff to translate for them at the ballot box. Ms. Terrazas and her husband specifically asked Ms. Reyes to meet them at their polling place to translate for them. *See* Docs. 148-6, pp. 4–5; 148-7. Two voters contacted Ms. Gonzalez with the same request during early voting. *See* Doc. 148-13, p. 20. And

Arkansas United's members include LEP voters who require assistance to vote. *See* Doc. 4-1, ¶ 34.

The weight of authority further contradicts the State Defendants' position. In *Havens Realty*, the Supreme Court found a fair-housing organization had organizational standing under the Fair Housing Act even though the organization was not seeking housing on its own behalf. *See* 455 U.S. at 379. In *OCA-Greater Houston*, the Fifth Circuit found a voting-rights organization had organizational standing to enforce § 208 of the VRA even though the organization was not a voter denied their assistor of choice. 867 F.3d at 610.[12]

Therefore, Arkansas United—a minority-rights organization—and its members are well within the "zone of interests" of the VRA's mandate to eliminate discrimination against minority groups in voting and, more specifically, § 208's mandate that LEP voters receive the assistor of their choice. The law is clear that an organization may establish organizational standing when it is forced to divert resources to respond to a state's alleged

---

[12] *See also Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1165–66 (11th Cir. 2008) (organizations challenging the state procedures for first-time registrants alleged an injury-in-fact sufficient to support organizational standing where the plaintiff organizations "reasonably anticipate that they will have to divert personnel and time to educating volunteers and voters on compliance with [the registration requirements] and to resolving the problem of voters left off the registration rolls on election day"); *Common Cause Ind. v. Lawson*, 937 F.3d 944, 952 (7th Cir. 2019) (plaintiff entity was injured where it had "devoted additional time and resources to ameliorating" the effects of a state voter roll provision that would automatically remove a voter from the state roll based on information from a third-party database); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1039 (9th Cir. 2015) (plaintiff organization's alleged injury of diversion of resources supported lawsuit alleging state's failure to comply with a federal law intended to facilitate voter registration by low-income citizens and those with disabilities); *Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014) (plaintiff organization had standing to sue for state's failure to provide recipients of federal benefits with voter registration forms, as required by the National Voter Registration Act, where the plaintiff organization alleged it had to devote resources to counteract the violation).

violation of federal law. Arkansas United has made that showing here and has suffered an injury-in-fact as a result.

### 2. *Arkansas United has shown Causation and Redressability*

Having shown an injury-in-fact, Arkansas United must show "a causal connection between the injury and the challenged law; and . . . that a favorable decision is likely to redress their injury." *Telescope Media*, 936 F.3d at 749 (citing *Spokeo*, 578 U.S. at 338). The organization easily satisfies these requirements. *See OCA-Greater Houston*, 867 at 613 ("The facial invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the State itself and its Secretary of State, who serves as the 'chief election officer of the state.'" (quoting Tex. Elec. Code § 31.001(a)).

As explained above, Arkansas United diverted resources from its phone-banking efforts to spend time coordinating and planning compliance with the six-voter limit. The challenged laws directly caused Arkansas United's resource-diversion injury, and the State and County Defendants are the parties that enforce those laws. The State Defendants conduct trainings, provide guidance, and enforce penalties for violations of the six-voter limit. If necessary, they refer violators for criminal prosecution. The County Defendants ensure the Assisted Voter Cards are completed and refer any violations of the six-voter limit to the State Defendants or directly to the county prosecutor. Just as Defendant's enforcement efforts caused Arkansas United's injury, an order from this Court enjoining Defendants from performing those actions would redress Plaintiff's injury in all future elections.

25

### C.  This Dispute is Ripe

The County Defendants argue the Court lacks subject matter jurisdiction over the claims against the County Defendants "because those claims have not ripened (and will, apparently, never ripen) into a justiciable case or controversy." (Doc. 132, p. 3).

"[T]he ripeness inquiry requires examination of both the 'fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.' *Neb. Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1038 (8th Cir. 2000) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). An issue is unfit for judicial review if it is based on a "hypothetical or speculative disagreement[]," *id.*, and "[t]he hardship prong asks whether delayed review 'inflicts significant practical harm' on the plaintiffs," *Parrish v. Dayton*, 761 F.3d 873, 875 (8th Cir. 2014) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).

The County Defendants argue Plaintiffs' claims against the County Defendants are too speculative to be fit for judicial resolution and Plaintiffs would suffer no hardship if the Court were to not enjoin the County Defendants.

The County Defendants point to the Eighth Circuit's opinion in *Public Water Supply District No. 10 of Cass County v. County of Peculiar*, 345 F.3d 570 (8th Cir. 2003). There, the plaintiff water district sought a declaratory judgment that the defendant municipality was "illegally acting to dissolve the District," along with damages under 42 U.S.C. § 1983. *Id.* at 571. The court held that the case was not ripe because the water district's injury was too speculative. *Id.* at 573. The court explained: "There is no contention that the District is suffering an injury now. The only possible injury to the District is dissolution under § 247.220. Yet no petition for dissolution has been filed, and it is not clear that a petition

September 9 2022 USCA8 54

will ever be filed." *Id.* The court further reasoned that the case was currently unfit for judicial resolution because "issue is not a purely legal one" and "would benefit from further factual development." *Id.* at 574. This bears little resemblance to the case at bar.

Here, the challenged statutes have already been enforced against Arkansas United's staff members. Its staff were required by county employees to fill out Assisted Voter Cards for each voter they helped during the 2020 election, and Aracelia Gonzalez reached the six-voter limit and ceased providing translations for fear of criminal prosecution. Plaintiffs need not subject themselves to criminal prosecution before challenging a statute's validity. *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979). If the six-voter limit remains in effect, there is no dispute Plaintiffs will have to comply with it in future elections. And the merits of this case—whether federal law preempts the challenged Arkansas statutes—requires no additional factual development.

The County Defendants further argue this controversy is too speculative because Plaintiffs improperly assume that if the Court "strike[s] down the 6-voter limit in Arkansas law . . . each County will continue to enforce the limit in defiance of the Court's order." (Doc. 132, p. 7). In other words, the County Defendants contend the Court need not enjoin them because—should this Court "strike down" the six-voter limit—they will follow that order regardless. This argument misunderstands the role of federal courts and the remedies those courts may issue. A federal court cannot strike a statute from the Arkansas Code. *See Steffel v. Thompson*, 415 U.S. 452, 469 (1974). Rather, federal courts may declare statutes invalid and enjoin their enforcement. In so doing, "the court enjoins, in effect, not the execution of the statute, but the acts of the official." *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923).

There is no dispute that the County Defendants play a significant role in implementing and enforcing the six-voter limit. *See 281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011) (explaining that a defendant official must have "some connection" to a challenged statute to be a proper party but that official "does not need to be the primary authority to enforce the challenged law"). County poll workers require each voter assistor to fill out an Assisted Voter Card, which informs the assistor that they may not assist more than six voters in any election. If a county election commission were to discover that an individual may have assisted more than six voters in a given election, the commission can either report that information to the State Election Commission for investigation or directly refer the complaint to the county prosecutor.

Given the significant role played by the counties in enforcing the six-voter limit, the disagreement between Plaintiffs and the County Defendants is far from hypothetical or speculative. The Court must enjoin the actions of the County Defendants to ensure a favorable ruling for Plaintiffs is carried out.

It also does not matter that "[t]he Arkansas election law does not vest county Election Commissions with the authority to deviate from the six voter assistance limit embedded in Arkansas law." (Doc. 132, p. 4). If that were the test, a dispute could never ripen—Arkansas law does not appear to vest *any* agency with the discretion to ignore the six-voter limit.

Therefore, while the Court has no doubt the County Defendants would follow this Court's decision whether they were a party to this case or not, the Court finds the County Defendants are a proper party to be enjoined from enforcing the challenged statutes. The

Court is satisfied that this dispute is ripe for decision with respect to both the State and County Defendants.

### D. Sovereign Immunity Does Not Bar Plaintiffs' Suit

The State Defendants renew their argument from the motion-to-dismiss phase that they are immune from suit based on sovereign immunity. State sovereign immunity, as enshrined in the Eleventh Amendment, prevents a federal court from hearing a suit against a state by a citizen of that state. *Hans v. Louisiana*, 134 U.S. 1, 11 (1890).

Plaintiffs point to two exceptions to sovereign immunity that allow their suit. First, Congress may abrogate state sovereign immunity when it acts pursuant to its enforcement power under Section 5 of the Fourteenth Amendment and Section 2 of the Fifteenth Amendment, so long as its intention to do so is "unmistakably clear in the language of the statute." *Dellmuth v. Muth*, 491 U.S. 223, 228 (1989) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)). Second, the Supreme Court held in *Ex parte Young* that the Eleventh Amendment does not bar suits for prospective injunctive relief against state officials to prevent violations of federal law so long as the official has "some connection with the enforcement of that act." 209 U.S. 123, 157 (1908). There is no dispute that Plaintiffs name the State Defendants in their official capacity, seek only prospective injunctive relief, and do not name the State of Arkansas as a party to their suit.

The State Defendants contend *Ex parte Young* does not apply here because, as they interpret § 3 of the VRA, only "the Attorney General or an aggrieved person" may sue to enforce the VRA's protections. They point to *Seminole Tribe of Florida v. Florida*, where the Supreme Court explained that "where Congress has prescribed a detailed

remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*." 517 U.S. 44, 74 (1996). Applying this test, the Supreme Court held that the Indian Gaming Regulatory Act could not be enforced by a private plaintiff in a suit under *Ex parte Young*. *Id.*

The State Defendants further contend they are immune from suit because "any federal enforcement authority under the Fourteenth or Fifteenth Amendments would be invalid as applied to Plaintiffs' claims, meaning that there is no federal right to vindicate." (Doc. 135, p. 18). They assert that § 208 contains no explicit statement of Congress's intent to abrogate sovereign immunity, Congress failed to identify a history and pattern of discrimination against LEP voters, and the remedial legislation is not congruent and proportional to the identified harm.

The Court has already explained at length, in its Memorandum Opinion and Order denying Defendants' motions to dismiss, why Plaintiffs may sue under *Ex Parte Young* and why the enactment of § 208 did not exceed Congress's lawmaking authority. *See* Doc. 102, pp. 12–19. The Court will not rehash that entire discussion here. In short, *Seminole Tribe* is inapposite because, unlike the "the intricate procedures set forth" by the Indian Gaming Regulatory Act, 517 U.S. at 74, the VRA does not lay out alternative sanctions or procedures that would be circumvented by enforcement under *Ex parte Young*. Nothing about permitting judicial proceedings to go forward undermines the effectiveness of any other portion of the VRA. Thus, the methods of enforcement contained in the VRA do not supplant officer suits under *Ex parte Young*.

As to Congress's authority to enact § 208, longstanding precedent is clear that the VRA was passed pursuant to Congress's authority under both the Fourteenth and Fifteenth Amendments. *E.g.*, *United States v. Bd. of Comm'rs of Sheffield*, 435 U.S. 110, 126–27 (1978) (noting that the VRA "is designed to implement the Fifteenth Amendment and, in some respects, the Fourteenth Amendment") (citing *Katzenbach v. Morgan*, 384 U.S. 641 (1966) and *South Carolina v. Katzenbach*, 383 U.S. 301 (1966)); *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) (explaining that "measures protecting voting rights are within Congress' power to enforce the Fourteenth and Fifteenth Amendments"). The enactment of § 208 was congruent and proportional to remedy Congress's finding that individuals who require assistance to vote were being denied their full voting rights.

The VRA, including § 208, was "passed pursuant to its Fifteenth Amendment enforcement power" and "validly abrogated state sovereign immunity. The immunity from suit that [the state] and its officials otherwise enjoy in federal court offers it no shield here." *OCA-Greater Houston*, 867 F.3d at 614 (citations omitted).

### E.  Preemption

Having cleared the procedural underbrush, the Court addresses the merits of Plaintiffs' claim: do the challenged provisions of the Arkansas Code conflict with § 208 of the VRA so as to render them preempted and unenforceable? As to the six-voter limit, the answer is yes. As to the requirement that poll workers keep a list of each voter assistor, the answer is no.

The Supremacy Clause of the United States Constitution provides that "the Laws of the United States . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl.

31

2. Accordingly, the Supreme Court has "long recognized that state laws that conflict with federal law are 'without effect.'" *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). This is known as preemption.

A federal statute can explicitly or—as is alleged here—implicitly preempt state law. Implied preemption occurs "where congressional intent to supersede state law may be inferred." *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 780 (8th Cir. 2009). The form of implied preemption implicated here is conflict preemption. "Conflict preemption exists where a party's compliance with both federal and state law would be impossible or where state law would pose an obstacle to the accomplishment of congressional objectives." *Id.* (citing *Whistler Invs., Inc. v. Depository Tr. & Clearing Corp.*, 539 F.3d 1159, 1166 (9th Cir. 2008)). "There is a presumption against preemption in areas of traditional state regulation, [which] is overcome if it was the clear and manifest purpose of [Congress] to supersede state authority." *Wuebker v. Wilbur-Ellis Co.*, 418 F.3d 883, 887 (8th Cir. 2005) (internal quotation marks omitted).

### 3. *The Six-Voter Limit at § 7-5-310(b)(4)(B) is Preempted by § 208*

The six-voter limit in Section 7-5-310(b)(4)(B) of the Arkansas Code conflicts with § 208 of the VRA and is preempted. Under § 208, a voter may select "a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." But, in Arkansas, if the person of a voter's choice had already assisted six voters, the voter could not be assisted by that person, and the voter would not be getting the assistor of their choice.

The six-voter limit is therefore more restrictive than § 208 and makes "compliance with both . . . impossible." *Pet Quarters*, 559 F.3d at 780 (citing *Whistler Invs.*, 539 F.3d

at 1166). If a voter complies with § 208 and selects the assistor of their choice, that assistor could violate Arkansas law and be subject to civil and criminal penalties. The Fifth Circuit, in holding that Texas's limitation on who could serve as a translator similarly conflicted with § 208, explained that "a state cannot restrict this federally guaranteed right by enacting a statute tracking its language, then defining terms more restrictively than as federally defined." *OCA-Greater Houston*, 867 F.3d at 615; *see Disability Rts. N.C v. N.C. State Bd. of Elections*, 2022 WL 2678884, at *5 (E.D.N.C. July 11, 2022) ("The plain language of North Carolina's provisions impermissibly narrows a Section 208 voter's choice of assistant from the federally authorized right to 'a person of the voter's choice' to 'the voter's near relative or verifiable legal guardian.'"). Here, Arkansas essentially adds a new clause to the end of § 208:

> Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union, *so long as that person has assisted fewer than six other voters during the election*.

This addition "impermissibly narrows the right guaranteed by Section 208." *Id.*

The six-voter limit in Section 7-5-310(b)(4)(B) also poses an obstacle to Congress's clear purpose to allow the voter to decide who assists them at the polls. With the exception of the voter's employer or union representative, Congress wrote § 208 to allow voters to choose any assistor they want. The Senate Report explained this broad protection was necessary to prevent discrimination against voters who require assistance because "many such voters may feel apprehensive about casting a ballot in the presence of, or may be misled by, someone other than a person of their own choice." S. Rep. No. 97-417, at 62 (1982). The Supreme Court has "explained that where Congress explicitly

enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Hillman v. Maretta*, 569 U.S. 483, 496 (2013) (cleaned up). Arkansas has determined that voters should only get the assistor of their choice up to a point, but there is no evidence Congress contemplated this numerical restriction on the right provided by § 208.

The State Defendants contend the six-voter limit only presents an obstacle to § 208 in a "far-fetched" and "implausible situation where more than six voters chose one-and-the-same person to be their only trusted assistant." (Doc. 135, p. 25). That scenario is far from "implausible." Take, for example, a family where a teenage child is fluent in English, but her parents, older siblings, and grandparents are not. Those family members may all wish to have the English-speaking child translate their voting materials for them. But some of the family members would be thwarted by the six-voter limit. Or, in a hypothetical based in the facts of this case: Aracelia Gonzalez translated for six voters by the early evening on Election Day 2020. At that point, had a family member, friend, or Arkansas United member who trusted Ms. Gonzalez asked for her help to vote, she would be forced to refuse out of fear of civil and criminal sanctions. A similar scenario could play for voters who require assistance due to blindness or other disability.

The State Defendants further contend the six-voter limit is not preempted because it serves Arkansas's compelling interests in election integrity, fighting voter fraud, and easing burdens on poll workers.[13] The State Defendants fail to cite any authority carving

---

[13] The State Defendants aver that nefarious voter assistors would influence "busloads of people" to vote fraudulently without the six-vote limit in place. (Doc. 135, p. 7). It is unclear why, if the would-be fraudsters were sufficiently motivated to organize busloads of voters to bring to the polls, they could not also bring some confederate assistors along to circumvent the six-voter limit. The State Defendants were also unable to cite any

out an exception to the Supremacy Clause when a state has a compelling interest in enacting a statute that conflicts with federal law. The preemption inquiry is driven by "congressional purpose," not the purpose of the state legislature. *In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Pracs. Litig.*, 621 F.3d 781, 791 (8th Cir. 2010).

The State Defendants also point to the legislative history of § 208. The discussion of § 208 in the Senate Report addresses the issue of state legislation as follows:

> The Committee intends that voter assistance procedures, including measures to assure privacy for the voter and the secrecy of his vote be established in a manner which encourages greater participation in our electoral process. The Committee recognizes the legitimate right of any State to establish necessary election procedures, subject to the overriding principle that such procedures shall be designed to protect the rights of voters.

> State provisions would be preempted only to the extent that they unduly burden the right recognized in this section, with that determination being a practical one dependent upon the facts. Thus, for example, a procedure could not deny the assistance at some stages of the voting process during which assistance was needed, nor could it provide that a person could be denied assistance solely because he could read or write his own name.

> By including the blind, disabled, and persons unable to read or write under this provision, the Committee does not require that each group of individuals be treated identically for purposes of voter assistance procedures. States, for example, might have reason to authorize different kinds of assistance for the blind as opposed to the illiterate. The Committee has simply concluded that, at the least, members of each group are entitled to assistance from a person of their own choice.

S. Rep. No. 97-417, at 62–63 (1982).

The State Defendants latch onto this "undue burden" language and argue the right to choose an assistor protected by § 208 does not extend to *any* person of the voter's

---

instances of voter fraud related to translation assistance. Regardless, because the State's "compelling interests" are not the focus of the preemption inquiry, these issues are immaterial to the Court's analysis.

choosing—the state may place additional restrictions on the choice of assistor so long as the restrictions are not an undue burden.[14]

The language of the Senate Report suggests that some state legislation on the topic of voter assistance is permissible but does not extend as far at the State Defendants suggest. Directly after recognizing that states may legislate in this area, the Senate Report states that "at the least, members of each group are entitled to assistance from a person of their own choice." *Id.* at 63. In other words, the one thing states cannot do is disallow voters the assistor of their choice—precisely what the six-voter limit does.

The State Defendants argue this is an absurd result because a voter's unfettered discretion in choosing their assistor would allow them to select even an incarcerated person. But a common-sense reading of § 208 suggests that any assistor chosen by a voter must be *willing* and *able* to assist. If a chosen person declines to assist the voter or simply does not show up at the polling place, that person has not violated § 208. And an incarcerated person would not be able assist at the polling place for reasons that are completely unrelated to Arkansas's elections laws.

The State Defendants further argue the six-voter limit is not an undue burden because it "did not prevent Reith or Arkansas United from assisting *any* identifiable person." (Doc. 149, p. 9). This argument is immaterial because Plaintiffs' contend—and the Court agrees—that the six-voter limit *facially* conflicts with § 208. This argument also misstates the facts—Ms. Gonzalez reached the six-voter limit on Election Day and

---

[14] The State Defendants point to *Ray v. Texas*, where the district court found that "Section 208 allows the voter to choose a person who will assist the voter, but it does not grant the voter the right to make that choice without limitation." 2008 WL 3457021, at *7 (E.D. Tex. Aug. 7, 2008). However, *Ray* pre-dates *OCA-Greater Houston*, where the Fifth Circuit adopted a broader view of § 208's protections.

therefore *could not* assist any additional voters. The record is clear that there were LEP voters that Ms. Gonzalez could have assisted absent the six-voter limit.

Having found the six-voter limit impermissibly conflicts with federal law, the Court necessarily finds that the criminal provisions at Arkansas Code Arkansas Code § 7-1-103(a)(19)(C) and (b)(1), which make it a Class A misdemeanor to assist a voter "except as provided in § 7-5-310," are similarly preempted to the extent they are used to enforce criminal penalties against any person assisting more than six voters.

### 4.  The Tracking Requirement at § 7-5-310(b)(5) is Not Preempted by § 208

While the six-voter limit is preempted by § 208 of the VRA, the same is not true of Arkansas's corresponding assistor-tracking provision. Section 7-5-310(b)(5) of the Arkansas Code provides: "It shall be the duty of the poll workers at the polling site to make and maintain a list of the names and addresses of all persons assisting voters." Unlike the six-voter limit, this tracking requirement does not prevent any voter from selecting the assistor of their choice. Therefore, while the tracking requirement addresses the same topic as § 208, the two statutes can "operate harmoniously." *Craig v. Simon*, 978 F.3d 1043, 1049 (8th Cir. 2020) (quoting *Gonzalez v. Arizona*, 677 F.3d 383, 398 (9th Cir. 2012)). The tracking requirement is the type of permissible state legislation contemplated by the legislative history to § 208.

### V.  CONCLUSION

For the reasons stated, the County and State Defendants' Motions for Summary Judgment (Docs. 131 & 134) are **DENIED**, and Plaintiffs' Motion for Summary Judgment (Doc. 137) is **GRANTED IN PART AND DENIED IN PART**.

The six-voter limit at § 7-5-310(b)(4)(B) of the Arkansas Code is **DECLARED** to be preempted by § 208 of the VRA. Sections 7-1-103(a)(19)(C) and 7-1-103(b)(1) of the Arkansas Code are also **DECLARED** to be preempted by § 208 to the extent they are used to enforce criminal penalties for violations of § 7-5-310(b)(4)(B). The Court hereby **PERMANENTLY ENJOINS** the State and County Defendants, their employees, agents, and successors in office, and all persons acting in concert with them, from enforcing § 7-5-310(b)(4)(B), or otherwise engaging in any practice that limits the right secured by § 208 of the Voting Rights Act based on the number of voters any individual has assisted, and from enforcing §§ 7-1-103(a)(19)(C) and 7-1-103(b)(1) to the extent they are used to enforce criminal penalties for violations of § 7-5-310(b)(4)(B). The State and County Defendants are **ORDERED** to inform their staff to cease enforcement of § 7-5-310(b)(4)(B) in advance of the 2022 General Election. The State and County Defendants are **FURTHER ORDERED** to use an updated Assisted Voter Card in all future elections that removes any reference to the six-voter limit at § 7-5-310(b)(4)(B). In all future elections after the 2022 General Election, Defendants are **ORDERED** to update all trainings, manuals, websites, and any materials given to voters or voter assistors to remove any reference to the six-voter limit at § 7-5-310(b)(4)(B).[15]

---

[15] The Court recognizes Defendants may have already produced training materials and/or conducted trainings in advance of the 2022 General Election. Mindful that federal courts must be cautious in burdening state election officials in the run-up to an election, *see Purcell v. Gonzalez*, 549 U.S. 1 (2006), the Court does not expect Defendants to conduct updated trainings or produce an updated training manual before the 2022 General Election (although they may certainly choose to do so). For the 2022 General Election, Defendants must simply inform their employees and volunteers to not enforce the six-voter limit and update the text on the Assisted Voter Card. Because the six-voter limit is not a voter-facing policy and its primary front-end enforcement mechanisms are the tracking requirement—which may stay in place—and the text on the Assisted Voter Card,

Judgment will enter contemporaneously with this opinion.

**IT IS SO ORDERED** on this 19th day of August, 2022.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

---

the Court finds no cause for concern that election officials or voters will be confused by the Court's enjoinment of the six-voter limit.

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**ARKANSAS UNITED**
**and L. MIREYA REITH**                                                                                   **PLAINTIFFS**

**V.**                                                           **CASE NO. 5:20-CV-5193**

**JOHN THURSTON, in his official capacity
as the Secretary of State of Arkansas;
SHARON BROOKS, BILENDA HARRIS-RITTER,
WILLIAM LUTHER, CHARLES ROBERTS,
JAMES SHARP, and J. HARMON SMITH,
in their official capacities as members
of the Arkansas State Board of Election Commissioners;
RENEE OELSCHLAEGER, BILL ACKERMAN,
MAX DEITCHLER, and JENNIFER PRICE,
in their official capacities as members
of the Washington County Election Commission;
RUSSELL ANZALONE, ROBBYN TUMEY,
and HARLAN STEE, in their official capacities as members
of the Benton County Election Commission;
DAVID DAMRON, LUIS ANDRADE, and LEE WEBB,
in their official capacities as members of the Sebastian
County Election Commission; and MEGHAN HASSLER, in
her official capacity as Election Coordinator for the
Sebastian County Election Commission**                          **DEFENDANTS**

<u>**JUDGMENT**</u>

        For the reasons set forth in the Court's Memorandum Opinion and Order filed

today, **IT IS HEREBY ORDERED AND ADJUDGED AS FOLLOWS:**

1.  The six-voter limit at § 7-5-310(b)(4)(B) of the Arkansas Code is **DECLARED** to

    be preempted by § 208 of the VRA. Sections 7-1-103(a)(19)(C) and 7-1-103(b)(1)

    of the Arkansas Code are also **DECLARED** to be preempted by § 208 to the extent

    they are used to enforce criminal penalties for violations of § 7-5-310(b)(4)(B).

1

2. The Court hereby **PERMANENTLY ENJOINS** all Defendants, their employees, agents, and successors in office, and all persons acting in concert with them, from enforcing § 7-5-310(b)(4)(B), or otherwise engaging in any practice that limits the right secured by § 208 of the Voting Rights Act based on the number of voters any individual has assisted, and from enforcing §§ 7-1-103(a)(19)(C) and 7-1-103(b)(1) to the extent they are used to enforce criminal penalties for violations of § 7-5-310(b)(4)(B).

3. The State and County Defendants are **ORDERED** to inform their staff to cease enforcement of § 7-5-310(b)(4)(B) in advance of the 2022 General Election. The State and County Defendants are **FURTHER ORDERED** to use an updated Assisted Voter Card in all future elections that removes any reference to the six-voter limit at § 7-5-310(b)(4)(B). In all future elections after the 2022 General Election, Defendants are **ORDERED** to update all trainings, manuals, websites, and any materials given to voters or voter assistors to remove any reference to the six-voter limit at § 7-5-310(b)(4)(B).

4. Plaintiffs have 14 days from today to file a motion for attorneys' fees.

**IT IS SO ORDERED** on this 19th day of August, 2022.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**ARKANSAS UNITED**
**and L. MIREYA REITH**                                                                 **PLAINTIFFS**

**V.**                                        **CASE NO. 5:20-CV-5193**

**JOHN THURSTON, in his official capacity**
**as the Secretary of State of Arkansas;**
**SHARON BROOKS, BILENDA HARRIS-RITTER,**
**WILLIAM LUTHER, CHARLES ROBERTS,**
**JAMES SHARP, and J. HARMON SMITH,**
**in their official capacities as members**
**of the Arkansas State Board of Election Commissioners;**
**RENEE OELSCHLAEGER, BILL ACKERMAN,**
**MAX DEITCHLER, and JENNIFER PRICE,**
**in their official capacities as members**
**of the Washington County Election Commission;**
**RUSSELL ANZALONE, ROBBYN TUMEY,**
**and HARLAN STEE, in their official capacities as members**
**of the Benton County Election Commission;**
**DAVID DAMRON, LUIS ANDRADE, and LEE WEBB,**
**in their official capacities as members of the Sebastian**
**County Election Commission; and MEGHAN HASSLER, in**
**her official capacity as Election Coordinator for the**
**Sebastian County Election Commission**                          **DEFENDANTS**

**AMENDED[1] MEMORANDUM OPINION AND ORDER**

---

[1] The Court has amended Part V of this opinion for the reasons stated in the Court's order issued on September 7, 2022, granting the State Defendants' Motion to Clarify.

# TABLE OF CONTENTS

I.     **INTRODUCTION** ................................................................................................ 3

II.    **BACKGROUND** ................................................................................................ 4

    A.   Section 208 of the Voting Rights Act .................................................... 4

    B.   The Challenged Arkansas Statutes ...................................................... 6

    C.   Arkansas United and the 2020 Election ............................................... 8

    D.   Procedural History ............................................................................12

III.   **LEGAL STANDARD**..........................................................................................13

IV.  **DISCUSSION** ................................................................................................14

    A.   Section 208's Protections Extend to Limited-English Proficient Voters ...............14

    B.   Plaintiffs have Standing.......................................................................16

        1.   Arkansas United Suffered an Injury-in-Fact....................................18

        2.   Arkansas United has shown Causation and Redressability ...........................25

    C.   This Dispute is Ripe ............................................................................26

    D.   Sovereign Immunity Does Not Bar Plaintiffs' Suit...............................29

    E.   Preemption ........................................................................................31

        3.   The Six-Voter Limit at § 7-5-310(b)(4)(B) is Preempted by § 208 ..................32

        4.   The Tracking Requirement at § 7-5-310(b)(5) is Not Preempted by § 208 .....37

V.    **CONCLUSION**....................................................................................................37

## I.   INTRODUCTION

This is a voting rights lawsuit filed by Plaintiffs Arkansas United and L. Mireya Reith against Arkansas Secretary of State John Thurston and the Arkansas State Board of Election Commissioners ("the State Defendants") and the Benton, Sebastian, and Washington County Election Commission members, along with Sebastian County's Election Coordinator ("the County Defendants"). Defendants are all sued in their official capacities. Plaintiffs allege an Arkansas statute that forbids individuals from assisting more than six voters in casting their ballot violates Section 208 of the Voting Rights Act (VRA), a provision of federal law that allows voters who require assistance due to an inability to read or write to have the assistor of the voter's choice.

The parties agree there are no disputes as to the material facts and each move for summary judgment.[2] Plaintiffs argue § 208 of the VRA preempts the challenged provisions of the Arkansas Code as a matter of law, and therefore those provisions must be declared to violate the Supremacy Clause of the United States Constitution and permanently enjoined.[3] The State Defendants argue Plaintiffs lack Article III standing, the State Defendants are immune from suit, § 208 of the VRA does not extend to limited-English proficient (LEP) voters, and, even if it does, the six-voter limit does not conflict

---

[2] The Court terminated the bench trial set for November 15, 2021.

[3] The Court considered Plaintiffs' Motion for Summary Judgment (Doc. 137), Brief and Statement of Facts in support of the Motion (Docs. 138 & 139), the State Defendants' Brief and Statement of Facts in response (Docs. 149 & 150), the County Defendants' Brief and Statement of Facts in response (Docs. 151 & 152), and Plaintiffs' Replies (Docs. 161 & 162).

3

with § 208 of the VRA.[4] The County Defendants argue all claims against them must be dismissed on ripeness grounds.[5]

The Court finds that § 208 of the VRA covers LEP voters, Plaintiffs have standing to challenge Arkansas's voting restrictions, this case is ripe for review, and the State Defendants are not protected from suit by sovereign immunity. The Court further finds § 208 of the VRA preempts the six-voter limit found at § 7-5-310(b)(4)(B) of the Arkansas Code but does not preempt the assistor-tracking requirement at § 7-5-310(b)(5). Accordingly, and for the reasons stated more fully below, Plaintiffs' Motion for Summary Judgment (Doc. 137) is **GRANTED IN PART AND DENIED IN PART**, and the County and State Defendants' Motions for Summary Judgment (Docs. 131 & 134) are **DENIED**. Plaintiffs are entitled to relief as ordered in Part V of this opinion.

## II.  BACKGROUND

The Court begins with an explanation of the federal and state statutes involved in this case before turning to Plaintiffs' efforts to provide translation assistance to LEP voters during the 2020 General Election.

### A.  Section 208 of the Voting Rights Act

"Congress enacted the Voting Rights Act of 1965 for the broad remedial purpose of ridding the country of racial discrimination in voting." *Chisom v. Roemer*, 501 U.S. 380,

---

[4] The Court considered the State Defendants' Motion for Summary Judgment (Doc. 134), Brief and Statement of Facts in support of the Motion (Docs. 135 & 136), Plaintiffs' Brief and Statement of Facts in response (Docs. 146 & 147), Plaintiffs' Appendix (Doc. 148), and the State Defendants' Reply (Doc. 155).

[5] The Court considered the County Defendants' Motion for Summary Judgment (Doc. 131), Brief and Statement of Facts in support of the Motion (Docs. 132 & 133), and Plaintiffs' Brief and Statement of Facts in response (Docs. 144 & 145).

403 (1991) (cleaned up). The VRA contains several different provisions meant to fulfill this remedial purpose. Section 2 of the VRA forbids any state or political subdivision from implementing voting practices that result in the denial or abridgment of the right of any citizen to vote on account of race or color. Section 3 sets forth judicial remedies to be used by a court when the Attorney General or an aggrieved person institutes a proceeding to enforce the voting guarantees of the Fourteenth or Fifteenth Amendments. Section 4 forbids the adoption of any test or device to deny or abridge the right to vote on the basis of race or color in certain jurisdictions, and § 5 requires those jurisdictions to obtain clearance from the Department of Justice before changing any voting practice.[6]

In 1975, Congress amended the VRA to add § 203, which requires certain jurisdictions to provide translated voting materials. A jurisdiction is covered by § 203 if more than five percent of its voting-age citizens (or 10,000 of its voting-age citizens) are members of a designated language minority group and are "limited-English proficient" and "the illiteracy rate of the citizens in the language minority as a group is higher than the national illiteracy rate." 52 U.S.C. § 10503(b)(2)(A)(i). No jurisdiction in Arkansas is covered by § 203, and therefore no jurisdiction in Arkansas is required to provide translated voting materials.

The VRA provision at issue in this case, § 208, codified at 52 U.S.C. § 10508, was added when Congress reauthorized the VRA in 1982. The provision reads: "Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's

---

[6] The jurisdiction designations in § 4 ("the coverage formula") were found unconstitutional in *Shelby County v. Holder*, 570 U.S. 529, 557 (2013), crippling § 5's preclearance regime.

employer or agent of that employer or officer or agent of the voter's union." Unlike § 203, § 208 applies nationwide.

In enacting § 208, the Report of the Senate Judiciary Committee found that "[c]ertain discrete groups of citizens are unable to exercise their rights to vote without obtaining assistance in voting including aid within the voting booth" and "many such voters may feel apprehensive about casting a ballot in the presence of, or may be misled by, someone other than a person of their own choice." S. Rep. No. 97-417, at 62 (1982). The Senate Report explained that § 208 was necessary "to limit the risks of discrimination against voters in these specified groups and avoid denial or infringement of their right to vote." *Id.*

### B.  The Challenged Arkansas Statutes

Plaintiffs argue § 208 preempts §§ 7-5-310(b)(4)(B), 7-5-310(b)(5), 7-1-103(a)(19), and 7-1-103(b)(1) of the Arkansas Code.

Arkansas Code § 7-5-310 sets out Arkansas's rules related to privacy and voter assistance at polling places. Arkansas Code § 7-5-310(b)(4)(A)(i)—which has not been challenged—provides that a voter may be assisted by a person of his or her choice. Added in 2009, § 7-5-310(b)(4)(B) adds the restriction that "[n]o person other than [poll workers] shall assist more than six (6) voters in marking and casting a ballot at an election." Section 7-5-310(b)(5) further provides that "[i]t shall be the duty of the poll workers at the polling site to make and maintain a list of the names and addresses of all persons assisting voters."

To enforce these provisions, § 7-1-103(a)(19)(C) provides that a person who assists a voter "in marking and casting the voter's ballot except as provided in § 7-5-310"

6

may be subject to criminal penalties. Section 7-1-103(b)(1) makes such a violation a Class A misdemeanor.

According to the State Defendants, the purpose of the six-voter limit is to prevent assistors from unduly influencing voters' decisions in the voting booth. *See* Doc. 135, p. 7. In the State Defendants' view, absent the six-voter limit, "busloads of people" could come to the polls and be fraudulently assisted by the same individual. *Id.*

The State Board of Election Commissioners is charged with civil enforcement authority for the State's election laws, including the six-voter limit. The Board's enforcement process is primarily driven by a complaint system. If a complaint facially alleges a state election law violation, the Board investigates the claim and either dismisses the complaint, orders a sanction—a warning letter or fine—or refers the violation to the prosecutor's office for criminal prosecution. *See* Doc. 139-14, pp. 149, 153. During the 2018 election, the Board found probable cause that two individuals had violated the six-voter limit. In the case of Carlon Henderson, he admitted to assisting eight voters, and he agreed to settle the claim against him by accepting a Letter of Caution from the Board. Had Mr. Henderson not agreed to the settlement, he could have faced fines and possible referral for criminal prosecution.

The Board conducts statewide trainings for county election authorities. These trainings include instruction on how to implement the six-voter limit and how to track each voter assistor. The Board also issues a procedure manual for use by county election authorities that covers the same material.

The County Defendants are required by statute to "[e]nsure compliance with all legal requirements relating to the conduct of elections" and "[e]xercise [their] duties

consistent with the training and materials provided by the State Board of Election Commissioners." Ark. Code Ann. §§ 7-4-107(a)(1)–(2). To comply with the six-voter limit and the assistor-tracking requirement, the County Defendants instruct poll workers to keep a list of all voters assisted and the person who assisted them. Each assistor fills out an Assisted Voter Card for each voter they help, filling in their own name and address and the name of the voter they assisted. The card specifies that all persons, other than a poll worker or county clerk, may assist no more than six voters during an election. *See, e.g.*, Doc. 148-16. The County Defendants have authority to report any suspected violations of the six-voter limit to either the Board or a prosecutor for criminal enforcement.

### C.  Arkansas United and the 2020 Election

Plaintiffs are Arkansas United, a non-profit organization located in Springdale, Arkansas, and L. Mireya Reith, the founder and executive director of the organization. Founded in 2010, Arkansas United advocates for immigrant populations in the state. Part of the organization's mission is "to ensure that immigrants in Arkansas have the information and resources they need to become full participants in the state's economic, political and social life." (Doc. 4-1, ¶ 2). Arkansas United is funded by grants, donations, and approximately 600 members who pay dues to support the organization's mission. Among other services, the organization assists LEP voters, including both organization members and nonmembers, to translate their ballots at polling places. *See* Doc. 4-1, ¶ 14.[7]

---

[7] The State Defendants contend the only services Arkansas United offers to its members—as opposed to nonmembers—are immigration-related and meant for noncitizens who cannot vote. *See* Doc. 150, p. 7. This misconstrues the deposition testimony and fails to create a genuine dispute of fact. Ms. Reith was asked if "there are any services that are extended to members that are not extended to nonmembers," and

Arkansas United also undertakes non-partisan, get-out-the-vote efforts within the immigrant community. These efforts include phone banking, text messaging, door-to-door canvassing, and providing car rides to the polls. From September 2020 until Election Day, November 3, 2020, Arkansas United staff and volunteers primarily focused on phone banking and answering calls to the organization's Spanish-language hotline to educate voters and encourage participation in the election. Arkansas United received a grant to perform its phone banking. The terms of that grant required Arkansas United to make 115,563 dials in Arkansas from September 1, 2020, through Election Day. Arkansas United receives no outside funding for the interpretation services it offers to voters.

In advance of the 2020 election, Arkansas United trained all its staff and volunteers—16 in total—to assist LEP voters at the polls. The organization's staff at the time included executive director Ms. Reith, legal coordinator Sohary Fonseca, civic engagement coordinator Celina Reyes, and fellow Aracelia Gonzalez.[8]

---

she responded that the organization's legal services are for members but that it grants exceptions to assist nonmembers as well. (Doc. 134-1, pp. 76–77). This does not imply that legal services are the *only* services offered to members, as the State Defendants suggest. It is undisputed that Arkansas United offers both members and nonmembers many services beyond immigration law, including voter outreach and assistance.

The State Defendants go on to suggest—apparently because Arkansas United serves immigrant and minority populations—that all of the organization's 600 dues-paying members must be "noncitizens who are ineligible to vote." (Doc. 155, p. 3). This is a baseless argument completely contradicted by the record.

[8] The State Defendants' briefing asks the Court to not consider Ms. Gonzalez and Ms. Fonseca's declarations (Docs. 139-22 & 139-23) for the reasons stated in the State Defendants' response in opposition (Doc. 141) to Plaintiffs' Motion for Leave to File Out of Time (Doc. 140). After summary-judgment briefing was complete, the Court granted Plaintiffs' Motion for Leave to File Out of Time and declined to strike the two declarations. *See* Doc. 163. Any late disclosure of the declarations was harmless.

In October 2020, Ms. Reith met with her staff and explained that each staff member could assist only six voters per election. Given this limit and anticipating high demand for translation assistance, Arkansas United recruited volunteers specifically to assist voters during the 2020 election. *See* 139-20, ¶ 5; 139-22, ¶ 18. Because of the six-voter limit, the organization determined it would need to deploy additional staff and volunteers for this purpose. Arkansas United also encouraged voters to find alternative assistors, in the form of friends and family, because, given the six-voter limit, the organization would not have the capacity to help every voter who asked for its assistance. *See* 139-20, ¶ 5. Ms. Fonseca used a form to track the number of voters each staff member or volunteer helped to ensure compliance with the six-voter limit.

Some voters requested Arkansas United's interpretation assistance during early voting in the 2020 general election. For example, Ms. Reyes called Susana Terrazas, a registered voter in Springdale, to ask if she and her husband were planning on voting. *See* Doc. 148-6, pp. 4–5. Ms. Terrazas said yes. A few days later, Ms. Terrazas called Ms. Reyes back to ask for help. Ms. Terrazas and her husband had decided they would need help understanding their ballots because, while Ms. Terrazas reads and speaks some English, she is not fluent. Ms. Reyes met Ms. Terrazas and her husband at the polling place, where she translated portions of the ballot from English to Spanish to aid the couple. *See* Doc. 148-7. At least two other voters contacted Arkansas United for translation assistance during early voting. Ms. Gonzalez met them at their respective polling places to assist them.

On Election Day, six Arkansas United staff members and volunteers were phone banking at the organization's office in downtown Springdale. That morning, a poll worker

from the Springdale Civic Center came to the office to ask if the organization could send staff to the Civic Center polling place to assist LEP voters. While there were some bilingual poll workers at the site, there were not enough to keep up with the demand for translation assistance.

Ms. Reith obliged and instructed Ms. Fonseca and Ms. Gonzalez to alternate in shifts at the Civic Center. Ms. Fonseca assisted four voters with translating and understanding their ballot.  For each voter she helped, she filled out an Assisted Voter Card and gave it to a poll worker. In the late afternoon, Ms. Fonseca returned to the office to continue phone banking.

Ms. Gonzalez had originally planned to phone bank all day at the Arkansas United office. Instead, she phone banked for four hours and then went to the Civic Center. Upon arrival, Ms. Gonzalez quickly assisted two voters with translation services. Because Ms. Gonzalez had already assisted two other voters during early voting, she had now helped a total of four voters. Once an Arkansas United staff member or volunteer assisted four voters—and thus were approaching the six-voter limit—the organization instructed them to ask another staff member or volunteer to prepare to takeover for them. *See* Doc. 139-22, ¶ 21. The volunteers recruited by the organization prior to election day were not able to help after all, and Ms. Gonzalez scrambled to find friends and relatives to fill in. *See id.* at ¶ 18. Her sister Margarita Gonzalez and Margarita's friend, Melissa Hernandez, agreed to come assist voters at the Civic Center.

By the time Margarita and Melissa arrived, Ms. Gonzalez had hit the six-voter limit. For each voter she helped, she filled out an Assisted Voter Card and gave it to a poll

worker. Because she could no longer assist voters, she returned to the Arkansas United offices to continue phone banking.

That evening, Ms. Fonseca received a call that an Arkansas United volunteer had assisted four voters and more help was needed. Ms. Fonseca returned to the Civic Center to assist one additional voter, bringing her total to five. Margarita Gonzalez assisted five voters and Melissa Hernandez assisted four. Another Arkansas United volunteer, Jamie Cascante, assisted one voter at the Civic Center on Election Day.

In total, then, Arkansas United's staff and volunteers assisted at least 21 voters during the 2020 election. The majority of voters were assisted in Washington County. A few were assisted in Benton and Sebastian Counties.

The organization ultimately fell well short of its phone-banking goals. The organization completed only 76,166 dials of the 115,563 dials required by the terms of its grant. Arkansas United contends that many more calls would have been completed had it not had to divert resources to ensure its voter assistance program complied with the six-voter limit.

### D.  Procedural History

Plaintiffs first filed the original complaint in this matter and a motion for temporary restraining order on the night before Election Day in 2020. The Court denied that motion on Election Day. *See* Doc. 35. While the Court found Plaintiffs demonstrated a likelihood of success on the merits, the balance of the equities weighed strongly against modifying an election rule halfway through Election Day.

Sebastian County, Benton County, and the State Defendants then filed motions to dismiss the Amended Complaint based on inadequate service of process, failure to state

a claim, sovereign immunity, standing, laches, and lack of indispensable parties. The Court denied those motions. *See* Doc. 102.

The Court now turns to issues raised by the cross-motions for summary judgment. The State and County Defendants argue Plaintiffs have failed to show this is a justiciable dispute under Article III's standing and ripeness requirements. The State Defendants also reassert their argument that sovereign immunity bars any suit against them. Plaintiffs seek summary judgment on the merits and ask the Court to declare that the challenged sections of the Arkansas Code are preempted by § 208 of the VRA and violate the Supremacy Clause of the United States Constitution; enjoin all Defendants from implementing or enforcing the challenged laws; and require Defendants to implement a remedial plan to ensure future compliance with § 208 of the VRA.

### III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l. Bank of Commerce v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir. 1999).

"Where the parties file cross-motions for summary judgment," as the parties do here, the Court "view[s] each motion separately, drawing all inferences in favor of the nonmoving party." *Shea v. Millett*, 36 F.4th 1, 6 (1st Cir. 2022) (quoting *Fadili v. Deutsche Bank Nat'l Tr. Co.*, 772 F.3d 951, 953 (1st Cir. 2014)).

## IV. DISCUSSION

### A.  Section 208's Protections Extend to Limited-English Proficient Voters

As a preliminary matter, the Court reiterates its prior finding that the voter-assistance protections in § 208 extend to voters with limited-English proficiency. *See* Doc. 102, pp. 10–12.

The plain language of § 208 compels this interpretation. Section 208 provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508. The text does not require the voter's "inability to read or write" be based on a disability rather than lack of education. The plain text encompasses anyone who cannot read or write the language the voting materials are written in. This squarely includes LEP voters, who lack the ability to read their ballot because they cannot read the English language.

The State Defendants' argument that § 208 only protects blind, disabled, and *illiterate* voters is unpersuasive. Even under this reading of the statute, voters who are "literate in the Spanish language but illiterate in English," *Cardona v. Power*, 384 U.S. 672, 675 (1966) (Douglas, J., dissenting), would nevertheless be covered by § 208, at least in a state, like Arkansas, that provides no Spanish-language voting materials.

September 9 2022 USCA8 83

The purpose of § 208 and its legislative history confirm the statute's plain language. *Cf. Wooden v. United States*, 142 S. Ct. 1063, 1072 (2022) (using "[s]tatutory history and purpose to confirm [the Court's] view of [a statute's] meaning"). Congress enacted § 208 to ensure those who required assistance to exercise their right to vote received the assistor of their choice. It would belie this purpose to exclude LEP voters— who cannot "read or write" the language the voting materials are printed in—from the statute's protections. The Senate Report that discussed the addition of § 208 to the VRA recognized that "[c]ertain discrete groups of citizens are unable to exercise their rights to vote without obtaining assistance." S. Rep. No. 97-417, at 62 (1982). It defined these groups as including "those who either do not have a written language or who are unable to read or write sufficiently well to understand the election material and the ballot." *Id.* The Senate Report also described an exception to § 208's employer limitation for "voters who must select assistance in a small community composed largely of language minorities," where voters may have limited options for translation assistance. *Id.* at 64. Congress clearly contemplated that § 208's protections would reach LEP voters.

The Department of Justice has consistently interpreted § 208 the same way, having entered into judicially-enforced consent decrees with jurisdictions that failed to extend § 208's protections to non-English speakers.[9] So have courts, which consistently

---

[9] *See* Consent Decree, Judgment, and Order, *United States v. Fort Bend Cnty.*, No. 4:09-cv-01058 (S.D. Tex. Apr. 13, 2009) (requiring county to allow Spanish-speaking voters with limited English proficiency to be assisted by the person of their choice pursuant to § 208); Memorandum of Agreement, *United States v. Kane Cnty.*, No. 07 C 5451 (N.D. Ill. Nov. 7, 2007) (same); Consent Decree, Judgment, and Order, *United States v. Brazos Cnty.*, No. H-06-2165 (S.D. Tex. June 29, 2006) (same); Consent Decree, *United States v. Orange Cnty.*, No. 6:02-cv-737-ORL-22JGG (M.D. Fla. Oct. 8, 2002) (same); Settlement Agreement, *United States v. City of Philadelphia*, No. 2:06cv4592 (E.D. Pa. June 4, 2007) (requiring city to allow limited-English-proficient Spanish-speaking voters

uphold challenges to state laws by individuals and organizations asserting that § 208 extends to LEP voters. The Fifth Circuit in *OCA-Greater Houston v. Texas* affirmed the district court's grant of summary judgment in favor of plaintiffs alleging § 208 preempted a Texas law that set certain minimum requirements for who could serve as an interpreter at the polls. 867 F.3d 604, 616 (5th Cir. 2017); *see also Priorities USA v. Nessel*, 462 F. Supp. 3d 792, 816 (E.D. Mich. 2020) (finding the plaintiffs adequately pleaded their claim that § 208 preempted a state law placing additional restrictions on who could assist LEP voters); *Nick v. Bethel*, 2008 WL 11456134 (D. Alaska Jul. 30, 2008) (granting preliminary injunction based on a finding that plaintiffs had demonstrated a likelihood of success on their claim that the state violated § 208 when it prevented Alaska Native Yup'ik-speaking voters from having assistance from a person of their choosing); *United States v. Berks Cnty.*, 277 F. Supp. 2d 570 (E.D. Pa. 2003) (holding that denying Spanish-speaking voters assistance by a person of their choice violated § 208).

The text of § 208 is clear that LEP voters receive its protections, and Defendants have failed to identify any authorities to the contrary.

## B. Plaintiffs have Standing

Under Article III of the United States Constitution, federal courts can only decide actual "Cases" and "Controversies" between two or more parties—the validity of a statute cannot be decided in the abstract. U.S. Const. art. III, § 2, cl. 1. Therefore, to have standing to sue, a plaintiff must show "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of

---

to be assisted by the person of their choice pursuant to § 208); Revised Agreed Settlement Order, *United States v. City of Springfield*, No. 06-301-23-MAP (D. Mass. Sept. 15, 2006) (same).

issues upon which [federal courts] so largely depend[] for illumination of difficult . . . questions." *Baker v. Carr*, 369 U.S. 186, 204 (1962).

At the motion-to-dismiss stage, the Court found Plaintiffs had adequately alleged Article III standing in their Amended Complaint. Now, with discovery complete and the undisputed evidence before it, the Court confirms that Plaintiffs have standing to challenge the six-voter limit and associated statutory provisions.

A plaintiff organization may establish standing in two ways: organizational standing and associational standing.[10] An entity may assert organizational standing when a challenged action or statute directly injures the entity's interests. In such a case, the court "conduct[s] the same inquiry as in the case of an individual," *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982), and the entity must "establish (1) an injury in fact; (2) a causal connection between the injury and the challenged law; and (3) that a favorable decision is likely to redress their injury," *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 749 (8th Cir. 2019) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

An entity that is not directly injured may nevertheless assert associational standing on behalf of its injured members. *See Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.*, 813 F.3d 1124, 1128 (8th Cir. 2016). To establish associational standing, the entity must show: (1) its members would have standing to sue in their own right; (2) the suit seeks to protect interests germane to the organization's purpose; and (3) neither the claim

---

[10] The Court focuses its standing inquiry on Arkansas United, rather than Ms. Reith, because in a multi-plaintiff suit, only one plaintiff need satisfy the constitutional standing requirements. *See Horne v. Flores*, 557 U.S. 433, 446–47 (2009).

September 9 2022 USCA8 86

asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

The State Defendants argue Plaintiffs lack standing because Plaintiffs are not "aggrieved persons" under the VRA, cannot assert the rights of unknown third-party voters, fail to state a resource-diversion injury, and fail to show associational standing.[11] Plaintiffs respond that they have established both organizational standing—"as an entity 'directly' affected by the challenged voter-assistance restrictions"—and associational standing because its members are voters injured by the challenged statutes. (Doc. 146, p. 13). The Court finds Arkansas United has established organizational standing and, therefore, does not address associational standing.

### 1. *Arkansas United Suffered an Injury-in-Fact*

An injury-in-fact is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and quotation marks omitted). An organization may establish injury-in-fact by showing it had to divert some of the organization's resources to counteract the challenged

---

[11] In a footnote, the State Defendants also point out that the six-voter limit applies only to individuals who "*assist* more than six (6) voters in *marking* and *casting* a ballot," § 7-5-310 (b)(4)(B) (emphasis added), and Ms. Reith testified that her staff does not physically mark or cast ballots for voters when they translate ballot language for voters. (Doc. 135, p. 8 n.6). However, the State Defendants have not argued this case is moot because translation is not considered assistance under Arkansas law. In fact, the deposition testimony of the state election officials indicated the six-voter limit applies to translation assistance, and there is no dispute that Arkansas United's staff and volunteers were required to complete Assisted Voter Cards—which state that assistors are subject to the six-voter limit—for providing translation assistance. *See* Docs. 148-8, pp. 106–108; 139-21, p. 17; 148-16. The Court also observes that the plain meaning of "assist[ing]" a voter to "mark[]" their ballot would seem to include translation services. The Court is satisfied that the six-voter limit applies to translation assistance and have been so interpreted and enforced by state and county officials. Therefore, a live controversy exists between the parties.

law. In *Havens Realty*, the Supreme Court held that an organization fighting racial discrimination in housing had standing to challenge a realty company's allegedly discriminatory practices under the Fair Housing Act (FHA). 455 U.S. at 379. The organization alleged the realty company's practices caused it to "to devote significant resources to identify and counteract" those practices. *Id.* The Court found the plaintiffs adequately alleged a resource drain that "perceptibly impaired [the organization's] ability to provide counseling and referral services for low-and moderate-income homeseekers," and, if proved, would constitute a "concrete and demonstrable injury to the organization's activities." *Id.*

In *OCA-Greater Houston*, the Fifth Circuit found organizational standing in a case similar to the one at bar. There, a voting rights organization challenged a Texas law that set certain requirements for who could serve as an interpreter in the voting booth. The court found the challenged law forced the plaintiff organization to "calibrate[] its outreach efforts to spend extra time and money educating its members about the[] Texas provisions and how to avoid their negative effects." *OCA-Greater Houston*, 867 F.3d at 610. For example, the plaintiff's employees and volunteers had to "spend more time on each call (and reach fewer people in the same amount of time)" to explain the requirements of Texas's law to voters. *Id.* This diversion of resources created an injury-in-fact for organizational standing.

The undisputed evidence shows Arkansas United similarly suffered a resource-diversion injury during the 2020 election. The six-voter limit caused Arkansas United to spend time recruiting volunteers to serve as voter assistors. *See* 139-20, ¶ 5; 139-22, ¶ 18. On Election Day, Arkansas United's staff had to spend time coordinating and

19

tracking their voter assistance efforts and traveling back and forth from their office to the Springdale Civic Center. *See* Docs. 148-11, ¶ 11; 148-13, ¶¶ 21, 26, 28; 148-14, ¶¶ 13, 17. Much of this planning would not have been necessary if a single staff member or volunteer could assist an unlimited number of voters. For example, after Ms. Fonseca had assisted four voters and returned to the office to continue phone banking, a volunteer called and asked that she return to the Civic Center because the volunteer had assisted four voters and was worried she would hit the limit. *See* Doc. 148-14, ¶ 17. Ms. Fonseca returned to the Civic Center and provided translation services to an additional voter. *Id.* As Ms. Gonzalez approached and eventually reached the six-voter limit, she had to spend additional time finding a replacement for herself to assist the line of LEP voters at the Civic Center. *See* Doc. 148-13, ¶¶ 26, 28.

The additional coordination associated with the six-voter limit diverted resources from Arkansas United's phone-banking efforts and contributed, at least in part, to the organization failing to meet the phone-banking goals required by its grant. *See* Docs. 148-11, ¶ 7; Doc. 148-13, ¶ 22. Because Arkansas United intends to continue providing interpretation services at the polls in future elections, this resource-diversion injury will recur.

The State Defendants half-heartedly argue that Arkansas United suffered no resource-diversion injury because the organization "had no formal arrangement with Washington County to provide language assistance at the polls during the 2020 general election" and the organization's phone banking was not "*materially* impeded as a result of Arkansas's six-voter limit." (Doc. 135, p. 16 (emphasis added)). It is irrelevant that Arkansas United did not have a formal arrangement to provide voter assistance. Both its

assistance to LEP voters and phone banking serve the organization's mission to promote civic engagement among Arkansas's immigrant population, and the six-voter limit hindered those efforts.

The issue is not whether Arkansas United's efforts were "materially impeded." It is true Arkansas United would have had staff and volunteers assisting voters regardless of the six-voter limit, and anyone who reached the limit could simply return to phone banking. But the six-voter limit did necessitate additional planning, coordination, and time that could have been spent elsewhere. This easily surpasses the "'perceptible impairment' of an organization's activities [that] is necessary for there to be an 'injury in fact.'" *Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 129 (2d Cir. 2020) (quoting *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011)); *see also OCA-Greater Houston*, 867 F.3d at 612 ("To be sure, OCA's injury was not large. But the injury alleged as an Article III injury-in-fact need not be substantial . . . .").

The State Defendants argue Plaintiffs have suffered no injury because § 3 of the VRA provides for procedures courts must use "[w]henever the Attorney General or an aggrieved person institutes a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment," and Plaintiffs are not "aggrieved persons" under the VRA. 52 U.S.C. § 10302. According to the State Defendants, only a voter who has been denied the assistor of their choice is an "aggrieved person" who may sue to enforce § 208.

Assuming the State Defendants are correct that a plaintiff organization must be an "aggrieved person" under § 3 of the VRA in order to sue under § 208, the term "aggrieved

21

person" is sufficiently broad to encompass a minority-rights organization suing to enforce § 208's protections.[12]

When assessing a plaintiff's standing to sue under a particular statute, courts "presume that a statute ordinarily provides a cause of action 'only to plaintiffs whose interests fall within the zone of interests protected by the law invoked.'" *Bank of Am. Corp. v. City of Miami.*, 137 S. Ct. 1296, 1302 (2017) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014)). In *Bank of America*, the Supreme Court held that "aggrieved person" under the FHA included the City of Miami, which was suing the defendant bank for "hinder[ing] the City's efforts to create integrated, stable neighborhoods." *Id.* at 1304. The Court observed that the FHA's "aggrieved person" language "reflects a congressional intent to confer standing broadly." *Id.* at 1303.

The State Defendants principally rely on *Roberts v. Wamser*, 883 F.2d 617, 624 (8th Cir. 1989). Michael Roberts was a Black candidate in the Democratic primary for

---

[12] While the judicial procedures prescribed by § 3 may not include an express right of action on their own, they do evince Congress's intent for private parties to be able to sue under the VRA. The Supreme Court has long found—consistent with § 3 and the VRA's remedial purpose—that a right of action exists for private parties to enforce the VRA's various sections. *See Allen v. State Bd. of Elections*, 393 U.S. 544, 556–557 (1969) (holding that private parties may enforce § 5 of the VRA); *Chisom*, 501 U.S. at 404 (allowing private plaintiffs to sue under § 2 of the VRA); *Morse v. Republican Party of Va.*, 517 U.S. 186, 234, 240 (1996) (five justices, in otherwise splintered opinions, held there is a private right of action to enforce § 10 of the VRA); *but see Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 2022 WL 496908, at *15–24 (E.D. Ark. Feb. 17, 2022) (distinguishing well-established precedent and finding there is no private right of action under § 2 of the VRA).

As for § 208, "every court that has considered the issue—and the Attorney General of the United States—agree that private parties may enforce" it. *Fla. State Conf. of NAACP v. Lee*, 576 F. Supp. 3d 974, 990 (N.D. Fla. 2021) (collecting cases). In any event, the State Defendants agree that Plaintiffs have a cause of action under § 208 but dispute that an organization can be an "aggrieved person" that has standing to sue.

President of the Board of Alderman in St. Louis, Missouri. Roberts lost the primary by just 171 votes. Roberts sued the Board of Alderman alleging, in part, "that the Board's use of [a] punch-card voting system resulted in the failure to count a disproportionate number of ballots cast by black voters" and violated § Two of the VRA. *Id.* at 619–20. The Eighth Circuit held that Roberts did not have standing because he "is not an aggrieved voter suing to protect his right to vote. Nowhere in his complaint (or anywhere else) does Roberts claim that his right to vote has been infringed because of his race. Nor does Roberts allege that he is suing on behalf of persons who are unable to protect their own rights." *Id.* at 621. The court further reasoned that Roberts could not sue under the VRA because "purpose of the Voting Rights Act is to protect minority voters, not to give unsuccessful candidates for state or local office a federal forum in which to challenge elections." *Id.* at 621.

*Roberts* is quite different from the instant case. Roberts was a political candidate— not a nonprofit organization—who was not seeking to protect the rights of voters. The Eighth Circuit's concern that Congress did not intend for failed political candidates to be able to sue under the VRA is not implicated in this case. Here, Arkansas United is effectuating the purpose of the VRA to protect minority voters by challenging a law it alleges infringes on the statutory right of its LEP members, and other LEP voters in Arkansas, to an interpreter of their choice. The record shows LEP voters, exercising their right under § 208, choose Arkansas United and its staff to translate for them at the ballot box. Ms. Terrazas and her husband specifically asked Ms. Reyes to meet them at their polling place to translate for them. *See* Docs. 148-6, pp. 4–5; 148-7. Two voters contacted Ms. Gonzalez with the same request during early voting. *See* Doc. 148-13, p. 20. And

Arkansas United's members include LEP voters who require assistance to vote. *See* Doc. 4-1, ¶ 34.

The weight of authority further contradicts the State Defendants' position. In *Havens Realty*, the Supreme Court found a fair-housing organization had organizational standing under the Fair Housing Act even though the organization was not seeking housing on its own behalf. *See* 455 U.S. at 379. In *OCA-Greater Houston*, the Fifth Circuit found a voting-rights organization had organizational standing to enforce § 208 of the VRA even though the organization was not a voter denied their assistor of choice. 867 F.3d at 610.[13]

Therefore, Arkansas United—a minority-rights organization—and its members are well within the "zone of interests" of the VRA's mandate to eliminate discrimination against minority groups in voting and, more specifically, § 208's mandate that LEP voters receive the assistor of their choice. The law is clear that an organization may establish organizational standing when it is forced to divert resources to respond to a state's alleged

---

[13] *See also Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1165–66 (11th Cir. 2008) (organizations challenging the state procedures for first-time registrants alleged an injury-in-fact sufficient to support organizational standing where the plaintiff organizations "reasonably anticipate that they will have to divert personnel and time to educating volunteers and voters on compliance with [the registration requirements] and to resolving the problem of voters left off the registration rolls on election day"); *Common Cause Ind. v. Lawson*, 937 F.3d 944, 952 (7th Cir. 2019) (plaintiff entity was injured where it had "devoted additional time and resources to ameliorating" the effects of a state voter roll provision that would automatically remove a voter from the state roll based on information from a third-party database); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1039 (9th Cir. 2015) (plaintiff organization's alleged injury of diversion of resources supported lawsuit alleging state's failure to comply with a federal law intended to facilitate voter registration by low-income citizens and those with disabilities); *Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014) (plaintiff organization had standing to sue for state's failure to provide recipients of federal benefits with voter registration forms, as required by the National Voter Registration Act, where the plaintiff organization alleged it had to devote resources to counteract the violation).

violation of federal law. Arkansas United has made that showing here and has suffered an injury-in-fact as a result.

### 2. *Arkansas United has shown Causation and Redressability*

Having shown an injury-in-fact, Arkansas United must show "a causal connection between the injury and the challenged law; and . . . that a favorable decision is likely to redress their injury." *Telescope Media*, 936 F.3d at 749 (citing *Spokeo*, 578 U.S. at 338). The organization easily satisfies these requirements. *See OCA-Greater Houston*, 867 at 613 ("The facial invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the State itself and its Secretary of State, who serves as the 'chief election officer of the state.'" (quoting Tex. Elec. Code § 31.001(a)).

As explained above, Arkansas United diverted resources from its phone-banking efforts to spend time coordinating and planning compliance with the six-voter limit. The challenged laws directly caused Arkansas United's resource-diversion injury, and the State and County Defendants are the parties that enforce those laws. The State Defendants conduct trainings, provide guidance, and enforce penalties for violations of the six-voter limit. If necessary, they refer violators for criminal prosecution. The County Defendants ensure the Assisted Voter Cards are completed and refer any violations of the six-voter limit to the State Defendants or directly to the county prosecutor. Just as Defendant's enforcement efforts caused Arkansas United's injury, an order from this Court enjoining Defendants from performing those actions would redress Plaintiff's injury in all future elections.

### C.  This Dispute is Ripe

The County Defendants argue the Court lacks subject matter jurisdiction over the claims against the County Defendants "because those claims have not ripened (and will, apparently, never ripen) into a justiciable case or controversy." (Doc. 132, p. 3).

"[T]he ripeness inquiry requires examination of both the 'fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.' *Neb. Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1038 (8th Cir. 2000) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). An issue is unfit for judicial review if it is based on a "hypothetical or speculative disagreement[]," *id.*, and "[t]he hardship prong asks whether delayed review 'inflicts significant practical harm' on the plaintiffs," *Parrish v. Dayton*, 761 F.3d 873, 875 (8th Cir. 2014) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).

The County Defendants argue Plaintiffs' claims against the County Defendants are too speculative to be fit for judicial resolution and Plaintiffs would suffer no hardship if the Court were to not enjoin the County Defendants.

The County Defendants point to the Eighth Circuit's opinion in *Public Water Supply District No. 10 of Cass County v. County of Peculiar*, 345 F.3d 570 (8th Cir. 2003). There, the plaintiff water district sought a declaratory judgment that the defendant municipality was "illegally acting to dissolve the District," along with damages under 42 U.S.C. § 1983. *Id.* at 571.The court held that the case was not ripe because the water district's injury was too speculative. *Id.* at 573. The court explained: "There is no contention that the District is suffering an injury now. The only possible injury to the District is dissolution under § 247.220. Yet no petition for dissolution has been filed, and it is not clear that a petition

26

will ever be filed." *Id.* The court further reasoned that the case was currently unfit for judicial resolution because "issue is not a purely legal one" and "would benefit from further factual development." *Id.* at 574. This bears little resemblance to the case at bar.

Here, the challenged statutes have already been enforced against Arkansas United's staff members. Its staff were required by county employees to fill out Assisted Voter Cards for each voter they helped during the 2020 election, and Aracelia Gonzalez reached the six-voter limit and ceased providing translations for fear of criminal prosecution. Plaintiffs need not subject themselves to criminal prosecution before challenging a statute's validity. *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979). If the six-voter limit remains in effect, there is no dispute Plaintiffs will have to comply with it in future elections. And the merits of this case—whether federal law preempts the challenged Arkansas statutes—requires no additional factual development.

The County Defendants further argue this controversy is too speculative because Plaintiffs improperly assume that if the Court "strike[s] down the 6-voter limit in Arkansas law . . . each County will continue to enforce the limit in defiance of the Court's order." (Doc. 132, p. 7). In other words, the County Defendants contend the Court need not enjoin them because—should this Court "strike down" the six-voter limit—they will follow that order regardless. This argument misunderstands the role of federal courts and the remedies those courts may issue. A federal court cannot strike a statute from the Arkansas Code. *See Steffel v. Thompson*, 415 U.S. 452, 469 (1974). Rather, federal courts may declare statutes invalid and enjoin their enforcement. In so doing, "the court enjoins, in effect, not the execution of the statute, but the acts of the official." *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923).

27

There is no dispute that the County Defendants play a significant role in implementing and enforcing the six-voter limit. *See 281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011) (explaining that a defendant official must have "some connection" to a challenged statute to be a proper party but that official "does not need to be the primary authority to enforce the challenged law"). County poll workers require each voter assistor to fill out an Assisted Voter Card, which informs the assistor that they may not assist more than six voters in any election. If a county election commission were to discover that an individual may have assisted more than six voters in a given election, the commission can either report that information to the State Election Commission for investigation or directly refer the complaint to the county prosecutor.

Given the significant role played by the counties in enforcing the six-voter limit, the disagreement between Plaintiffs and the County Defendants is far from hypothetical or speculative. The Court must enjoin the actions of the County Defendants to ensure a favorable ruling for Plaintiffs is carried out.

It also does not matter that "[t]he Arkansas election law does not vest county Election Commissions with the authority to deviate from the six voter assistance limit embedded in Arkansas law." (Doc. 132, p. 4). If that were the test, a dispute could never ripen—Arkansas law does not appear to vest *any* agency with the discretion to ignore the six-voter limit.

Therefore, while the Court has no doubt the County Defendants would follow this Court's decision whether they were a party to this case or not, the Court finds the County Defendants are a proper party to be enjoined from enforcing the challenged statutes. The

Court is satisfied that this dispute is ripe for decision with respect to both the State and County Defendants.

### D. Sovereign Immunity Does Not Bar Plaintiffs' Suit

The State Defendants renew their argument from the motion-to-dismiss phase that they are immune from suit based on sovereign immunity. State sovereign immunity, as enshrined in the Eleventh Amendment, prevents a federal court from hearing a suit against a state by a citizen of that state. *Hans v. Louisiana*, 134 U.S. 1, 11 (1890).

Plaintiffs point to two exceptions to sovereign immunity that allow their suit. First, Congress may abrogate state sovereign immunity when it acts pursuant to its enforcement power under § 5 of the Fourteenth Amendment and § 2 of the Fifteenth Amendment, so long as its intention to do so is "unmistakably clear in the language of the statute." *Dellmuth v. Muth*, 491 U.S. 223, 228 (1989) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)). Second, the Supreme Court held in *Ex parte Young* that the Eleventh Amendment does not bar suits for prospective injunctive relief against state officials to prevent violations of federal law so long as the official has "some connection with the enforcement of that act." 209 U.S. 123, 157 (1908). There is no dispute that Plaintiffs name the State Defendants in their official capacity, seek only prospective injunctive relief, and do not name the State of Arkansas as a party to their suit.

The State Defendants contend *Ex parte Young* does not apply here because, as they interpret § 3 of the VRA, only "the Attorney General or an aggrieved person" may sue to enforce the VRA's protections. They point to *Seminole Tribe of Florida v. Florida*, where the Supreme Court explained that "where Congress has prescribed a detailed

29

remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*." 517 U.S. 44, 74 (1996). Applying this test, the Supreme Court held that the Indian Gaming Regulatory Act could not be enforced by a private plaintiff in a suit under *Ex parte Young*. *Id.*

The State Defendants further contend they are immune from suit because "any federal enforcement authority under the Fourteenth or Fifteenth Amendments would be invalid as applied to Plaintiffs' claims, meaning that there is no federal right to vindicate." (Doc. 135, p. 18). They assert that § 208 contains no explicit statement of Congress's intent to abrogate sovereign immunity, Congress failed to identify a history and pattern of discrimination against LEP voters, and the remedial legislation is not congruent and proportional to the identified harm.

The Court has already explained at length, in its Memorandum Opinion and Order denying Defendants' motions to dismiss, why Plaintiffs may sue under *Ex Parte Young* and why the enactment of § 208 did not exceed Congress's lawmaking authority. *See* Doc. 102, pp. 12–19. The Court will not rehash that entire discussion here. In short, *Seminole Tribe* is inapposite because, unlike the "the intricate procedures set forth" by the Indian Gaming Regulatory Act, 517 U.S. at 74, the VRA does not lay out alternative sanctions or procedures that would be circumvented by enforcement under *Ex parte Young*. Nothing about permitting judicial proceedings to go forward undermines the effectiveness of any other portion of the VRA. Thus, the methods of enforcement contained in the VRA do not supplant officer suits under *Ex parte Young*.

As to Congress's authority to enact § 208, longstanding precedent is clear that the VRA was passed pursuant to Congress's authority under both the Fourteenth and Fifteenth Amendments. *E.g.*, *United States v. Bd. of Comm'rs of Sheffield*, 435 U.S. 110, 126–27 (1978) (noting that the VRA "is designed to implement the Fifteenth Amendment and, in some respects, the Fourteenth Amendment") (citing *Katzenbach v. Morgan*, 384 U.S. 641 (1966) and *South Carolina v. Katzenbach*, 383 U.S. 301 (1966)); *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) (explaining that "measures protecting voting rights are within Congress' power to enforce the Fourteenth and Fifteenth Amendments"). The enactment of § 208 was congruent and proportional to remedy Congress's finding that individuals who require assistance to vote were being denied their full voting rights.

The VRA, including § 208, was "passed pursuant to its Fifteenth Amendment enforcement power" and "validly abrogated state sovereign immunity. The immunity from suit that [the state] and its officials otherwise enjoy in federal court offers it no shield here." *OCA-Greater Houston*, 867 F.3d at 614 (citations omitted).

### E.  Preemption

Having cleared the procedural underbrush, the Court addresses the merits of Plaintiffs' claim: do the challenged provisions of the Arkansas Code conflict with § 208 of the VRA so as to render them preempted and unenforceable? As to the six-voter limit, the answer is yes. As to the requirement that poll workers keep a list of each voter assistor, the answer is no.

The Supremacy Clause of the United States Constitution provides that "the Laws of the United States . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl.

31

2. Accordingly, the Supreme Court has "long recognized that state laws that conflict with federal law are 'without effect.'" *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). This is known as preemption.

A federal statute can explicitly or—as is alleged here—implicitly preempt state law. Implied preemption occurs "where congressional intent to supersede state law may be inferred." *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 780 (8th Cir. 2009). The form of implied preemption implicated here is conflict preemption. "Conflict preemption exists where a party's compliance with both federal and state law would be impossible or where state law would pose an obstacle to the accomplishment of congressional objectives." *Id.* (citing *Whistler Invs., Inc. v. Depository Tr. & Clearing Corp.*, 539 F.3d 1159, 1166 (9th Cir. 2008)). "There is a presumption against preemption in areas of traditional state regulation, [which] is overcome if it was the clear and manifest purpose of [Congress] to supersede state authority." *Wuebker v. Wilbur-Ellis Co.*, 418 F.3d 883, 887 (8th Cir. 2005) (internal quotation marks omitted).

### 3. The Six-Voter Limit at § 7-5-310(b)(4)(B) is Preempted by § 208

The six-voter limit in § 7-5-310(b)(4)(B) of the Arkansas Code conflicts with § 208 of the VRA and is preempted. Under § 208, a voter may select "a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." But, in Arkansas, if the person of a voter's choice had already assisted six voters, the voter could not be assisted by that person, and the voter would not be getting the assistor of their choice.

The six-voter limit is therefore more restrictive than § 208 and makes "compliance with both . . . impossible." *Pet Quarters*, 559 F.3d at 780 (citing *Whistler Invs.*, 539 F.3d

32

at 1166). If a voter complies with § 208 and selects the assistor of their choice, that assistor could violate Arkansas law and be subject to civil and criminal penalties. The Fifth Circuit, in holding that Texas's limitation on who could serve as a translator similarly conflicted with § 208, explained that "a state cannot restrict this federally guaranteed right by enacting a statute tracking its language, then defining terms more restrictively than as federally defined." *OCA-Greater Houston*, 867 F.3d at 615; *see Disability Rts. N.C v. N.C. State Bd. of Elections*, 2022 WL 2678884, at *5 (E.D.N.C. July 11, 2022) ("The plain language of North Carolina's provisions impermissibly narrows a Section 208 voter's choice of assistant from the federally authorized right to 'a person of the voter's choice' to 'the voter's near relative or verifiable legal guardian.'"). Here, Arkansas essentially adds a new clause to the end of § 208:

> Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union, *so long as that person has assisted fewer than six other voters during the election.*

This addition "impermissibly narrows the right guaranteed by Section 208." *Id.*

The six-voter limit in § 7-5-310(b)(4)(B) also poses an obstacle to Congress's clear purpose to allow the voter to decide who assists them at the polls. With the exception of the voter's employer or union representative, Congress wrote § 208 to allow voters to choose any assistor they want. The Senate Report explained this broad protection was necessary to prevent discrimination against voters who require assistance because "many such voters may feel apprehensive about casting a ballot in the presence of, or may be misled by, someone other than a person of their own choice." S. Rep. No. 97-417, at 62 (1982). The Supreme Court has "explained that where Congress explicitly

enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Hillman v. Maretta*, 569 U.S. 483, 496 (2013) (cleaned up). Arkansas has determined that voters should only get the assistor of their choice up to a point, but there is no evidence Congress contemplated this numerical restriction on the right provided by § 208.

The State Defendants contend the six-voter limit only presents an obstacle to § 208 in a "far-fetched" and "implausible situation where more than six voters chose one-and-the-same person to be their only trusted assistant." (Doc. 135, p. 25). That scenario is far from "implausible." Take, for example, a family where a teenage child is fluent in English, but her parents, older siblings, and grandparents are not. Those family members may all wish to have the English-speaking child translate their voting materials for them. But some of the family members would be thwarted by the six-voter limit. Or, in a hypothetical based in the facts of this case: Aracelia Gonzalez translated for six voters by the early evening on Election Day 2020. At that point, had a family member, friend, or Arkansas United member who trusted Ms. Gonzalez asked for her help to vote, she would be forced to refuse out of fear of civil and criminal sanctions. A similar scenario could play out for voters who require assistance due to blindness or other disability.

The State Defendants further contend the six-voter limit is not preempted because it serves Arkansas's compelling interests in election integrity, fighting voter fraud, and easing burdens on poll workers.[14] The State Defendants fail to cite any authority carving

---

[14] The State Defendants aver that nefarious voter assistors would influence "busloads of people" to vote fraudulently without the six-vote limit in place. (Doc. 135, p. 7). It is unclear why, if the would-be fraudsters were sufficiently motivated to organize busloads of voters to bring to the polls, they could not also bring some confederate assistors along to circumvent the six-voter limit. The State Defendants were also unable to cite any

out an exception to the Supremacy Clause when a state has a compelling interest in enacting a statute that conflicts with federal law. The preemption inquiry is driven by "congressional purpose," not the purpose of the state legislature. *In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Pracs. Litig.*, 621 F.3d 781, 791 (8th Cir. 2010).

The State Defendants also point to the legislative history of § 208. The discussion of § 208 in the Senate Report addresses the issue of state legislation as follows:

> The Committee intends that voter assistance procedures, including measures to assure privacy for the voter and the secrecy of his vote be established in a manner which encourages greater participation in our electoral process. The Committee recognizes the legitimate right of any State to establish necessary election procedures, subject to the overriding principle that such procedures shall be designed to protect the rights of voters.

> State provisions would be preempted only to the extent that they unduly burden the right recognized in this section, with that determination being a practical one dependent upon the facts. Thus, for example, a procedure could not deny the assistance at some stages of the voting process during which assistance was needed, nor could it provide that a person could be denied assistance solely because he could read or write his own name.

> By including the blind, disabled, and persons unable to read or write under this provision, the Committee does not require that each group of individuals be treated identically for purposes of voter assistance procedures. States, for example, might have reason to authorize different kinds of assistance for the blind as opposed to the illiterate. The Committee has simply concluded that, at the least, members of each group are entitled to assistance from a person of their own choice.

S. Rep. No. 97-417, at 62–63 (1982).

The State Defendants latch onto this "undue burden" language and argue the right to choose an assistor protected by § 208 does not extend to *any* person of the voter's

---

instances of voter fraud related to translation assistance. Regardless, because the State's "compelling interests" are not the focus of the preemption inquiry, these issues are immaterial to the Court's analysis.

choosing—the state may place additional restrictions on the choice of assistor so long as the restrictions are not an undue burden.[15]

The language of the Senate Report suggests that some state legislation on the topic of voter assistance is permissible but does not extend as far at the State Defendants suggest. Directly after recognizing that states may legislate in this area, the Senate Report states that "at the least, members of each group are entitled to assistance from a person of their own choice." *Id.* at 63. In other words, the one thing states cannot do is disallow voters the assistor of their choice—precisely what the six-voter limit does.

The State Defendants argue this is an absurd result because a voter's unfettered discretion in choosing their assistor would allow them to select even an incarcerated person. But a common-sense reading of § 208 suggests that any assistor chosen by a voter must be *willing* and *able* to assist. If a chosen person declines to assist the voter or simply does not show up at the polling place, that person has not violated § 208. And an incarcerated person would not be able assist at the polling place for reasons that are completely unrelated to Arkansas's elections laws.

The State Defendants further argue the six-voter limit is not an undue burden because it "did not prevent Reith or Arkansas United from assisting *any* identifiable person." (Doc. 149, p. 9). This argument is immaterial because Plaintiffs' contend—and the Court agrees—that the six-voter limit *facially* conflicts with § 208. This argument also misstates the facts—Ms. Gonzalez reached the six-voter limit on Election Day and

---

[15] The State Defendants point to *Ray v. Texas*, where the district court found that "Section 208 allows the voter to choose a person who will assist the voter, but it does not grant the voter the right to make that choice without limitation." 2008 WL 3457021, at *7 (E.D. Tex. Aug. 7, 2008). However, *Ray* pre-dates *OCA-Greater Houston*, where the Fifth Circuit adopted a broader view of § 208's protections.

therefore *could not* assist any additional voters. The record is clear that there were LEP voters that Ms. Gonzalez could have assisted absent the six-voter limit.

Having found the six-voter limit impermissibly conflicts with federal law, the Court necessarily finds that the criminal provisions at Arkansas Code Arkansas Code § 7-1-103(a)(19)(C) and (b)(1), which make it a Class A misdemeanor to assist a voter "except as provided in § 7-5-310," are similarly preempted to the extent they are used to enforce criminal penalties against any person assisting more than six voters.

### 4.  *The Tracking Requirement at § 7-5-310(b)(5) is Not Preempted by § 208*

While the six-voter limit is preempted by § 208 of the VRA, the same is not true of Arkansas's corresponding assistor-tracking provision. Section 7-5-310(b)(5) of the Arkansas Code provides: "It shall be the duty of the poll workers at the polling site to make and maintain a list of the names and addresses of all persons assisting voters." Unlike the six-voter limit, this tracking requirement does not prevent any voter from selecting the assistor of their choice. Therefore, while the tracking requirement addresses the same topic as § 208, the two statutes can "operate harmoniously." *Craig v. Simon*, 978 F.3d 1043, 1049 (8th Cir. 2020) (quoting *Gonzalez v. Arizona*, 677 F.3d 383, 398 (9th Cir. 2012)). The tracking requirement is the type of permissible state legislation contemplated by the legislative history to § 208.

### V.  CONCLUSION

For the reasons stated, the County and State Defendants' Motions for Summary Judgment (Docs. 131 & 134) are **DENIED**, and Plaintiffs' Motion for Summary Judgment (Doc. 137) is **GRANTED IN PART AND DENIED IN PART**.

The six-voter limit at § 7-5-310(b)(4)(B) of the Arkansas Code is **DECLARED** to be preempted by § 208 of the VRA. Sections 7-1-103(a)(19)(C) and 7-1-103(b)(1) of the Arkansas Code are also **DECLARED** to be preempted by § 208 to the extent they are used to enforce criminal penalties for violations of § 7-5-310(b)(4)(B). The Court hereby **PERMANENTLY ENJOINS** the State and County Defendants, their employees, agents, and successors in office, and all persons acting in concert with them, from enforcing § 7-5-310(b)(4)(B), or otherwise engaging in any practice that limits the right secured by § 208 of the Voting Rights Act based on the number of voters any individual has assisted, and from enforcing §§ 7-1-103(a)(19)(C) and 7-1-103(b)(1) to the extent they are used to enforce criminal penalties for violations of § 7-5-310(b)(4)(B). The State and County Defendants are **ORDERED** to inform their staff to cease enforcement of § 7-5-310(b)(4)(B) in advance of the 2022 General Election, and the members of the State Board of Election Commissioners are **FURTHER ORDERED** to send a memorandum to all county election boards in Arkansas setting forth the Court's rulings, including that the six-voter limit has been declared invalid under federal law, **no later than September 16, 2022**. Any Defendant that intends to use the Assisted Voter Card or equivalent document to track voter assistors in future elections is **ORDERED** to remove from that document any reference to the six-voter limit at § 7-5-310(b)(4)(B). In all future elections after the 2022 General Election, Defendants are **ORDERED** to update all trainings, manuals, websites, and any materials given to voters or voter assistors to remove any reference to the six-voter limit at § 7-5-310(b)(4)(B).[16]

---

[16] The Court recognizes Defendants may have already produced training materials and/or conducted trainings in advance of the 2022 General Election. Mindful that federal courts must be cautious in burdening state election officials in the run-up to an election, *see*

An amended Judgment will enter contemporaneously with this opinion.

**IT IS SO ORDERED** on this 7th day of September, 2022.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

---

*Purcell v. Gonzalez*, 549 U.S. 1 (2006), the Court does not expect Defendants to conduct updated formal trainings or produce an updated training manual before the 2022 General Election (although they may certainly choose to do so). For the 2022 General Election, Defendants must simply inform their employees and volunteers to not enforce the six-voter limit, update the text on the Assisted Voter Card if they use it, and the State Board must send a memorandum to all county election boards. Because the six-voter limit is not a voter-facing policy and its primary front-end enforcement mechanisms are the tracking requirement—which may stay in place—and the text on the Assisted Voter Card, the Court finds no cause for concern that election officials or voters will be confused by the Court's enjoinment of the six-voter limit.

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

**ARKANSAS UNITED**
**and L. MIREYA REITH**                                                    **PLAINTIFFS**

**V.**                                      **CASE NO. 5:20-CV-5193**

**JOHN THURSTON, in his official capacity**
**as the Secretary of State of Arkansas;**
**SHARON BROOKS, BILENDA HARRIS-RITTER,**
**WILLIAM LUTHER, CHARLES ROBERTS,**
**JAMES SHARP, and J. HARMON SMITH,**
**in their official capacities as members**
**of the Arkansas State Board of Election Commissioners;**
**RENEE OELSCHLAEGER, BILL ACKERMAN,**
**MAX DEITCHLER, and JENNIFER PRICE,**
**in their official capacities as members**
**of the Washington County Election Commission;**
**RUSSELL ANZALONE, ROBBYN TUMEY,**
**and HARLAN STEE, in their official capacities as members**
**of the Benton County Election Commission;**
**DAVID DAMRON, LUIS ANDRADE, and LEE WEBB,**
**in their official capacities as members of the Sebastian**
**County Election Commission; and MEGHAN HASSLER, in**
**her official capacity as Election Coordinator for the**
**Sebastian County Election Commission**                  **DEFENDANTS**

<u>**AMENDED[1] JUDGMENT**</u>

For the reasons set forth in the Court's Memorandum Opinion and Order filed

today, **IT IS HEREBY ORDERED AND ADJUDGED AS FOLLOWS:**

1. The six-voter limit at § 7-5-310(b)(4)(B) of the Arkansas Code is **DECLARED** to

   be preempted by § 208 of the VRA. Sections 7-1-103(a)(19)(C) and 7-1-103(b)(1)

   of the Arkansas Code are also **DECLARED** to be preempted by § 208 to the extent

   they are used to enforce criminal penalties for violations of § 7-5-310(b)(4)(B).

---

[1]   The Court has amended this Judgment for the reasons stated in the Court's order
issued on September 7, 2022, granting the State Defendants' Motion to Clarify.

2.  The Court hereby **PERMANENTLY ENJOINS** all Defendants, their employees, agents, and successors in office, and all persons acting in concert with them, from enforcing § 7-5-310(b)(4)(B), or otherwise engaging in any practice that limits the right secured by § 208 of the Voting Rights Act based on the number of voters any individual has assisted, and from enforcing §§ 7-1-103(a)(19)(C) and 7-1-103(b)(1) to the extent they are used to enforce criminal penalties for violations of § 7-5-310(b)(4)(B).

3.  The State and County Defendants are **ORDERED** to inform their staff to cease enforcement of § 7-5-310(b)(4)(B) in advance of the 2022 General Election, and the members of the State Board of Election Commissioners are **FURTHER ORDERED** to send a memorandum to all county election boards in Arkansas setting forth the Court's rulings, including that the six-voter limit has been declared invalid under federal law, **no later than September 16, 2022**. Any Defendant that intends to use the Assisted Voter Card or equivalent document to track voter assistors in future elections is **ORDERED** to remove from that document any reference to the six-voter limit at § 7-5-310(b)(4)(B). In all future elections after the 2022 General Election, Defendants are **ORDERED** to update all trainings, manuals, websites, and any materials given to voters or voter assistors to remove any reference to the six-voter limit at § 7-5-310(b)(4)(B).Plaintiffs have 14 days from today to file a motion for attorneys' fees.

**IT IS SO ORDERED** on this 7th day of September, 2022.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

2

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

ARKANSAS UNITED, et al.,                                                                     PLAINTIFFS,

v.                                          No. 5:20CV05193 TLB

JOHN THURSTON, in his official capacity as
the Secretary of State of Arkansas, et al.,

                                                                                              DEFENDANTS.

NOTICE OF APPEAL

The State Defendants, John Thurston in his official capacity as the Secretary of State of the

State of Arkansas, and Sharon Brooks, Bilenda Harris-Ritter, William Luther, Charles Roberts,

James Sharp, and J. Harmon Smith, in their official capacities as member of the Arkansas State

Board of Election Commissioners, give notice of their appeal to the United States Court of Appeals

for the Eighth Circuit from this Court's Amended Memorandum Opinion and Order (Doc. 179)

issued on September 7, 2022, and the Amended Judgment entered the same day.  (Doc. 180).

The Eighth Circuit has jurisdiction because this is an appeal from a final judgment of a

district court of the United States, 28 U.S.C. 1291, which also confers jurisdiction over "all of the

previous rulings and orders that led up to and served as a predicate for that final judgment."  *Greer*

*v. St. Louis Reg'l Med. Ctr.*, 258 F.3d 843, 846 (8th Cir. 2001); *see Johnson v. Leonard*, 929 F.3d

569, 575 (8th Cir. 2019).

Dated: September 8, 2022

<div style="margin-left:40%">

Respectfully Submitted,

LESLIE RUTLEDGE
  Arkansas Attorney General
MICHAEL A. CANTRELL (2012287)
  Assistant Solicitor General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
Phone:      (501) 682-2007
Michael.Cantrell@ArkansasAG.gov

*Attorneys for the Secretary of State and State Board of Election Commissioners*

</div>

2

```
MIME-Version:1.0
From:NEF@arwd.uscourts.gov
To:NEF@localhost.localdomain
Bcc:
--Case Participants: Nicholas J. Bronni (nicholas.bronni@arkansasag.gov), Michael A.
Cantrell (crystal.callahan@arkansasag.gov, michael.cantrell@arkansasag.gov), Francisco
Fernandez del Castillo (ffernandez-delcastillo@maldef.org, francisco506@gmail.com,
jvazquez@maldef.org), Brian R. Lester (blester@washingtoncountyar.gov,
gharlan@washingtoncountyar.gov), Jason E. Owens (lewis@jowenslawfirm.com,
miranda@jowenslawfirm.com, owens@jowenslawfirm.com, parker@jowenslawfirm.com), Brooklyn
Parker (miranda@jowenslawfirm.com, owens@jowenslawfirm.com, parker@jowenslawfirm.com),
Nina Perales (cleija@maldef.org, ipina@maldef.org, nperales@maldef.org), Susana Sandoval
Vargas (jvazquez@maldef.org, ssandovalvargas13@gmail.com, ssandovalvargas@maldef.org),
Charles Daniel Shue, Jr (dshue@co.sebastian.ar.us, obrazets@sbcglobal.net), Griselda Vega
Vega Samuel (gvegasamuel@maldef.org, gvegasamuelmaldef@gmail.com, jvazquez@maldef.org),
Lawrence Anthony Walker (l-walker@onu.edu, tonywalkeratty@gmail.com), Honorable Timothy L.
Brooks (tlbinfo@arwd.uscourts.gov)
--Non Case Participants: David H. Bernstein (gecurfman@debevoise.com,
jjmarley@debevoise.com), Rachel Kluender (rachel.kluender@sos.arkansas.gov), Elizabeth
Amanda O'Neal (amanda.oneal@sos.arkansas.gov), Gary L. Sullivan (gary@acluarkansas.org),
Chambers - TLBinfo@arwd.uscourts.gov (tlbinfo@arwd.uscourts.gov)
--No Notice Sent:

Message-Id:2224027@arwd.uscourts.gov
Subject:Activity in Case 5:20-cv-05193-TLB Arkansas United et al v. Thurston et al Order
on Motion to Stay
Content-Type: text/html
```

## U. S. District Court

### Western District of Arkansas

**Notice of Electronic Filing**

The following transaction was entered on 9/8/2022 at 6:05 PM CDT and filed on 9/8/2022

**Case Name:**    Arkansas United et al v. Thurston et al

**Case Number:**    5:20–cv–05193–TLB

**Filer:**

**WARNING: CASE CLOSED on 09/07/2022**

**Document Number:** 184(No document attached)

**Docket Text:**

 **TEXT ONLY ORDER DENYING [182] Emergency Motion to Stay Injunction Pending Appeal and for Expedited Consideration. The Court finds a stay of the Court's injunction unwarranted pending the State Defendants' appeal of the Court's judgment. The State Defendants' Motion misrepresents the Court's Order (Doc. 178) granting the State Defendants' Motion to Clarify, misstates the breadth of the Court's injunction and the facts in the record related to enforcement of the six–voter limit, and again fails to recognize that the Court, in addition to enjoining certain parties from enforcing the six–voter limit, also declared the law preempted by the Voting Rights Act. The *Purcell* principle does not favor a stay for reasons previously articulated by the Court, *see* Doc. 179, p. 38 n.16, and no reasonable confusion could result from the State Board of Election Commissioners announcing to county election officials that the Court has declared the six–voter limit invalid under federal law. Moreover, despite the State Defendants rehashing the same arguments that the Court thoroughly rejected in its Amended Memorandum Opinion and Order (Doc.**

**179), "the underlying merits are entirely clearcut in favor of" the Plaintiffs.** *Merrill v. Milligan*, **142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). The State Defendants may redirect their Motion to the Eighth Circuit. Signed by Honorable Timothy L. Brooks on September 8, 2022. (glk)**

**5:20–cv–05193–TLB Notice has been electronically mailed to:**

Charles Daniel Shue, Jr   dshue@co.sebastian.ar.us, obrazets@sbcglobal.net

Nina Perales   nperales@maldef.org, cleija@maldef.org, ipina@maldef.org

Jason E. Owens   owens@jowenslawfirm.com, lewis@jowenslawfirm.com, miranda@jowenslawfirm.com, parker@jowenslawfirm.com

Brian R. Lester   blester@washingtoncountyar.gov, gharlan@washingtoncountyar.gov

Lawrence Anthony Walker   tonywalkeratty@gmail.com, l–walker@onu.edu

Michael A. Cantrell   Michael.Cantrell@ArkansasAG.gov, crystal.callahan@arkansasag.gov

Nicholas J. Bronni   nicholas.bronni@arkansasag.gov

Griselda Vega Vega Samuel   gvegasamuel@maldef.org, gvegasamuelmaldef@gmail.com, jvazquez@maldef.org

Francisco Fernandez del Castillo   ffernandez–delcastillo@maldef.org, francisco506@gmail.com, jvazquez@maldef.org

Susana Sandoval Vargas   ssandovalvargas@maldef.org, jvazquez@maldef.org, ssandovalvargas13@gmail.com

Brooklyn Parker   parker@jowenslawfirm.com, miranda@jowenslawfirm.com, owens@jowenslawfirm.com

**5:20–cv–05193–TLB Notice has been delivered by other means to:**

# U.S. COURT OF APPEALS - EIGHTH CIRCUIT
## NOA SUPPLEMENT

Please note any additions or deletions to the style of the case from the style listed on the docket sheet or attach an amended docket sheet with the final style of the case.

Western District of Arkansas  -  FAYETTEVILLE DIVISION

**20-cv-5193, Arkansas United and L. Mireya Reith v. John Thurston, et al.**

Length of Trial: N/A

Financial Status:    Fee Paid?                                    YES

　　　　　　　　If NO, has IFP been granted?

　　　　　　　　Is there a pending motion for IFP?            NO

Are there any other post-judgment motions?            NO

Please identify the court reporter.

　　　　　If no court reporter, please check  ☐

　　　　　Name and Phone Number        **Paula Barden (479) 695-4460**


SPECIAL COMMENTS: