No. 22-2918

# In the United States Court of Appeals for the Eighth Circuit

ARKANSAS UNITED, et al.,

*Plaintiffs-Appellees*,

v.

JOHN THURSTON, et al.,

*Defendants-Appellants*.

On Appeal from the United States District Court for the Western District of Arkansas
No. 5:20-cv-05193-TLB

**BRIEF OF HONEST ELECTIONS PROJECT AS AMICUS CURIAE IN SUPPORT OF APPELLANTS**

i

Appellate Case: 22-2918   Page: 1   Date Filed: 12/27/2022 Entry ID: 5230614

# TABLE OF CONTENTS

Table of Contents ........................................................................................... ii

Table of Authorities ..................................................................................... iii

Interest of Amicus Curiae ............................................................................. 1

Summary of the Argument ........................................................................... 1

   I. **The presumption against preemption requires that Section 208 does not displace Ark. Code § 7-5-310(b)(4)(B).** ............................................... 2

      A. Congress enacted Section 208 of the VRA against the backdrop of the States' neutral, nondiscriminatory, and non-burdensome run-of-the-mill election regulations. ........................................................... 4

      B. Arkansas Code § 7-5-310(b)(4)(B) does not unduly burden the statutory right to assistance created in 1982 by Section 208. ............ 6

      C. Section 208's permissive "may" language on its face permits some state regulation and favors the presumption against preemption. ... 11

Conclusion .................................................................................................. 13

# TABLE OF AUTHORITIES

**Cases**                                                  **Page(s)**

*Priorities USA v. Nessel*,
    2022 U.S. Dist. LEXIS 167264 ............................................................... 12

*Ark. United v. Thurston*,
    2022 U.S. Dist. LEXIS 149490 ............................................................... 10

*Aurora Dairy Corp. Organic Milk Mktg. & Sales Practices Litig. v. Aurora Organic Dairy*,
    621 F.3d 781 ............................................................................................ 3

*Brnovich v. Democratic Nat'l Comm.*,
    141 S. Ct. 2321 .................................................................................. 5-6, 7

*Chisom v. Roemer*,
    501 U.S. 380 ......................................................................................... 4-5

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 ......................................................................................... 6, 8

*Disability Rts. N.C v. N.C. State Bd. of Elections*,
    2022 U.S. Dist. LEXIS 121307 ............................................................... 10

*LeFaivre v. KV Pharm. Co.*,
    630 F.3d 733 ......................................................................................... 3, 4

*Mallard v. U.S. Dist. Court for S. Dist. of Iowa*,
    490 U.S. 296 ................................................................................. 11-12, 12

*Mut. Pharm. Co. v. Bartlett*,
    570 U.S. 472 ............................................................................................ 13

*Ray v. Texas*, No. 2-06-CV-385,
    2008 U.S. Dist. LEXIS 59852 ............................................................... 5, 10

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 ............................................................................................ 3

*Saxton v. Fed. Hous. Fin. Agency*,
    901 F.3d 954 ............................................................................................ 11

*Wuebker v. Wilbur-Ellis Co.*,

Appellate Case: 22-2918   Page: 3   Date Filed: 12/27/2022 Entry ID: 5230614

418 F.3d 883 ............................................................................................. 3

**Statutes**

25 P.S. § 3058 ........................................................................................ 9

28 U.S.C. § 1915 .............................................................................. 11, 12

52 U.S.C. § 10508 ............................................................................ 11, 2, 5

89 P.L. 110, 79 Stat. 437 ........................................................................ 4

97 P.L. 205, 96 Stat. 131 ........................................................................ 4

Ala. Code § 17-9-13(a) ........................................................................... 9

A.C.A. § 7-5-310 ........................................................................... 1, 2, 4, 6

O.C.G.A. § 21-2-409 .............................................................................. 8

K.R.S. § 117.255 .................................................................................... 9

Minn. Stat. § 204C.08 ............................................................................ 8

O.R.C. Ann. 3505.24 .............................................................................. 8

Utah Code § 20A-3a-208 ................................................................ *passim*

# INTEREST OF AMICUS CURIAE[1]

The Honest Elections Project is a nonpartisan organization devoted to supporting the right of every lawful voter to participate in free and honest elections. The Honest Elections Project supports commonsense voting rules and opposes efforts to reshape elections for partisan gain. It therefore has a significant interest in this important case concerning Arkansas's lawful authority to limit the number of voters that a single individual can assist in casting their ballots.

Amicus Curiae the Honest Elections Project submits this brief supporting the Defendants' brief asking this Court to vacate the district court's order enjoining Defendants from enforcing Ark. Code § 7-5-310(b)(4)(B). The Honest Elections Project has requested and obtained the written consent of all parties to file this brief.

# SUMMARY OF THE ARGUMENT

The district court announces a breathtaking rule: States cannot enact *any* limits on the number of voters that a person may assist in filling out and casting their ballots. The Honest Elections Project submits to this Court an interpretation of Section 208 much more in line with both history and precedent: States may enact reasonable, nondiscriminatory limits on voter assistance.

---

[1] No party's counsel authored this brief in whole or in part, and no one besides amicus curiae and its counsel contributed money to fund the brief's preparation or submission.

1

Below, the district court reasoned that if the person of a voter's choice had already assisted six other voters, then Section 7-5-310(b)(4)(B) mandates that the voter must find someone else, thereby preventing the voter from receiving assistance from their preferred helper. This logic would, of course, apply with equal force to a sixty-person limit, or even a six-*hundred*-person limit; if all voter assistance limitations are preempted by the VRA, then any limit is unlawful. The district court's holding is therefore that the VRA bars States from imposing any limit whatsoever on how many voters may be assisted by a particular individual. That cannot be right.

Section 208 of the Voting Rights Act[2] does not preempt Arkansas's six-voter assistance cap.[3] Section 7-5-310(b)(4)(B) works hand-in-glove with Section 208 and does not obstruct Congress's anti-discriminatory purpose in enacting the VRA. The presumption against preemption applies in full force in this quintessential area of State regulation—the administration of elections.

## I. The presumption against preemption requires that Section 208 does not displace Ark. Code § 7-5-310(b)(4)(B).

Everyone agrees this is a case about conflict preemption, which applies only where a party's simultaneous compliance with both federal and state law is

---

[2] 52 U.S.C. § 10508 ("Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union.").

[3] Ark. Code § 7-5-310(b)(4)(B) ("No person other than [poll workers] shall assist more than six (6) voters in marking and casting a ballot at an election.").

2

impossible or where state law poses an obstacle to the accomplishment of congressional objectives, *Aurora Dairy Corp. Organic Milk Mktg. & Sales Practices Litig. v. Aurora Organic Dairy*, 621 F.3d 781, 794 (8th Cir. 2010); *see also LeFaivre v. KV Pharm. Co.*, 630 F.3d 733, 737 (8th Cir. 2011) ("There are two types of conflict preemption—impossibility preemption and obstruction preemption."). In evaluating conflict preemption, this Court recognizes a presumption against preemption in areas of traditional state regulation, overcome only if it was the "clear and manifest purpose of [Congress]" to supersede state authority. *Aurora Dairy*, 621 F.3d at 794 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). As such, "congressional purpose is the ultimate touchstone in every preemption case." *Id.* at 792 (internal quotation marks omitted). This Court looks to the language and history of a law to determine if it was meant to be the "floor or ceiling" for the State's regulation. *Wuebker v. Wilbur-Ellis Co.*, 418 F.3d 883, 888 (8th Cir. 2005).

Congress made no clear statement in Section 208 that States would be prohibited from enacting ordinary, nondiscriminatory regulations governing the conduct of elections. In other words, Section 208 is a floor below which States may not sink, not a ceiling that supplants *all* state election regulations. We know—and no one contends otherwise—what Congress's purpose was in enacting and amending the VRA: Eliminating discriminatory State laws that were obstructing citizens from participating in the normal process of elections. Section 208 must not be read as

3

impliedly preempting all run-of-the-mill State regulations on voter assistance, lest Section 208 be expanded far beyond the bounds of congressional intent and the presumption against preemption be rendered toothless and null.

> A. Congress enacted Section 208 of the VRA against the backdrop of the States' neutral, nondiscriminatory, and non-burdensome run-of-the-mill election regulations.

This case is about obstruction conflict preemption—whether Section 7-5-310(b)(4)(B) stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in Section 208. *See LeFaivre*, 630 F.3d at 737. It is clear why Congress enacted the VRA and, by extension, Section 208: To eradicate invidiously discriminatory election regulations, not to override generally applicable valid laws.

The historical backdrop and legislative history of Section 208 evince no congressional intent to displace nondiscriminatory state election laws. The express purpose of the 1982 amendments was "[t]o amend the Voting Rights Act of 1965 to extend the effect of certain provisions," 97 P.L. 205, 96 Stat. 131, and those original provisions in turn were passed with the express purpose of eradicating voting qualifications that denied or abridged the right of any U.S. citizen to vote on account of race or color, 89 P.L. 110, 79 Stat. 437; *see also Chisom v. Roemer*, 501 U.S. 380, 403 (1991) ("Congress enacted the Voting Rights Act of 1965 for the broad remedial

4

purpose of ridding the country of racial discrimination in voting." (internal quotation marks omitted)).

With regard to Section 208 in particular, the text manifests Congress's intent to protect certain voters from discrimination based on disability or inability to read or write. As with the rest of the VRA, the focus is on discriminatory, burdensome laws. The Senate Report explained that "State provisions would be preempted only to the extent that they unduly burden the right recognized." S. Rep. No. 97-417, at 62–63 (1982). States retained their "legitimate right … to establish necessary election procedures," including authorizing "different kinds of assistance." *Id*. As one federal court has summed up the congressional intent underlying Section 208: "The legislative history evidences an intent to allow the voter to choose a person whom the voter trusts to provide assistance. It does not preclude all efforts by the State to regulate elections by limiting the available choices to certain individuals." *Ray v. Texas*, No. 2-06-CV-385, 2008 U.S. Dist. LEXIS 59852, at *19 (E.D. Tex. Aug. 7, 2008).

Consistent with this purpose, the 1982 amendments to Section 2 of the Voting Rights Act were meant to remedy unconstitutional vote dilution, and the Supreme Court has noted that none of the examples of problematic State regulations concerned the "application of a facially neutral rule specifying the time, place, or manner of voting." *Brnovich v. Democratic Nat'l Comm*., 141 S. Ct. 2321, 2333

5

(2021). That is, the 1982 amendments to a different section of the VRA were legislated against the backdrop of neutral State rules about the manner of voting and were never intended to displace them. It stands to reason the same would be true for the purpose of Section 208, which was enacted at the same time. Section 7-5-310(b)(4)(B) is a facially neutral rule specifying the manner in which the voter assistance authorized by Section 208 may occur and therefore is not the type of discriminatory regulation targeted by the VRA and its amendments.

      B.      <u>Arkansas Code § 7-5-310(b)(4)(B) does not unduly burden the statutory right to assistance created in 1982 by Section 208.</u>

The Senate Committee's "unduly burden" language evokes the type of election law balancing federal courts employ in the constitutional context. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190 (2008) (plurality op.) ("[A] court evaluating a constitutional challenge to an election regulation weigh[s] the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule."). Applying *Anderson-Burdick* as a helpful hermeneutic for understanding preemption in the Section 208 context, (1) Arkansas has a significant interest in preventing fraud perpetuated through improper coercion in the voting booth, and (2) Arkansas's law limiting each Arkansan who is not a poll worker to only assisting six other voters in marking their ballots does not severely burden voting rights. Everyone still has an unlimited

6

opportunity to be assisted by a poll worker, and *every* Arkansan—even those who are not poll workers—can help up to six other voters mark their ballots.

The federal courts have long recognized the States' compelling interest in ensuring the integrity of elections. The *Crawford* Court noted the States' interest in preventing fraud generally and "counting only the votes of eligible voters." *Id.* at 196. The *Brnovich* Court similarly endorsed the States' interest in proactively preventing potential voter coercion by restricting ballot collection. *Brnovich*, 141 S. Ct. at 2348. Third-party ballot collection is not the only practice that "can lead to pressure and intimidation"; a vulnerable voter who requires in-person assistance to cast their ballot could also be subject to improper pressure from the individual who assists them. *Id.* If a single malicious actor is permitted to coerce an unlimited number of voters, then that individual could potentially have an impact on the outcome of an election. States like Arkansas are not required to wait for fraud or voter intimidation to happen before they take proactive actions to prevent those "real risk[s]." *Id*.

Voters, on the other hand, are not severely burdened by Arkansas's six-voter assistance cap. Here, Plaintiffs at most point to a situation where one person helps six people, and then a seventh voter also desires that person's assistance but is unable to receive it. This remote possibility, even were it to occur, would impose only a minimal burden on the right to vote. The hypothetical seventh voter can still obtain

7

the assistance to which they are legally entitled under Section 208; the only difference is that such assistance must come from their *second* choice of assister, or from *any* poll worker. This can hardly be considered more than a "usual burden[] of voting." *Crawford*, 553 U.S. at 198 (plurality op.). And again, that situation will occur rarely, if ever. Combined with the fact that historical, reasonable limits on voting assistance sit well within the realm of neutral, nondiscriminatory regulations that were not displaced by the VRA, this burden is negligible.

This Court should also consider the remarkable slippery slope endorsed by the district court. The presumption against preemption finds its fullest iteration where preemption would completely wipe out generally valid State regulations. This is such a case. It is no exaggeration to say that giving Section 208 such broad preemptive power would prevent States from enacting *any* limits on the ability of *any* person to assist a voter in *any* context whatsoever. Consider the relatively common prohibitions on candidates for political office assisting voters in marking their ballots.[4] Such generally applicable regulations are not discriminatory and are

---

[4] *See, e.g.*, Ohio Rev. Code § 3505.24 ("[A]ny elector … may be accompanied in the voting booth and aided by any person of the elector's choice, other than the elector's employer, an agent of the elector's employer, or an officer or agent of the elector's union . . . . and no candidate whose name appears on the ballot shall assist any person in marking that person's ballot."); Utah Code § 20A-3a-208(2) ("The individual providing assistance may not be: (a) the voter's employer; (b) an agent of the employer; (c) an officer or agent of the voter's union; or (d) a candidate."); Ga. Code § 21-2-409(b) ("Any elector who is entitled to receive assistance in voting under this Code section shall be permitted by the managers to select any person of

targeted squarely at the potential harm that a political candidate might coerce vulnerable voters within the privacy of the voting booth to mark their ballots in the candidate's favor. Yet even this reasonable regulation of the voting process would be ensnared by the district court's voluminous net. Additionally, the States draw their prohibitions concerning employers and union assistance directly from Section 208 and replicate those prohibitions in numerous state statutes.[5] In other words, the very federal law upon which the district court putatively relied when striking down

---

the elector's choice except such elector's employer or agent of that employer or officer or agent of such elector's union to enter the voting compartment or booth with him or her to assist in voting, such assistance to be rendered inside the voting compartment or booth. No person whose name appears on the ballot as a candidate at a particular election nor the mother, father, grandparent, aunt, uncle, sister, brother, spouse, son, daughter, niece, nephew, grandchild, son-in-law, daughter-in-law, mother-in-law, father-in-law, brother-in-law, or sister-in-law of that candidate shall offer assistance during that particular election under the provisions of this Code section to any voter who is not related to such candidate."); Minn. Stat. § 204C.08(1d)(6) ("If you need assistance, you may be accompanied into the voting booth by a person of your choice, except by an agent of your employer or union or a candidate.").

[5] *See, e.g.*, Ala. Code § 17-9-13(a) ("Any person who wishes assistance in voting may receive assistance from any person the voter chooses except the voter's employer, an agent of the employer, or an officer or agent of the voter's union."); 25 Pa. Stat. Ann. § 3058(b) ("Any elector who is entitled to receive assistance in voting under the provisions of this section shall be permitted by the judge of election to select a person of the elector's choice . . . to assist him in voting . . . except that the judge of election, the elector's employer or an agent of the employer or an officer or agent of the elector's union shall not be eligible to assist the elector."); Ky. Rev. Stat. § 117.255(3) ("A voter requiring assistance in voting may, if the voter prefers, be assisted by a person of the voter's own choice who is not an election officer, except that the voter's employer, an agent of the voter's employer, or an officer or agent of the voter's union shall not assist a voter.").

9

Arkansas law expressly prohibits certain categories of persons from assisting voters, so the federal statute by its own terms is not even the blanket guarantee the district court characterizes it as. Congress in enacting Section 208 clearly indicated there are certain categories of people who should not be allowed to assist voters even if some voters would prefer their assistance, and there is nothing to indicate the federal statute provides an exhaustive list of those who States may properly classify as off-limits.

There is no evidence—textual or otherwise—that Congress intended to restrict States so comprehensively in Section 208 beyond the VRA's explicit purpose to eradicate discriminatory voting rules. Instead, "[t]he language of Section 208 allows the voter to choose a person who will assist the voter, *but it does not grant the voter the right to make that choice without limitation.*" *Ray*, 2008 U.S. Dist. LEXIS 59852, at *19 (emphasis added). The district court here concluded otherwise, as have other courts in recent decisions. *Ark. United v. Thurston*, No. 5:20-CV-5193, 2022 U.S. Dist. LEXIS 149490, at *39–45 (W.D. Ark. Aug. 19, 2022); *see also Disability Rts. N.C v. N.C. State Bd. of Elections*, 2022 WL 2678884, at *5 (E.D.N.C. July 11, 2022) ("The purpose of Section 208 was to give voters with disabilities *unrestricted choice* in their right to assistance, thus it cannot have been Congress's intent to permit state voting laws to directly restrict that right.") (emphasis added). There is no limiting principle whatsoever in the district court's logic, which radically

expands the scope of the VRA far beyond its manifest purpose. Would a sixteen-voter limit be lawful? A six-hundred-voter limit? The district court provides no answer to these questions, but its logic indicates that no restriction could stand.

    C.    <u>Section 208's permissive "may" language on its face permits some state regulation and favors the presumption against preemption.</u>

All the preceding case law requires a clear congressional statement in the VRA before displacing reasonable, nondiscriminatory state regulation of elections. But no such clear statement can be found. Indeed, the opposite is true: Section 208 includes permissive—not clear and mandatory—language: "Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write *may* be given assistance by a person of the voter's choice." 52 U.S.C. § 10508 (emphasis added). This is hardly a congressional clarion call declaring void—as the district court did—any possible state limitation on individuals assisting other voters in filling out ballots. "Ordinarily, the word 'may is permissive,' while 'shall is mandatory.'" *Saxton v. Fed. Hous. Fin. Agency*, 901 F.3d 954, 961 (8th Cir. 2018) (quoting Antonin Scalia & Bryan A. Garner, Reading Law 112–15 (2012)) (emphasis omitted).

The Supreme Court has given an exegesis on what was formerly codified as 28 U.S.C. § 1915(d), a statute sufficiently analogous to Section 208 so as to be dispositive in this case. *See Mallard v. U.S. Dist. Court for S. Dist. of Iowa*, 490 U.S. 296, 300–08 (1989). Under the plain text of that statute, a court "may request an

11

attorney to represent" an indigent litigant. *Id.* at 298. The Court held that the statute's permissive language meant it did not license *compulsory* appointments of counsel when the attorney in question declined appointment. *Id.* at 301. Requesting, asking, petitioning, and entreating are not semantically interchangeable with verbs like "require" or "demand." *Id*.

The same is true here. Section 208's "may be given assistance by a person of the voter's choice" is semantically equivalent to Section 1915(d)'s "may request an attorney." It is not mandatory language; Congress in Section 208 did not use "must be given" or "may demand," or even "shall." Therefore, "a State law that limits a voter's choice does not automatically flout Section 208." *Priorities USA v. Nessel*, No. 2:19-cv-13341, 2022 U.S. Dist. LEXIS 167264, at *31 (E.D. Mich. Sept. 15, 2022). Read correctly, under Section 208 States *may* permit disabled voters to receive assistance in casting their ballot from any individual of their choice, but they are not required to do so.

The district court itself noted instances in which a chosen person may not be able to assist even if the voter makes a request, such as if they are unwilling or unable (e.g., incarcerated). *See* ECF No. 168 at 36. Section 208, then, does not in fact *absolutely* require a person of the voter's choice to assist the voter, as even the district court acknowledges. There are commonsense exceptions, even in the federal statute itself. The presumption against preemption—coupled with the clear evidence

12

of congressional intent—should encourage federal courts to recognize that nonburdensome state regulations are not overridden by Section 208.

True, one could make the semantic argument for a mandatory "may" in Section 208. But the possibility of ambiguity is another reason why the presumption against preemption should apply here. *See Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 498 n.1 (2013) (Breyer, J., dissenting) ("[T]he whole point of the presumption against pre-emption is that congressional ambiguity should cut in favor of preserving state autonomy."). "May" in Section 208 could mean several things, but it indisputably means that it is not mandatory to give a voter an unrestricted choice of assistant in every single circumstance. Traditional state election regulation survived the enactment of Section 208.

## **CONCLUSION**

For the foregoing reasons, the Court should reverse.

Respectfully Submitted,

Jason B. Torchinsky, VA #47481
HOLTZMAN VOGEL BARAN
TORCHINSKY JOSEFIAK
15405 John Marshall Highway
Haymarket, VA 20169
P: (540) 341-8808
F: (540) 341-8809
E: jtorchinsky@holtzmanvogel.com

# CERTIFICATE OF COMPLIANCE

I certify that pursuant to Federal Rules of Appellate Procedure 29, 32(a)(5), and 32(a)(7), the foregoing amicus curiae brief is proportionally spaced, has a typeface of 14-point Times New Roman, and contains 3,288 words, excluding those sections identified in Fed. R. App. P. 32(f).

/s/ Jason B. Torchinsky
Jason B. Torchinsky

## CERTIFICATE OF SERVICE

I certify that on December 23, 2022, the foregoing amicus curiae brief was served on all parties or their counsel of record through the CM/ECF system.

/s/ Jason B. Torchinsky
Jason B. Torchinsky

15

Appellate Case: 22-2918     Page: 19     Date Filed: 12/27/2022 Entry ID: 5230614