# UNITED STATES COURT OF APPEALS
# FOR THE EIGHT CIRCUIT

ARKANSAS UNITED AND L. MIREYA REITH
*Plaintiffs-Appellees,*

*v.*

JOHN THURSTON, IN HIS OFFICIAL CAPACITY AS THE SECRETARY OF STATE OF
ARKANSAS; AND SHARON BROOKS, BILENDA HARRIS-RITTER, WILLIAM LUTHER,
CHARLES ROBERTS, JAMES SHARP, AND J. HARMON SMITH, in their official
capacities as members of the Arkansas State Board of Election Commissioners,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Arkansas - Fayetteville
No. 5:20-CV-05193 (Honorable Timothy L. Brooks)

# RESPONSE BRIEF OF APPELLEES
# ARKANSAS UNITED AND MIREYA L. REITH

Nina Perales
TX State Bar No. 24005046
110 Broadway, Suite 300
San Antonio, Texas 78205
Mexican American Legal Defense &
  Educational Fund (MALDEF)
(210) 224-5476
nperales@maldef.org

Susana Sandoval Vargas
IL State Bar No. 6333298
Mexican American Legal Defense &
  Educational Fund (MALDEF)
100 La Salle Street
Chicago, IL 60602
(312) 427-0701
ssandovalvargas@maldef.org
Lawrence Walker,
AR Bar No. 2012042
1723 Broadway
Little Rock, AR 72206
(501) 374-3758
lwalker@jwwlawfirm.com

**SUMMARY AND STATEMENT REGARDING ORAL ARGUMENT**

The federal Voting Rights Act provides that voters who require assistance to vote because they cannot read the ballot are entitled to "assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508 ("Section 208"). Applying well-established preemption doctrine, the district court correctly concluded that the State of Arkansas cannot add to the four categories of individuals whom Congress prohibits from serving as assisters.

Because the district court properly reached and adjudicated Plaintiffs' claim under the Supremacy Clause of the U.S. Constitution, the Court's decision in *Arkansas State Conference NAACP v. Arkansas Board of Apportionment* does not resolve this case. 86 F.4th 1204 (8th Cir. 2023). The Arkansas law that prohibits voters from choosing assisters who have already helped six voters in an election must yield to Section 208 and the district court's conclusion to that effect should be affirmed. Additionally, the district court's award of attorney's fees and costs was proper.

Arkansas United respectfully requests oral argument. This case raises important questions under the federal Voting Rights Act and state election law, and oral argument will help illuminate the positions of the parties and aid the Court in reaching a decision.

# TABLE OF CONTENTS

SUMMARY AND STATEMENT REGARDING ORAL ARGUMENT ............... ii

TABLE OF AUTHORITIES .................................................................v

STATEMENT OF THE ISSUES PRESENTED.....................................1

STATEMENT OF THE CASE.............................................................2

A.   Statutory Framework ...............................................................3

  1. Section 208 of the Voting Rights Act.........................................3

  2. The Arkansas Six Voter Limit..................................................7

B.   Voter Assistance ....................................................................7

  1. No Fraud in Voter Assistance...................................................9

  2. Election Officials Work with Arkansas United, a Trusted
     Community Organization .......................................................10

  3. In the 2020 Election, Voters Were Unable to Vote with
     Their Chosen Assister Because of the Six-Voter Limit...........12

  4. The District Court's Decision.................................................16

SUMMARY OF THE ARGUMENT ....................................................18

ARGUMENT ...................................................................................20

I.    STANDARD OF REVIEW ............................................................21

II.   THE DISTRICT COURT PROPERLY REACHED PLAINTIFFS'
      SUPREMACY CLAUSE CLAIM ........................................................21

III.  SECTION 208 PREEMPTS ARKANSAS'S SIX-VOTER LIMIT ................24

A.   The Plain Meaning of Section 208 Precludes the State's Arguments About the Scope and Limit of Voter Protections ................................27

B.   The State's Own "Undue Burden" Standard Does Not Supplant Preemption Doctrine ....................................................31

IV.   THE DISTRICT COURT'S AWARD OF ATTORNEYS' FEES AND COSTS IS APPROPRIATE ................................................................................36

A.   Plaintiffs are Prevailing Parties Entitled to Attorney's Fees And Costs .........................................................................................36

B.   The District Court's Award is Appropriate Under 52 U.S.C. 10310(e) ......................................................................................36

1.   The State is Precluded from Challenging on Appeal the Statutory Basis for the Award ......................................................37

2.   Eligibility for Fees and Costs Under the VRA Does not Require a Claim Directly Under the 14th or 15th Amendments ..38

C.   The District Court did not Abuse its Discretion in Declining an Across-the-Board Reduction of the Fees Award ...........42

D.   The District Court did not Abuse its Discretion in Awarding Fees Related to the Preliminary Injunction ........................46

E.   The District Court did not Abuse Its Discretion in Determining Plaintiff's Rates .............................................................47

F.   The District Court's Award of Fees and Costs is not Excessive ........49

G.   The District Court did not Abuse its Discretion in Refusing to Consider Impact on Public Services .................................52

H.   Plaintiffs are Entitled to Fees and Costs for their Supremacy Clause Claim ................................................................................53

CONCLUSION ......................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama State Conference of Nat'l Ass'n for the Advancement of Colored People v. Alabama*,
949 F.3d 647 (11th Cir. 2020) ............................................................. 20

*Allen v. Milligan*,
599 U.S. 1 (2023) .................................................................. 2, 20, 38

*Anderson v. Celebrezze*,
460 U.S. 780 (1983) ................................................................. 29, 30

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
570 U.S. 1 (2013) ................................................................... Passim

*Arizona v. U.S.*,
567 U.S. 387 (2012) .......................................................... 1, 20, 21, 32

*Arkansas State Conference NAACP v. Arkansas Bd. of Apportionment*,
86 F.4th 1204 (8th Cir. 2023) ...................................................... 14, 38

*Aware Woman Clinic v. City of Cocoa Beach*,
629 F.2d 1146 (5th Cir. 1980) .......................................................... 50

*Bone Shirt v. Hazeltine*,
524 F. 3d 863 (8th Cir. 2008) .......................................................... 37

*Bostock v. Clayton Cnty., Georgia*,
590 U.S. 644 (2020) ................................................................... 28

*Bryant v. Jeffery Sand Co.*,
919 F. 3d. 520 (8th Cir. 2019) ......................................................... 44

*Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human*,
532 U.S. 598 (2001) ................................................................... 33

*Buckman Co. v. Plaintiffs' Legal Comm.*,
    531 U.S. 341 (2001) ........................................................ 32

Burdick v. Takushi,
    504 U.S. 428 (1992) ........................................................ 29

*Campbell v. Am. Crane Corp.*,
    60 F.3d 1329 (8th Cir. 1995) ............................................ 34

*Connor v. Winter*,
    519 F. Supp. 1337 (S.D. Miss. 1981) ................................ 49

*Cromeans v. Morgan Keegan & Co.*,
    859 F.3d 558 (8th Cir. 2017) ............................................ 17

*DiPietrae v. City of Philadelphia*,
    666 A.2d 1132 (Pa. Commw. Ct. 1995) ............................ 27

*Donnell v. U.S.*,
    682 F.2d 240 (D.C. Cir. 1982) .......................................... 37

*DSCC v. Simon*,
    950 N.W.2d 280 (Minn. 2020) .................................... 23, 24

*Emery v. Hunt*,
    272 F.3d 1042 (8th Cir. 2001) ................................... Passim

*Express Scripts, Inc. v. Aegon Direct Mktg. Servs., Inc.*,
    516 F.3d 695 (8th Cir. 2008) ...................................... 17, 19

*Fagnan v. City of Lino Lakes, Minn.*,
    745 F.3d 318 (8th Cir. 2014) ............................................ 17

*Fair v. Norris*,
    480 F.3d 865 (8th Cir. 2007) ...................................... 17, 19

*Fjelsta v. Zogg Dermatology, PLC*,
    488 F.3d 804 (8th Cir. 2007) ............................................ 34

*Fla. Lime & Avocado Growers, Inc. v. Paul,*
    373 U.S. 132 (1963) ....................................................................... 21

*Fla. State Conf. of NAACP v. Lee,*
    576 F. Supp. 3d 974 (N.D. Fla. 2021) ........................................ 38

*Gruttemeyer v. Transit Auth.,*
    31 F.4th 638 (8th Cir. 2022) ........................................................ 17

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ....................................................................... 11

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983) .............................................. 1, 40, 41, 42

*Hillman v. Maretta,*
    569 U.S. 483 (2013) ....................................................................... 25

*Jenkins v. Winter,*
    540 F.3d 742 (8th Cir. 2008) ............................................. 17, 19

*Jenkins by Jenkins v. State of Mo.,*
    *127 F.3d 709 (8th Cir. 1997)* ...................................................... 44

*Jesski v. Dakota, Minnesota & E. R.R. Corp.,*
    43 F.4th 861 (8th Cir. 2022) ........................................................ 21

*Johnson v. Georgia Highway Exp., Inc.,*
    488 F.2d 714 (5th Cir. 1974) ........................................................ 45

*Johnson v. State of Miss.,*
    606 F.2d 635 (5th Cir. 1979) ........................................................ 49

*Jordan v. Allain,*
    619 F. Supp. 98 (N.D. Miss. 1985) ............................................ 36

*Katzenbach v. Morgan,*
    384 U.S. 641 (1966) ....................................................................... 37

*La Union del Pueblo Entero v. Abbott*,
  618 F. Supp. 3d 504 (W.D. Tex. 2022)................................................................. 38

*Lankford v. Sherman*,
  451 F.3d 496 (8th Cir. 2006)................................................................. 21

*Libertarian Party of S. Dakota v. Krebs*,
  2018 WL 4762966 (D.S.D. Oct. 2, 2018) ................................................................. 45

*Ludlow v. BNSF Ry. Co.*,
  788 F.3d 794 (8th Cir. 2015)................................................................. 32, 40

*McFadden v. United States*,
  576 U.S. 186 (2015) ................................................................. 26

*Moore v. City of Des Moines*,
  766 F.2d 343 (8th Cir. 1988)................................................................. 45

*Morris v. City of Chillicothe*,
  512 F.3d 1013 (8th Cir. 2008)................................................................. 17

*Morrow v. Greyhound Lines, Inc.*,
  541 F.2d 713 (8th Cir. 1976)................................................................. 34

*Mut. Pharm. Co., Inc. v. Bartlett*,
  570 U.S. 472 (2013) ................................................................. 22

*Nick v. Bethel*,
  2008 WL 11456134 (D. Alaska July 30, 2008) ................................................................. 24

*OCA Greater Houston v. Texas*,
  2017 WL 401275 (W.D. Tex. Jan. 30, 2017) ................................................................. 37

*OCA-Greater Houston v. Texas*,
  867 F.3d 604 (5th Cir. 2017)................................................................. 1, 23, 27

*Perdue v. Kenny A. ex rel. Winn*,
  559 U.S. 542 (2010) ................................................................. 50

*Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*,
  559 F.3d 772 (8th Cir. 2009)...................................................................... 13, 21, 22

*Planned Parenthood, Sioux Falls Clinic v. Miller*,
  70 F.3d 517 (8th Cir. 1995)................................................................................ 46

*Priorities USA v. Nessel*,
  487 F. Supp. 3d 599 (E.D. Mich. 2020)............................................................. 30

*Qualkinbush v. Skubisz*,
  826 N.E.2d 1181 (Ill. App.Ct. 2004) .................................................................. 27

*Ray v. Texas*,
  2008 WL 3457021 (E.D. Tex. Aug. 7, 2008) ..................................................... 27

*Republic of Argentina v. NML Cap., Ltd.*,
  573 U.S. 134 (2014) ........................................................................................... 26

*Riddell v. Nat'l Democratic Party*,
  624 F.2d 539 (5th Cir. 1980).............................................................................. 49

*Rogers Grp., Inc. v. City of Fayetteville*,
  683 F.3d 903 (8th Cir. 2012).............................................................................. 33

*Sheppard v. United States Dep't of Just.*,
  2022 WL 245480 (W.D. Mo. Jan. 25, 2022) ...................................................... 48

*South Carolina v. Katzenbach*,
  383 U.S. 301(1966) ............................................................................................ 38

*St. Louis Developmental Disabilities Treatment Ctr. Parents' Ass'n v. Mallory*,
  767 F.2d 518 (8th Cir. 1985).............................................................................. 34

*St. Louis Effort for AIDS v. Lindley-Myers*,
  877 F.3d 1069 (8th Cir. 2017)...................................................................... 16, 50

*Texas v. United States*,
  49 F. Supp. 3d 27 (D.D.C. 2014) ....................................................................... 37

*Thomas v. Corwin*,
   483 F.3d 516 (8th Cir.2007).................................................................. 17

*United States v. Bd. of Comm'rs of Sheffield*,
   435 U.S. 110 (1978) ........................................................................... 37

*United States v. Berks Cnty., Pa.*,
   277 F. Supp. 2d 570 (E.D. Pa. 2003) .................................................. 24

*United States v. Smith*,
   499 U.S. 160 (1991) ........................................................................... 26

*Vega v. Tekoh*,
   597 U.S. 134 (2022) ........................................................................... 38

**Statutes**

42 U.S.C. § 1971, 1973, and 1983 ............................................................ 36
42 U.S.C. § 1973l (e) ............................................................................... 36
42 USC 1988 ............................................................................................ 36
52 U.S. Code § 10302 (c) ......................................................................... 19
52 U.S.C. 10310(e) ........................................................................... Passim
52 U.S.C. § 10310 ................................................................................. 3, 4
52 U.S.C. § 10508 ............................................................................ 2, 3, 18

Ark. Code §§ 7-5-310(b)(4)(B), 7-1-103(a)(19)(C) and 7-1-103(b)(1) ... 2, 7, 13, 18

Ark. Const. Amend. 50, § 2 .............................................................. 31, 37

Ark. Const. Amend. 81 ............................................................................ 31
Section 7-1-103(a)(19)(C) ......................................................................... 8
section 7-1-103(b)(1) ................................................................................. 8
Section 7-5-310(b)(5) of the Arkansas Code ........................................... 13
Sections 7-1-103(a)(19)(C) and 7-1-103(b)(1) of the Arkansas Code ... 18

Tex. Elec. Code § 61.033 ......................................................................... 27

U.S. Const. art. VI .................................................................................... 20

U.S. Const. Art. VI, cl. 2 .................................................................... 14, 18

§ 7-5-310 ............................................................................................ 8

## Rules

Fed. R. App. P. 32(a)(5) .................................................................. 54
Fed. R. App. P. 32(a)(6) .................................................................. 54
Fed. R. App. P. 32(a)(7)(B) ............................................................. 54
Fed. R. App. P. 32(f) ....................................................................... 54
Fed. R. Civ. P. 4(c) .......................................................................... 47
Fed. R. Civ. P. 4(d)(2) ..................................................................... 47
Fed. R. Civ. P. 4(d)(4) ..................................................................... 47

## Other Authorities

121 Cong.Rec. H4735 ...................................................................... 36
180 ...................................................................................................... 4
240-41 ................................................................................................. 4
241 ...................................................................................................... 5
242 ...................................................................................................... 6
1982 U.S.C.C.A.N. 177 .............................................................. 4, 5, 6
*H.R. 3112* .......................................................................................... 7
H.R. Rep. No. 227 .............................................................................. 6
*S. 54* .................................................................................................. 7
*S. 1761* .............................................................................................. 7
*S. 1975* .............................................................................................. 7
*S. 1992* .............................................................................................. 7
S. Rep. No. 94-295 ...................................................................... 36, 37
S. Rep. No. 97–417 ................................................................... Passim

# STATEMENT OF THE ISSUES PRESENTED

1. Whether the district court properly reached Plaintiffs' claim under the Supremacy Clause of the U.S. Constitution.

   **Apposite Authority**: *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013).

2. Whether the district court properly granted summary judgment to Plaintiffs after concluding that Arkansas's restriction on voter assistance impermissibly conflicts with Section 208 of the federal Voting Rights Act.

   **Apposite Authority**: *Arizona v. Inter Tribal Council of Arizona, Inc.* 570 U.S. 1 (2013); *Arizona v. U.S.*, 567 U.S. 387 (2012); *OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017).

3. Whether the district court properly awarded attorney's fees and costs to Plaintiffs.

   **Apposite Authority**: *Hensley v. Eckerhart*, 461 U.S. 424 (1983); *Emery v. Hunt*, 272 F.3d 1042 (8th Cir. 2001).

**STATEMENT OF THE CASE**

Last year, the U.S. Supreme Court reiterated that the federal Voting Rights Act ("VRA") is considered by many to be "the most successful civil rights statute in the history of the Nation." *Allen v. Milligan*, 599 U.S. 1, 10 (2023) (quoting S. Rep. No. 97–417, at 111 (1982)). This case involves a section of the VRA that guarantees voters the right to choose his or her assister when the voter is unable to read or write.

Because the VRA does not require Arkansas to translate ballots into languages other than English, Arkansas voters who cannot read or write in English often bring a person with them to the polls to help them vote. APP011-12; R. Doc. 4-1, at 10-11 ¶31-32; 2SUPPAPP004-05, R. Doc. 148-1, at 18:14-25, 19:1-12. Section 208 of the VRA guarantees these voters the right to receive "assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508 ("Section 208").

In 2009, Arkansas amended its Election Code to criminalize assisting more than six voters. ARK. CODE §§ 7-5-310(b)(4)(B), 7-1-103(a)(19)(C) and 7-1-103(b)(1) (collectively the "six-voter limit"). In areas of the state with significant numbers of limited English proficient voters and few bilingual poll workers, private individuals and community organizations meet the need for voter assistance. In northwest Arkansas, many limited English proficient voters choose assisters with

Arkansas United, a local nonprofit social services organization. Local election officials also depend on Arkansas United to provide assistance to voters.

Arkansas's six-voter limit prevents a voter from choosing, and receiving help from, an assister who has already helped six voters. Section 208 contains no such limitation on voter assistance. The district court properly held that the six-voter limit conflicts with, and is thus preempted by, Section 208.

## A.   Statutory Framework

## 1.  Section 208 of the Voting Rights Act

Section 208 of the VRA provides: "Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508.

The VRA defines the terms "vote" and "voting" to include: "all action necessary to make a vote effective . . . including, but not limited to, registration, [action] required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast[.]" 52 U.S.C. § 10310.

In the hearings on the VRA amendments of 1982, members of Congress expressed concerns about the continuing problems facing disabled and low-literate

voters at the polls, particularly with poll workers who threatened and coerced these voters.

The Senate Committee wrote in its Report:

> [M]embers of such groups run the risk that they will be discriminated against at the polls and that their right to vote in state and federal elections will not be protected. Clearly, the manner of providing assistance has a significant effect on the free exercise of the right to vote by such people who need assistance. Specifically, it is only natural that many such voters may feel apprehensive about casting a ballot in the presence of, or may be misled by, someone other than a person of their own choice. As a result, people requiring assistance in some jurisdictions are forced to choose between casting a ballot under the adverse circumstances of not being able to choose their own assistance or forfeiting their right to vote. The committee is concerned that some people in this situation do in fact elect to forfeit their right to vote.

S. Rep. No. 97-417, at 62 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 240-41.

Congress carefully deliberated over which voters should have a right to assistance and who should not be allowed to serve as an assister. For example, the Senate Committee considered and rejected an amendment that would have deleted the phrase "inability to read or write" from Section 208. S. Rep. No. 97-417, at 3-4 (1982). The Committee adopted a late amendment prohibiting officials or agents of a voter's union from serving as an assister. *Id.*

In its report, the Senate Committee concluded that "meaningful" assistance means permitting a voter to bring a "trust[ed]" person into the voting booth. S. Rep. 97-417, at 62-63. Noting that states might adopt different procedures to facilitate assistance to voters who are blind versus voters who are unable to read or write, the

Senate Committee emphasized that "at the least, members of each group are entitled to assistance from a person of their own choice." S. Rep. 97-417 at 63.

The legislative history of the federal VRA generally, and Section 208 specifically, evinces Congress's intent to allow voters to choose their own assister in order to protect the ability to vote without interference or coercion by poll workers. *See* Bills to Amend the VRA of 1965: Hearings Before the Subcomm. on the Const. of the S. Comm. on the Judiciary, 97th Cong. 63 (May 4, 1982) (Senator DeConcini, in an Executive Session considering the VRA in the Senate Judiciary Committee, stated "We made some additional minor changes such as . . . a provision to insure that blind, handicapped, and illiterate voters can receive assistance from persons of their choice in the voting booth so that such individuals will not be subject to undue influence or harassment from voting officials."); *see* also H.R. Rep. No. 97-227, at 14 (1981) (discussing need to deter coercion of voters by election officials); *see also* State's Br. at 5-6 ("the Senate Report explained that 'having assistance provided by election officials discriminates against those voters who need such aid because it infringes upon their right to a secret ballot and can discourage many from voting for fear of intimidation or lack of privacy.'") (citing S. Rep. No. 97-417, 97th Cong., 2d Sess., at 62 n.207).

The legislative history of Section 208 also shows that Congress intended to protect the right to vote of limited English proficient persons. The Senate Committee

recognized that voters who were unable to read or write include "language minority" voters who lacked proficiency in English. S. Rep. No. 97-417, 64 (1982).

Congress's inclusion of voters who are limited English proficient is also borne out by the Senate Committee's colloquy between Senator Denton and then-Senator Biden:

> Senator DENTON: I just have a question here, Mr. Chairman, for those who are advocating this language, "inability to read or write." It is my understanding that the voting booths have a multilingual kind of aspect. In fact, it is my understanding that Spanish, even the Aleutian tongue is used in some of the booths, and I wonder what language is referred to when one states "inability to read or write"? I just am confused by the intent.

> Senator BIDEN. The answer is any language, any language whatsoever, if the person cannot understand for whom they are voting, and they just state they cannot understand that, whether it is Aleutian, or Portuguese or Swahili. If they say they cannot understand it, they cannot read or write or understand what is going on in the booth, and they need help, that is what we are talking about. It is clear on its face what we are talking about. That is what read or write means. Read or write, whatever the language is, that is in the language that the person is required to vote.

*Voting Rights Act: Hearing on S. 54, S. 1761, S. 1975, S. 1992 and H.R. 3112 Hearing Before Subcomm. on the Constitution of the S. Comm. on the Judiciary*, Volume 2 97th Cong. at 89-90 (1982).

Congress designed Section 208 to work in tandem with Section 203 of the VRA, which mandates bilingual ballots and other language assistance in jurisdictions that meet a minimum threshold of limited English proficient voters. 52

U.S.C. § 10503. Where jurisdictions are not covered by Section 203, like Arkansas, Section 208 guarantees that limited English proficient voters have the right to bring an assister to help them. *Id.*

### 2. The Arkansas Six-Voter Limit

In 2009, Arkansas amended its Election Code to prohibit voters from choosing certain assisters. Section 7-5-310(b)(4)(B) of the Arkansas Code provides that "[n]o person other than [poll workers] shall assist more than six (6) voters in marking and casting a ballot at an election."

Two additional provisions intersect with the six-voter limit: section 7-1-103(a)(19)(C) prohibits anyone assisting a voter from "marking and casting the voter's ballot except as provided in § 7-5-310," and section 7-1-103(b)(1) makes such a violation a Class A misdemeanor.

### B. Voter Assistance

Local election officials from Benton, Sebastian and Washington counties testified that their counties have larger, growing Latino populations and that they have voters who are limited English proficient and require assistance with voting. 2SUPPAPP029, 032; R. Doc. 148-3, at 22:12-18; 28:12-25 (Benton); 2SUPPAPP002-003, R. Doc. 148-1 at 15:11-16:1; 16:5-8 (Sebastian); 2SUPPAPP045, R. Doc. 148-4 at 15:5-7; 15:12-25 (Washington).

Benton and Washington county election officials face challenges recruiting a sufficient number of poll workers. 2SUPPAPP030-031, 033; R. Doc. 148-3, at 23:21-24:1; 31:6-32:17 (Benton); 2SUPPAPP048-049, 053-054; R. DOC. 148-4 at 18:23-19:18; 24:20-25:22 (Washington). This is also true for recruiting bilingual poll workers. 2SUPPAPP053-055, 057, 075; R. DOC. 148-4 at 24:20-25:22; 26:12-24; 28:13-16; 79:1-13 (Washington). As a result, Sebastian and Washington Counties try to recruit high school students who speak Spanish to volunteer as poll workers. 2SUPPAPP007-008, 016-018; R. Doc. 148-1 at 21:23-22:20; 33:18-35:15 ("I mean, when I call the high schools, I say, 'You got any bilingual, please, send them.' That's it.") (Sebastian); 2SUPPAPP046-047, R. DOC. 148-4 at 16:5-17:3; 17:8-16 (Washington).

Assistance for limited English proficient voters varies across the region. Sebastian County doesn't have bilingual poll workers and relies on limited English proficient voters to bring their own assister. 2SUPPAPP014-015, 004-005; R. Doc. 148-1 at 31:6-32:19; 18:14-19:12 (Sebastian). Sebastian County has no staff designated to ensure that language assistance is available to limited English proficient voters and provides no translated voting materials or signage to limited English proficient voters. 2SUPPAPP006, 016-018; R. Doc. 148-1 at 20:19-22; 33:18-35:15 (Sebastian). Benton County asks its poll workers if they can speak Spanish then tries to disperse those bilingual poll workers to the vote centers where

they are needed. 2SUPPAPP033-034, R. Doc. 148-3 at 31:6-32:17 (Benton). Washington County places bilingual poll workers only at its Springdale polling places, and sometimes lacks poll workers, having to deploy a bilingual "rover" poll worker for its Springdale polls. 2SUPPAPP048-049, 052; R. DOC. 148-4 at 18:8-15; 18:23-19:18; 22:9-22 (Washington).

### a.    No Fraud in Voter assistance.

Local election officials testified there are few to no instances of voter fraud in their counties, and could recall no voter assistance fraud. Washington County Executive Director Jennifer Price testified "we have never investigated nor turned in anyone for voter fraud." 2SUPPAPP071-072, R. Doc. 148-4 at 55:3-6; 54:17-23. When asked about voter fraud, Benton County Election Commissioner Russell Anzalone could only recall a few incidents in which elderly voters voted by mail and then mistakenly tried to vote on Election Day. 2SUPPAPP040, R. Doc. 148-3 at 51:5-19. Sebastian Election Coordinator Meghan Hassler also testified that she did not know of any incidents of voter fraud. 2SUPPAPP019-020, R. Doc. 148-1 at 41:19-42:15.

When asked about voter assistance fraud in Arkansas, state election officials could only identify phone calls about one occasion on which an individual drove

voters to the polls.  APP240; R. Doc. 134-5, at 26:7-24; APP283; R. Doc. 134-6, at 28:12-23.[1]

### b. Election Officials Work with Arkansas United, a Trusted Community Organization.

Plaintiff Arkansas United is a community-based, non-profit membership organization located in Springdale, Arkansas.  APP003; R. Doc. 4-1 at ¶¶1-3. Plaintiff L. Mireya Reith is the founder and executive director of Arkansas United. APP002; R. Doc. 4-1 at ¶1.

Arkansas United provides social services to members of the immigrant community in the state, including family-based legal services, helping individuals advocate for themselves in administrative proceedings, citizenship workshops, education on voter registration, and voter assistance.  Arkansas United operates resource centers in Springdale and Little Rock and provides Community Navigators in 10 localities who work in partnership with local service providers to connect qualified immigrants to their services.  Arkansas United also provides specialized assistance to Hispanic businesses and Hispanic parents. APP003; R. Doc. 4-1 at ¶¶ 4, 14.  Arkansas United directly assists about 20,000 Arkansans every year through

---

[1] The record contains one letter of caution to an individual who assisted eight voters in a past election.  APP254-255, R. Doc. 134-5 at 82:9-83:18, 84:4-25, 85:1-86:2, 89:3-8.  Benton County could not think of a purpose for the six-voter limit.  2SUPPAPP039-040, R. Doc. 148-3 at 50:15-51:1 (Benton).

its various services. APP003; R. Doc. 4-1 at ¶5. Arkansas United relies primarily on grants and donations to fund its work, but it is also funded by its member's dues. APP003-004, R. Doc. 4-1 at ¶¶ 3,11.

Since its incorporation in 2010, Arkansas United, among other things, has operated non- partisan voter registration and Get Out the Vote campaigns. APP003; R. Doc. 4-1, at ¶6. Arkansas United, through the coordinated work of staff and volunteers, also assists limited English proficient voters with voting at the polls. App004; R. Doc. 4-1, at ¶8. Limited English proficient voters rely on Arkansas United as a trusted organization and choose its staff and volunteers as assisters to help them vote. APP012-013; R. Doc. 4-1, at ¶ 34.

Washington County has a good relationship with Arkansas United and relies on Arkansas United to recruit bilingual poll workers and prepare Spanish language voting instructions for the polling places, all in an effort to make voting accessible for limited English proficient voters. 2SUPPAPP046-047, 059, 064-068, R. Doc. 148-4 at 16:5-17:3; 31:6-22; 38:17-39:5; 39:8-23; 40:12-24; 41:3-42:12 ("I've reached out to [Plaintiff Mireya Reith] for different needs, and I've always thought we had a really good working relationship.") (Washington). Washington County also asks Arkansas United to refer its employees and volunteers to serve as poll workers for the county. 2SUPPAPP079, 053-054, R. Doc. 148-4 at 88:21-25; 24:20-25:22 (Washington).

One example of public-private cooperation took place during the 2016 election, when Washington County "set up a booth where [Arkansas United] brought in a lot of volunteers to be able to . . . assist voters at the rodeo grounds[.]" 2SUPPAPP069-070, R. Doc. 148-4 at 43:4-44:5 (Washington). Also that year, when Washington County received new voting equipment, the county worked with Arkansas United to organize voting equipment demonstrations for the public. 2SUPPAPP065, R. DOC. 148-4 at 39:8-23 (Washington).

Arkansas United painstakingly adheres to the six-voter limit. APP378, R. DOC. 139-20 ¶¶ 4-5; *see also* 2SUPPAPP078-079, R. Doc. 148-4 at 87:22-88:10 ("[Arkansas United] wanted to make sure that they did not violate that election law.") (Washington). Throughout the region, as a result of assisters' adherence to the six-voter limit, county election officials could not identify any instances of an assister helping more than six voters. 2SUPPAPP037-038, R. Doc. 148-3 at 46:8-47:7 (Benton); APP322; R. Doc. 134-7 at 53:7-18 (Sebastian).

**b.    In the 2020 Election, Voters Were Unable to Vote With Their Chosen Assister Because of the Six-Voter Limit[2]**

---

[2] The State's suggestion that only an individual voter may sue under the VRA case is patently wrong (Br. at 17).  The district court properly recognized that an organization can sue under the VRA.  *See* APP510-512, R. Doc. 179 at 16-18 (*citing Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982).  In order to comply with the six-voter limit, Arkansas United was forced to turn away members and others who requested voter assistance, recruit more volunteers to serve as voter assisters, coordinate and track its voter assistance efforts, and send staff from the office to the polls as assisters reached the six-voter limit.  *See* APP513-514, R. Doc. 179 at 19-20; *see also* APP376; R. Doc. 139-20, at 2, ¶ 5.

In the 2020 General Election, Arkansas United conducted its regular activities of informing voters about the election, answering questions of voters who called the Arkansas United office, and providing voter assistance at the polls.

For example, during the early voting period, Ms. Susana Terrazas, a registered voter, voted with assistance from Arkansas United staff member Celina Reyes. APP356, 362; R. Doc. 139-12, at 6:19-22, 12:12-13:13; APP368-369; R. Doc. 139-13; APP224; R. Doc. 134-4 at 14:12-21. Ms. Terrazas is Spanish-speaking and had no other person to help her vote, so she and her husband chose an assister with Arkansas United. APP362-363; R. Doc. 139-12, at 12:12-13:2. Ms. Reyes helped Ms. Terrazas and Ms. Terrazas' husband, Saul Octavio Acosta, to vote. APP355, 365; R. Doc. 139-12, at 5:8-9; 15:8-10; APP368-369; R. Doc. 139-13. Ms. Terrazas did not see any bilingual poll workers at the poll when she voted with assistance from Ms. Reyes. APP357, R. Doc. 139-12, at 7:14-17.

To assist voters, Arkansas United staff member Araceli Gonzalez, who holds a college degree, researched and drafted election education materials in Spanish, including a guide to voting safely during the COVID-19 pandemic and a voting glossary into Spanish. APP388, R. Doc. 139-22 at ¶ 9; APP218, R. Doc. 134-3 at 48:5-9. The glossary contained the names of the various positions and candidates on the ballots as well as descriptions of their responsibilities and duties—

information she carefully researched from official sources. *Id.* and APP218, R. Doc. 134-3 at 49:17-24. As part of her assistance to voters, Ms. Gonzalez explained the voting process before the voter entered the voting booth. APP390, R. Doc. 139-22 at ¶ 15. She told them what the voting machines looked like, what kind of ballot they would get and how to process it once they were done voting. She did not tell anyone who to vote for, and she explained each position in general terms, so that the voter was informed about what to expect on the ballot in front of them once they entered the voting booth. *Id.* Gonzalez provided only requested assistance, and did not influence any voter's vote. APP390, R. Doc. 139-22 at ¶ 15. Ms. Gonzalez never marked or cast a ballot for a voter, never told a voter how to vote, and was vigilantly non-partisan. APP217, 219; R.Doc. 134-3 at 43:7-9; 50:13-22 ("it's asking you if you want to vote for or against XYZ."); APP219, R. Doc. 134-3 at 50:23-51:2).

During the election period, as Arkansas United contacted voters to encourage them to vote, the organization received requests for language assistance from more voters than it was able to help within the six-voter limit. About 100 voters chose an assister from Arkansas United and Arkansas United turned them away because of the six-voter limit. APP378, R. Doc. 139-20 at 2, ¶ 5. Without the six-voter limit, Arkansas United's small group of staff and volunteers could have helped the voters who chose them as assisters, but instead the voters were unable to vote with their chosen assisters. APP378-379, R. Doc. 139-20 at 2-3, ¶¶ 5-7.

On Election Day, Arkansas United was very busy. APP381-382, R. Doc. 139-20 at 5-6, ¶¶ 12-14. Staff members were calling voters to remind them about the election and there were more voters requesting language assistance than in past elections. APP381-382, R. Doc. 139-20 at 5-6, ¶¶ 13-14. Through its citizenship workshops, Arkansas United had seen the number of Latino citizens grow and also seen their excitement grow at having the opportunity to cast their first vote in an election. APP381, R. Doc. 139-20 at ¶ 13.

That morning, a poll worker from the Springdale Civic Center polling place arrived at the Arkansas United office and asked staff from Arkansas United to assist the voters who were arriving and needed language assistance. APP209-210, 216; R. Doc. 134-3 at 13:20-14:4; 39:1-12.[3] The Arkansas United staff person who went to help quickly met her limit and contacted her sister who then came to assist voters. APP209-210, R. Doc. 134-3 at 13:20-14:4.

Throughout the day, Arkansas United staff and volunteers provided language assistance to voters. APP367-369, 405-424; R. Doc 139-13 at 1-3; R. Doc 139-25 at 1-9; R. Doc. 139-26 at 1-6; R. Doc. 139-27 at 1-5. Voters chose Arkansas United

---

[3] The State asserts that Arkansas United was told that its "services were not needed because the county would handle the provision of language services to voters." Br. at 6-7. The opposite is true. The State appears to base its mistaken assertion on a phone call in which a Sebastian County employee told Arkansas United that it need not bring extra hand sanitizer and masks to the polls in the 2020 General Election. APP330-31, APP333; R. Doc. 134-7 at 66:8-11; 67:1-23; 69:5-10 (Sebastian) The exchange had nothing to do with language assistance.

assisters after learning of their availability from poll workers. APP206, R. Doc. 134-3 at. 20:15-21:14. However, each time an Arkansas United staff member or volunteer neared the six-voter limit, she would have to call the Arkansas United office and request more assisters, then stop assisting voters. APP401-402, R. Doc. 139-23 at ¶¶ 14-15; APP393, R. Doc. 139-22 at ¶ 25; APP216-217, R. Doc. 134-3 at 41:19-42:1; 42:21-43:2; APP402, R. Doc. 139-23 at ¶ 17.

If not for the six-voter limit, voters who chose assisters with Arkansas United would have been able to vote with that assistance. Because Arkansas United's limited number of staff and volunteers could only help six voters each, they were forced to turn away voters who chose them for assistance. Benton County agreed that, in the situation in which a voter's chosen assister had already helped six voters, and the poll worker didn't speak Spanish, the voter would have to be able to speak, read and write in English in order to vote. 2SUPPAPP041-042, R. Doc. 148-3, at 54:11-55:15 (Benton).

### 4. The District Court's Decision

The district court ruled that the six-voter limit and related criminal provisions are preempted under the Supremacy Clause. APP532, R. Doc. 179 at 38 and APP534, R. Doc. 180 at 1. Comparing the federal and state statutes at issue, the district court observed that "Under § 208, a voter may select 'a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent

of the voter's union.' But, in Arkansas, if the person of a voter's choice had already assisted six voters, the voter could not be assisted by that person, and the voter would not be getting the assister of their choice." APP527, R. Doc. 179 at 32. Because the six-voter limit prohibits the assistance to which voters are entitled under Section 208, the district court concluded "'compliance with both . . . impossible'" and the six-voter limit is preempted. *Id.* (*quoting Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 780 (8th Cir. 2009). The district court also concluded that the six-voter limit "poses an obstacle to Congress's clear purpose to allow the voter to decide who assists them at the polls" by adding categories of prohibited assisters beyond those enumerated by Congress in the statute. *Id*. at 33 (noting that Section 208 prohibits assisters who are the voter's employer or agent of that employer or officer or agent of the voter's union).

The district court reasoned, based on the same preemption analysis, that Section 7-5-310(b)(5) of the Arkansas Code, which requires poll workers to keep a list of people who assist voters, is not preempted because "[u]nlike the six-voter limit, this tracking requirement does not prevent any voter from selecting the assister of their choice." *Id.* at 37. Concluding that the tracking requirement can "operate harmoniously" with Section 208, the district court explained that "[t]he tracking requirement is the type of permissible state legislation contemplated by the legislative history to § 208." *Id.*

The district court ordered the state and county defendants to cease enforcement of the six-voter limit, and cease enforcement of the related criminal provisions at §§ 7-1-103(a)(19)(C) and 7-1-103(b)(1) "to the extent they are used to enforce criminal penalties for violations of § 7-5-310(b)(4)(B)."  APP535, R. Doc. 180 at 2.

The county defendants did not appeal.  State defendants appealed.  APP536, R. Doc. 181.

Plaintiffs' motions to amend the complaint and for indicative ruling remain pending in the district court.  R. Doc. 211-216.

## SUMMARY OF THE ARGUMENT

Recent precedent does not foreclose Plaintiffs' claim under the Supremacy Clause of the U.S. Constitution.  U.S. CONST. Art. VI, cl. 2.  The State incorrectly argues that "[b]ecause Plaintiffs lack a private right of action to enforce Section 208, this Court must reverse the district court's judgment." Br. at 22 (citing *Arkansas State Conference NAACP v. Arkansas Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023) ("*Arkansas NAACP*"); *see also* Br. at ii.  But *Arkansas NAACP* does not speak to a plaintiff's ability to sue under the Supremacy Clause, and the district court also adjudicated and rendered judgment on Plaintiffs' claim under the Supremacy Clause. The State does not contend that Plaintiffs lack the ability to sue under the Supremacy Clause, or that the district court committed any other legal error in reaching

Plaintiffs' Supremacy Clause claim. Accordingly, *Arkansas NAACP* does not require reversal of the district court's decision.

The district court properly resolved Plaintiffs' Supremacy Clause claim with a straightforward conflict preemption analysis. *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 9-15 (2013). The State maintains, erroneously, that the district court should instead have applied an "undue burden" test of the State's own making. The State's "undue burden" test bears no relationship to preemption law, departs fatally from election law cases involving constitutional claims, and also conflicts with the text of Section 208.

In order to avoid the obvious conflict between Section 208's guarantee of the choice of voter assister, and the Arkansas Election Code's restriction of that choice, the State advances an incoherent reading of Section 208 which comports with neither Section 208's plain meaning nor its legislative history. In doing so, the State claims, without any support, that Congress intended to exclude from Section 208's protections those voters whose "inability to read or write" is based on their inability to read or write the English language. The State then advances the equally unpersuasive argument that, after Congress carefully decided that only four categories of individuals should be disqualified from serving as assisters under Section 208, the State should be allowed to add more categories of individuals to that list. The district court properly rejected these arguments.

The district court appropriately awarded Plaintiffs, as prevailing parties, fees and costs under the VRA's fee-shifting provision, 52 U.S.C. 10310(e). The State is precluded from challenging for the first time on appeal the statutory basis for the court's award. Even assuming *arguendo* that the State's argument is properly before this Court, the VRA's fee-shifting provision's text and legislative history establish that a prevailing party in voting rights litigation should recover fees. The district court carefully considered the evidence in support, and thus did not abuse its discretion in setting the fees award.

## ARGUMENT

The State does not challenge any of the district court's findings of fact as clearly erroneous. *See generally* Br.; *see also Fagnan v. City of Lino Lakes, Minn.*, 745 F.3d 318, 322 (8th Cir. 2014) (in appeal of summary judgment, findings of fact are reviewed for clear error), *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008) ("In considering a motion for summary judgment the court does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue.") (quoting *Thomas v. Corwin*, 483 F.3d 516, 526–27 (8th Cir.2007)).  The State has thus waived any argument regarding the facts. *Jenkins v. Winter*, 540 F.3d 742, 751 (8th Cir. 2008) ("Claims not raised in an opening brief are deemed waived.").  Because the district court correctly applied the applicable law, the judgment below should be affirmed.

## I.    STANDARD OF REVIEW

On appeal of summary judgment, this Court reviews the district court's legal conclusions *de novo* and its fact findings for clear error, considering the evidence in the light most favorable to the nonmoving party.  *Fagnan v. City of Lino Lakes, Minn.*, 745 F.3d 318, 322 (8th Cir. 2014).

This Court "review[s] legal questions related to the awarding of attorney's fees de novo and review[s] the amount of fees and costs awarded for abuse of discretion."  *Gruttemeyer v. Transit Auth.*, 31 F.4th 638, 649 (8th Cir. 2022).

"Arguments not raised before the district court are waived on appeal." *Cromeans v. Morgan Keegan & Co.*, 859 F.3d 558, 568 n.5 (8th Cir. 2017). Furthermore, "[c]laims not raised in an opening brief are deemed waived." *Jenkins v. Winter*, 540 F.3d 742, 751 (8th Cir. 2008) (citing *Fair v. Norris*, 480 F.3d 865, 869 (8th Cir. 2007) and *Express Scripts, Inc. v. Aegon Direct Mktg. Servs., Inc.*, 516 F.3d 695, 702 (8th Cir. 2008)).

## II.    THE DISTRICT COURT PROPERLY REACHED PLAINTIFFS' SUPREMACY CLAUSE CLAIM

The State conflates a statutory claim under the VRA with a constitutional claim under the Supremacy Clause when it argues that the judgment below must be reversed under *Arkansas NAACP*.  *See* Br. at 17 ("The district court allowed this

case to proceed only by . . . using Section 3 to imply a cause of action for Section 208[]”); *see also* Br. at 22.

Plaintiffs’ first cause of action is under the Supremacy Clause of the United States Constitution. U.S. CONST. art. VI, cl. 2; *see* APP045, R. Doc. 79 at 20 (“First Cause of Action[:] Supremacy Clause of the U.S. Constitution”).[4] The district court adjudicated Plaintiffs’ Supremacy Clause claim and ruled that “[t]he six-voter limit at § 7-5-310(b)(4)(B) of the Arkansas Code is . . . preempted by § 208 of the VRA. Sections 7-1-103(a)(19)(C) and 7-1-103(b)(1) of the Arkansas Code are also . . . preempted by § 208 to the extent they are used to enforce criminal penalties for violations of § 7-5-310(b)(4)(B).” APP532, R. Doc. 179 at 38. The State concedes this. *See, e.g.* Br. at ii (“the district court . . . determine[d] whether Section 208 preempts Arkansas’s commonsense statute[.]”); *id*. at 19 (“The district court [conducted] a ‘straightforward conflict preemption analysis.’”); *id*. at 13 (“The district court held that the tracking provision is not preempted by Section 208.”).

Because the availability of a private right of action under Section 2 of the VRA does not determine whether a plaintiff can bring a Supremacy Clause claim, the State’s argument that, “[b]ecause Plaintiffs lack a private right of action to enforce Section 208, this Court must reverse the district court’s judgment” is limited

---

[4] Plaintiffs separately asserted a violation of Section 208 of the VRA. *See id*. at 21 (“Second Cause of Action[:] Section 208 of the Federal Voting Rights Act of 1965, 52 U.S.C. §10508”).

to Plaintiffs' claim under Section 208. The State does not make, and has waived, any argument that the district court erred in reaching Plaintiffs' constitutional claim under the Supremacy Clause. *Jenkins v. Winter*, 540 F.3d 742, 751 (8th Cir. 2008); *Express Scripts, Inc. v. Aegon Direct Mktg. Servs., Inc.*, 516 F.3d 695, 702 (8th Cir.2008).

As a result, the State lacks grounds for its argument that, based on *Arkansas NAACP*, the district court's preemption decision "should be reversed." Br. at ii.

With respect to Plaintiffs' claim under Section 208 of the VRA, Plaintiffs respectfully disagree with the holding in *Arkansas NAACP* and believe the case was wrongly decided. For the reasons set out in the district court's Memorandum Opinion, including that 52 U.S. Code § 10302(c) creates a private right of action to enforce the VRA, Plaintiffs maintain that Section 208 is privately enforceable and the Court should affirm. *See* APP050, R. Doc. 102; *see also Alabama State Conference of Nat'l Ass'n for the Advancement of Colored People v. Alabama*, 949 F.3d 647, 652 (11th Cir. 2020) ("The VRA, as amended, clearly expresses an intent to allow private parties to sue the States.") and *Allen v. Milligan*, 599 U.S. 1 (2023) (affirming preliminary injunction for plaintiffs and assuming but not deciding that plaintiffs have a private right of action to sue under § 2 of the VRA).

### III.  SECTION 208 PREEMPTS ARKANSAS'S SIX-VOTER LIMIT

The district court properly applied preemption doctrine to conclude that Section 208 preempts the six-voter limit.  In its argument to the contrary, the State ignores binding precedent from the U.S. Supreme Court and this Court.

The Supremacy Clause provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. CONST. art. VI.

A state law must give way when it "creates a conflict with the plan Congress put in place." *Arizona v. United States*, 567 U.S. 387, 403 (2012).  "Conflict preemption exists where a party's compliance with both federal and state law would be impossible or where state law would pose an obstacle to the accomplishment of congressional objectives."  *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 141 (1963); *Arizona v. United States*, 567 U.S. 387, 403 (2012);  *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 780 (8th Cir. 2009); *see also Jesski v. Dakota, Minnesota & E. R.R. Corp.*, 43 F.4th 861, 865-66 (8th Cir. 2022) (federal statute preempts conflicting claims under state law); *Lankford v. Sherman*, 451 F.3d 496, 509–10 (8th Cir. 2006) ("Under the preemption doctrine, state laws

that interfere with, or are contrary to the laws of congress, made in pursuance of the constitution are preempted.") (internal quotation marks omitted).

In elections, where federal law grants a right, a state law that limits that right, "so far as the conflict extends, ceases to be operative." *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 9 (2013). *Arizona v. Inter Tribal Council of Arizona, Inc.* compared the federal National Voter Registration Act, which permits individuals to register to vote using a federal voter registration form, with an Arizona law that required local registrars to reject the federal form unless it was accompanied by documentary proof of citizenship. The Supreme Court held that the Arizona law was conflict preempted, concluding that "a state-imposed requirement of evidence of citizenship not required by the Federal Form is inconsistent with the NVRA's mandate that States accept and use the Federal Form." *Id.* at 15 (internal quotation marks omitted). The Court explained that the National Voter Registration Act "precludes Arizona from requiring a Federal Form applicant to submit information beyond that required by the form itself." *Id.* at 20.

The district court properly applied preemption doctrine to reach the same conclusion here. Section 208 permits voters to "be given assistance by a person of the voter's choice" with four exceptions enumerated in the statute. The State's six-voter limit adds to Section 208 a new class of prohibited assisters, making it impossible for a voter to receive assistance from his or her chosen assister when the

assister has already helped six people. The six-voter limit is thus preempted by Section 208. *See Mut. Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 480 (2013) (state law preempted where it was impossible for company to comply with both its duties under state and federal law). The six-voter limit is also preempted by Section 208 because the State's additional restrictions on whom Congress permits to provide voter assistance frustrates and stands as an obstacle to Congress's purpose of ensuring the right to vote for voters who are disabled or cannot read their ballots. *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 781-82 (8th Cir. 2009). As explained in Section 208's legislative history:

> By including the blind, disabled, and persons unable to read or write under this provision, the Committee does not require that each group of individuals be treated identically for purposes of voter assistance procedures. States, for example, might have reason to authorize different kinds of assistance for the blind as opposed to the illiterate. The Committee has simply concluded that, *at the least*, members of each group are entitled to assistance from a person of their own choice.

S. Rep. No. 97-417, at 62–63 (emphasis added).

The district court's ruling here is also consistent with that of the Fifth Circuit when it invalidated a Texas law that limited categories of voter assisters. *OCA-Greater Houston v. Texas.*, 867 F.3d 604 (5th Cir. 2017). The law at issue in *OCA-Greater Houston* required an assister who helped a voter in a language other than English to be registered to vote in the same county in which the voter in need of assistance resides. *Id*. at 615-16. Comparing the state law restriction to Section 208,

the Fifth Circuit concluded that the state law was preempted. *Id*. at 615 ("It should go without saying that a state cannot restrict this federally guaranteed right by enacting a statute tracking its language, then defining terms more restrictively than as federally defined.").

Similarly, in *DSCC v. Simon*, the Minnesota Supreme Court concluded that Minnesota's voter assistance restriction was preempted by Section 208 of the VRA because it limited the number of voters an assister was permitted to help. 950 N.W.2d 280, 287-88 (Minn. 2020). The Court explained, "[a] plain-language comparison leads to the conclusion that Minnesota's three-voter limit on marking assistance can be read to stand as an obstacle to the objectives and purpose of Section 208 because it could disqualify a person from voting if the assistant of choice is, by reason of other completed assistance, no longer eligible." *Id.* at 289.

Consistent with these cases, the district court properly concluded that a state law that limits a voter's choice of assister, beyond the limits set forth in Section 208, cannot coexist with Section 208. *See also United States v. Berks Cnty., Pa.*, 277 F. Supp. 2d 570, 580 (E.D. Pa. 2003); *Nick v. Bethel*, No. 3:07-CV-0098 TMB, 2008 WL 11456134, *4 (D. Alaska July 30, 2008).

### A. The Plain Meaning of Section 208 Precludes the State's Arguments About the Scope and Limit of Voter Protections

Neither Section 208's plain meaning nor its legislative history support the State's anti-preemption arguments.

First, the district court properly rejected the State's argument that Section 208's phrase "inability to read or write" excludes persons who cannot read or write in English. *Compare* Br. at 5 ("Section 208 of the Voting Rights Act Protects the Right to a Secret Ballot Free From Undue Influence, Not a Right to Language Assistance.") *with* APP527, R. Doc. 179 at 33. The text of Section 208 protects voters who have an "inability to read or write." Congress is not obligated to detail in the statute every group of voters who cannot read or write, and there is no rule of statutory construction that requires the Court to add "even though they speak English" after the words "inability to read or write." Furthermore, even if the statute were vague (and it is not), the legislative history of Section 208 reflects Congress's intent to ensure voter assistance for limited English proficient voters. *See supra* Section A.1.

The State's second argument, that other portions of the VRA which also protect limited English proficient voters, require excluding these same voters from the protections of Section 208, is equally unavailing. Before and concurrently with enacting Section 208, Congress recognized that limited English proficient voters face special barriers to voting, and Congress included provisions in the VRA to protect limited English proficient voters. *See* 52 USC §§ 10303 (e), 10304, 10503.

Contrary to the State's arguments, the ways in which these provisions operate together to guarantee voters either translated written materials and assistance from poll workers (*see* 52 U.S.C. §§ 10303 (e) and 10503), or help from the voter's assister of choice (52 U.S.C. § 10508), reinforces the conclusion that Congress intended Section 208 to protect limited English proficient voters.

Third, nothing in the text of Section 208 invites states to add categories of prohibited voter assisters. Br. 25. In Section 208, Congress carefully limited the universe of assisters. Generally, "[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Hillman v. Maretta*, 569 U.S. 483, 496 (2013) (citation omitted). The Supreme Court has repeatedly cautioned against creating right-limiting exceptions beyond the ones Congress created. *See, e.g., Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 144-46 (2014); *United States v. Smith*, 499 U.S. 160, 166–67 (1991). Section 208 should not be read to imply restrictions beyond those enumerated.

Section 208's guarantee of assistance from "a person of the voter's choice" does not permit the State "to regulate the class of persons from which voters may choose[.]" Br. at 25 (quoting Section 208). The State concedes that "[w]hen used as an indefinite article, 'a' means some undetermined or unspecified particular." Br. at 24 (quoting *McFadden v. United States*, 576 U.S. 186, 191 (2015) (cleaned up)).

Section 208 uses the indefinite article "a" because "person of the voter's choice" is not a specific person known to the reader; the identity of the assister will be decided by the voter. The State's argument that it would have drafted Section 208 differently than Congress does not require the Court to re-interpret the statute to permit states to "regulate the class of persons from which voters may choose[.]" Br. at 25. The State's further argument, that Section 208 allows it to ban all assisters as long as it leaves two individuals from which the voter can choose (Br. 25-26), flies in the face of Section 208's plain meaning and subverts Section 208's purpose of protecting voters from having to choose between voting with poll workers or not voting at all. *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. at 20 (federal election statute precludes states from requiring voters to satisfy requirements beyond those required by federal law).[5]

The State's cases are unhelpful. *Ray v. Texas*, No. 06-cv-385, 2008 WL 3457021 (E.D. Tex. Aug. 7, 2008) is off-point because it dealt with delivery of absentee ballots; to the extent it applies to polling place assisters it was abrogated by the Fifth Circuit's decision in *OCA-Greater Houston*. 867 F.3d at 615 ("We must conclude that the limitation on voter choice expressed in Tex. Elec. Code § 61.033 impermissibly narrows the right guaranteed by Section 208 of the VRA").

---

[5] With respect to the State's assertion that an incarcerated person is not available to assist a voter (Br. at 26), Congress is not required to name and specifically exclude persons who may be unavailable to assist voters.

*Qualkinbush v. Skubisz*, 826 N.E.2d 1181, 1198 (Ill. App.Ct. 2004) was an equal protection case, not a preemption case, and does not even mention Section 208. In *DiPietrae v. City of Philadelphia*, 666 A.2d 1132, 1135-36 (Pa. Commw. Ct. 1995), the question before the court was whether a state trial judge's expansion of voter assistance went beyond the state election code and a federal injunction; no party contended that, and *DiPietrae* did not address whether, Section 208 preempted the state judge's limitation of absentee ballot delivery agents to one household. *Id*. at 1135. The State's reliance on Sixth Amendment caselaw is also unavailing. Br. at 27-28. Those cases dealt with the limits of judicial rules interpreting the Constitution, not preemption or voter assistance.

## B. The State's Own "Undue Burden" Standard Does Not Supplant Preemption Doctrine

The district court properly rejected the State's argument that Supremacy Clause claims are governed by the State's own version of an undue burden standard. APP529-31, R. Doc. 179 at 35-37. The State's "undue-burden" test bears no relationship to preemption law, departs fatally from election law cases involving constitutional claims, and find no foothold in the text of Section 208. Br. at 29-30.

On its face, Section 208 does not contain an undue burden standard. As pointed out by the district court, "State Defendants latch onto this 'undue burden' language" in the legislative history of 208. APP529, R. Doc. 179 at 35. But where a statute is unambiguous, a court does not delve into legislative history. *See Bostock*

*v. Clayton Cnty., Georgia*, 590 U.S. 644, 673-74 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end. The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration."). This is because "it is ultimately the provisions of those legislative commands rather than the principal concerns of our legislators by which we are governed." *Id.* (cleaned up).

If Congress had wanted to change the preemption standard to an undue burden standard in Section 208, it would have done so. Because Congress did not, the inquiry ends. Even if it were appropriate here to insert legislative history into a statute (and it is not), the district court correctly observed that "[t]he language of the Senate Report . . . does not extend as far at the State Defendants suggest." APP530, R. Doc. 179 at 36. In the Senate Report, Congress offered examples of unduly burdensome restrictions on assisters that are analogous to the six-voter limit, and explained, "[t]he Committee has simply concluded that, at the least, members of each group are entitled to assistance from a person of their own choice." S. Rep. No. 97-417, at 62–63 (1982); see also APP530, R. Doc. 179 at 36 (reviewing the legislative history of Section 208 and concluding "[i]n other words, the one thing states cannot do is disallow voters the assister of their choice—precisely what the six-voter limit does.")

The Court should also reject the State's undue burden test because it is unmoored from the established election law undue burden cases. Although the State invokes "the undue burden standard so familiar in election cases[,]" (Br. at 18), the State purposefully avoids citing or relying on *Anderson v. Celebrezze*, 460 U.S. 780 (1983) or *Burdick v. Takushi*, 504 U.S. 428 (1992)—the Supreme Court cases that articulate today's undue burden standard in election cases. *See generally* Br. (not citing *Anderson* or *Burdick*). This is because the *Anderson-Burdick* undue burden test "so familiar in election cases" was developed after Congress enacted Section 208 and could not possibly have formed part of Congress's thinking about Section 208 or its legislative history.

Second, the State creates a new undue burden test out of whole cloth, and it bears no relationship to the undue burden test of election cases. For example, the State's definition of undue burden excludes any election law that does not directly regulate voters. Br. at 30-31.[6] By contrast, *Anderson* held that a law that did not

---

[6] The State is also wrong that the six-voter limit "does not regulate *voters*[.]" Br. at 31 (emphasis in original). The six-voter limit bars voters from choosing, and receiving assistance from, individuals who have already helped six voters. As explained by the district court, "This argument also misstates the facts—Ms. Gonzalez reached the six-voter limit on Election Day and therefore could not assist any additional voters. The record is clear that there were LEP voters that Ms. Gonzalez could have assisted absent the six-voter limit." APP529-30, R. Doc. 179 at 35-36. Because of the six-voter limit, Plaintiffs were forced to turn away over 100 voters who chose Arkansas United staff as their assisters. *See supra* Section B.3. The record demonstrates that the six-voter limit deprived voters of their choice of

directly regulate voters nevertheless unduly burdened voters' constitutional rights. *See Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983) (invalidating early filing deadline for independent candidates and explaining "[t]he impact of candidate eligibility requirements on voters implicates basic constitutional rights.").

The State's undue burden test also excludes statutory rights, such as the right to voter assistance under Section 208. *See* Br. at 30 (arguing the six-voter limit "has not burdened any voter's right to a secret ballot."); *id*. at 32, 34. Instead the State's undue burden test is only satisfied if the six-voter limit unduly burdens a voter's "right to a secret ballot" enshrined in the Arkansas Constitution. Ark. Const. Amend. 50, § 2; Ark. Const. Amend. 81 (guaranteeing all elections shall be by ballot or voting machines which preserve secrecy). The State's undue burden test, not unsurprisingly, can never be satisfied unless a challenged assistance limitation criminalizes voters for choosing assisters, and violates the secrecy of the ballot. These arguments drift impossibly far from the Supremacy Clause and preemption doctrine.

Finally, the district court properly rejected the State's proposed balancing test, in which the State's interest in election integrity outweighs the preemptive force of federal legislation. *Compare* Br. at 32-35 (citing "the important and compelling

---

assister, and thus *Priorities USA v. Nessel*, 487 F. Supp. 3d 599, 619 (E.D. Mich. 2020) (citing lack of evidence), is not applicable here.

interests served by Arkansas's six-voter provision") *with* APP528-29, R. Doc. 179 at 34-35 ("State Defendants fail to cite any authority carving out an exception to the Supremacy Clause when a state has a compelling interest in enacting a statute that conflicts with federal law.").[7]

The State's argument is foreclosed by binding precedent. *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 14-15 (state election law was preempted because "the States' role in regulating congressional elections—while weighty and worthy of respect—has always existed subject to the express qualification that it terminates according to federal law.'") (quoting *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 347 (2001))*; see also Arizona v. United States*, 567 U.S. 387, 397 (2012) (recognizing "the importance of immigration policy to the States [and that] Arizona bears many of the consequences of unlawful immigration" and concluding that state statute is preempted).

The district court properly conducted a straightforward analysis under preemption legal standards and concluded that the challenged Arkansas provision must yield to federal law.

---

[7] On its face, the six-voter limit says nothing about preventing voter fraud and the State offered no evidence of the purpose of the six-voter limit; speculation by local election officials years after enactment of a statute does not prove a statute's "design" or purpose.  Br. 32.  The State's further, additional, contention that the six-voter limit "eas[es] burdens on poll workers" (Br. at 18) is contradicted by the record, including the testimony that Washington County election officials rely on Arkansas United for voter assistance in the polling place.  *See supra* Section B.2.

**IV.** **THE DISTRICT COURT'S AWARD OF ATTORNEYS' FEES AND COSTS IS APPROPRIATE**

This Court reviews *de novo* legal issues related to the award of attorney's fees and costs, but reviews for abuse of discretion the trial court's consideration of evidence and the actual award amount granted. *See Ludlow v. BNSF Ry. Co.*, 788 F.3d 794, 803-805 (8th Cir. 2015) (affirming district court's consideration of evidence and ultimate award).

**A**. **Plaintiffs are Prevailing Parties Entitled to Attorney's Fees and Costs**

The State argues that the district court's fees award must be reversed because judgment in favor of Plaintiffs must be reversed. Br. 35-36. The State's argument relies solely on an uncertain future outcome — that the State will prevail on the merits — and thus effectively concedes that Plaintiffs are entitled to fees as prevailing parties if the merits judgment is affirmed. *See* Br. 35-36.

Plaintiffs are prevailing parties because they secured injunctive relief in the district court. *See Rogers Grp., Inc. v. City of Fayetteville*, 683 F.3d 903, 909 (8th Cir. 2012) (*quoting Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603 (2001)) (A prevailing party is "one who has obtained some relief by the court.").

**B.** **The District Court's Award is Appropriate Under 52 U.S.C. 10310(e)**

The district court appropriately awarded fees and costs under the VRA's fee-shifting provision because Plaintiffs brought their lawsuit to "enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. 10310(e). While the State disputes for the first time the basis for the award, it misreads the VRA's fee-shifting provision only to apply to claims brought directly under the 14th and 15th Amendments. *See* Br. 36-37.

1. **The State is Precluded from Challenging on Appeal the Statutory Basis for the Award**

The State is precluded from raising this issue because it failed to raise this argument before the district court. *See St. Louis Developmental Disabilities Treatment Ctr. Parents' Ass'n v. Mallory*, 767 F.2d 518, 521 (8th Cir. 1985) (Generally, "a reviewing court will consider a case only on the theory upon which it was tried in the district court."). Allowing the State to raise this issue for the first time on appeal would be an "inherent injustice." *See Fjelsta v. Zogg Dermatology, PLC*, 488 F.3d 804, 809 (8th Cir. 2007); *see also Campbell v. Am. Crane Corp.*, 60 F.3d 1329, 1332 (8th Cir. 1995) (refusing to consider for first time on appeal a strict liability theory).

This Court has recognized a narrow exception where following this rule "would be a plain miscarriage of justice or inconsistent with substantial justice," *Morrow v. Greyhound Lines, Inc.*, 541 F.2d 713, 724 (8th Cir. 1976) (quotations and

internal citations omitted), but the State demonstrated neither. *See* Br. 36. The State

provided no reason for not raising this issue until now. *See id.*

### 2. Eligibility for Fees and Costs Under the VRA Does Not Require a Claim Directly Under the 14th or 15th Amendments

Even if this Court concludes the State did not waive this issue, the district

court's award is appropriate because Plaintiffs brought this lawsuit to protect voter's

rights under the VRA.

As both text and placement reinforce, the VRA's fee-shifting statute applies

to VRA claims, and claims of VRA preemption. The State's theory — that the VRA's

fee-shifting statute applies only to claims brought directly under the 14th and 15th

Amendments — is inconsistent with the plain wording and structure of the law. *See*

Br. 36-37. Instead of looking at the text, which allows fees in "any action or

proceeding to enforce the voting guarantees of the fourteenth or fifteenth

amendment," the State invites the Court to judicially amend the statute so that it

allows fees only in "any action or proceeding [brought under] the fourteenth or

fifteenth amendment." *See id*.

The language "to enforce the voting guarantees" follows VRA sections that

protect voters' rights under the 14th and 15th Amendments, including Section 208.

Thus, the VRA's fees-shifting provision's text encompasses any action enforcing

the VRA, and also claims of VRA preemption.

The plain meaning of the VRA resolves any dispute about whether the fee-shifting provision applies to all VRA claims, but if there were any ambiguity, legislative history forecloses the State's arguments.

The legislative history demonstrates Congress's clear intent to "allow[] a court, in its discretion, to award attorneys' fees to a prevailing party in suits to enforce the voting guarantees of the Fourteenth and Fifteenth amendments, *and statutes enacted under those amendments.*" S. Rep. No. 94-295, at 40 (1975) (emphasis added); *see also Jordan v. Allain*, 619 F. Supp. 98, 104 (N.D. Miss. 1985) ("legislative histor[y] of . . . § 1973*l* (e) . . ., make clear beyond peradventure that a prevailing voting rights litigant is entitled to recover attorneys' fees regardless of the statutory or constitutional predicate of the action".) During floor debate on Section 402 of the VRA (later codified as 42 U.S.C. § 1973l (e)), a House Sponsor explained:

The provision for attorneys' fees in Section 402 is available in 'any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment.' Such litigation would include not only suits based directly on those amendments, but also cases based on statutes passed pursuant to them, such as 42 U.S.C. § 1971, 1973, and 1983. The *phrase used are words of inclusion, not*

*limitation.  Allain*, 619 F. Supp. at 104 (citing 121 Cong.Rec. H4735 (daily ed. June 2, 1975) (Rep. Robert Drinan)) (emphasis added).[8]

Congress added the fee-shifting provision to the VRA to 'encourag[e] private litigants to act as 'private attorneys general' in seeking to vindicate the civil rights laws.'" *Texas v. United States*, 49 F. Supp. 3d 27, 36 (D.D.C. 2014) (citing *Donnell v. U.S.*, 682 F.2d 240, 245 (D.C. Cir. 1982)); *see also* S. Rep. No. 94-295, at 40 (1975) ("Fee awards are a necessary means of enabling private citizens to vindicate these Federal rights."). Accordingly, courts routinely award attorney's fees under 52 U.S.C. 10310(e) in VRA litigation, including Section 208 cases. *See Bone Shirt v. Hazeltine*, 524 F. 3d 863, 865 (8th Cir. 2008) (affirming award of fees in Section 2 lawsuit); *See OCA Greater Houston v. Texas,* No. 1:15-CV-679-RP, 2017 WL 401275, at *5 (W.D. Tex. Jan. 30, 2017) (granting attorneys' fees and costs for Section 208 claim).

Interpreting the VRA's fee-shifting provision to exclude VRA claims would lead to the incorrect conclusion that Congress exceeded its authority in enacting the VRA, which was enacted under the enforcement authority of the two post-Civil War

---

[8] Limiting fees to only cases brought under the 14th and 15th Amendments would also render the VRA provision superfluous.  A federal statute, 42 U.S.C. 1988, already entitles plaintiffs who prevail on constitutional claims to recover fees and costs.

amendments. This Court must ignore decades of precedent to accept the State's argument that VRA claims do not "enforce" the 14th and 15th Amendments.

The U.S. Supreme Court has already determined that Congress acted properly in enacting the VRA *See, e.g., United States v. Bd. of Comm'rs of Sheffield*, 435 U.S. 110, 126–27 (1978) (VRA "is designed to implement the Fifteenth Amendment and, in some respects, the Fourteenth Amendment") (citing *Katzenbach v. Morgan*, 384 U.S. 641 (1966) and *South Carolina v. Katzenbach*, 383 U.S. 301(1966)).[9] Congress similarly enacted Section 208 "to enforce the Fourteenth Amendment's guarantees." *See La Union del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 504, 556 (W.D. Tex. 2022) (citing *Fla. State Conf. of NAACP v. Lee*, 576 F. Supp. 3d 974, 989 (N.D. Fla. 2021)).

The State improperly cites *Allen v. Milligan* to support its contention that Section 208 exceeds congressional authority. *See* Br. 37. On the contrary, *Allen* supports Plaintiffs, not the State. *Allen,* 599 U.S. 1, 41 (2023) ("prior decisions of this Court foreclose any argument that Congress may not, pursuant to § 2 [of the Fifteenth Amendment] outlaw voting practices that are discriminatory in effect."). The State's reliance on a footnote in *Arkansas NAACP*, 86 F. 4th at 1213 n.3, is also

_____

[9] *Vega v. Tekoh*, 597 U.S. 134 (2022), which the State cites, is distinguishable. *Vega* held that *Miranda* rules for criminal suspects are prophylactic, *i.e.* rules adopted by the courts to protect suspects' rights under the Fifth Amendment. Unlike *Miranda* rules, the VRA's effects standard is not a set of rules—it is a federal statute, properly enacted under authority of the 14th and 15th Amendments.

unpersuasive where the Supreme Court has consistently held that Congress properly adopted Section 2, and the VRA as a whole, using its powers under the Fourteenth and Fifteenth Amendments. *See Allen,* 599 U.S. at 41.

### C. The District Court did not Abuse its Discretion in Declining an Across-the-Board Reduction of the Fees Award

The district court's refusal of an across-the-board reduction of Plaintiff's fees award was not an abuse of its discretion because Plaintiffs prevailed in their principal effort to ensure that voters are able to vote with the assistance of their chosen assister. In arguing the contrary, the State advances the wrong standard of review, applies the wrong standard, and mischaracterizes the scope of the court's injunction. Br. 37, 39.

The district court ruled in favor of Plaintiffs' core challenge to the six-voter limit, striking down § 7-5-310(b)(4)(B) as preempted. APP534-35, R. Doc. 180 at 1-2. The judge enjoined Defendants from enforcing "any practice that limits the right secured by Section 208 of the VRA based on the number of voters any individual has assisted, and from enforcing §§ 7-1-103(a)(19)(C) [criminal provision] and 7-1-103(b)(1) [criminal provision] to the extent they are used to enforce criminal penalties for violations of § 7-5-310(b)(4)(B)." *Id*. As a result, Plaintiffs prevailed in their effort to ensure that voters are able to vote with their chosen assister.

The district court declined to invalidate a subsidiary provision, which requires poll workers to record information on assisters. *See* § 7-5-310(b)(5). *See id*. As a result, the district court did not enjoin the State from enforcing § 7-5-310(b)(5) or

the criminal provisions in §§ 7-1-103(a)(19)(C) and 7-1-103(b)(1) to the extent they apply to § 7-5-310(b)(5). *See id.*

Under the correct standard of review, which is abuse of discretion, the district court did not err.[10] The court carefully reviewed Plaintiffs' degree of success and concluded that Plaintiffs are entitled to a full fee award because Plaintiffs "obtained excellent results." SAPP84, R. Doc. 199 at 6. (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)). The district court noted that "the tracking requirement was not central to Plaintiffs' claims," and Plaintiffs were successful in "the primary object of this lawsuit" — obtaining declaratory judgment and an injunction against the six-voter limit. *Id*. at 5-6. *See, e.g. Emery v. Hunt*, 272 F.3d 1042, 1047 (8th Cir. 2001) ("In terms of the relief sought and the relief granted in this case, the plaintiffs achieved as much on their state constitutional claim as they could have achieved on their federal voting rights claims. Because the plaintiffs obtained an excellent result in this case, they are entitled to reasonable compensation for the time their attorneys worked on their claims under the Voting Rights Act.").

The State concedes, and agrees with the district court, that in awarding attorney's fees "the most critical factor is the degree of success obtained." Br. 39

---

[10] The State incorrectly argues for de novo review, asserting the court "legally erred" in awarding fees." Br. at 39. Abuse of discretion is the correct standard of review for the award amount. *See Ludlow v. BNSF Ry. Co.*, 788 F.3d 794, 803-805 (8th Cir. 2015) (affirming, as not abuse of discretion, district court's consideration of evidence and arguments and ultimate award of fees and costs).

(quoting *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)). But the State argues that the court should have reduced the award even though it enjoined the more significant portion of the laws Plaintiffs challenged. Br. 38.[11]

Deference to district court determination of the degree of success is "appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley*, 461 U.S. at 437. Here, the State requested "an adjustment . . . on the basis of [the] limited nature of the relief obtained by the plaintiff," and the district court "ma[de] clear that it has considered the relationship between the amount of the fee awarded and the results obtained." *Id.*

In *Hensley,* the Supreme Court explained that a "fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Id.*; *see also Emery v. Hunt*, 272 F.3d at 1047. The nature of complex civil rights litigation is such that counsel's time "will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis," and the correct approach to awarding fees is instead to "focus on the significance of the overall relief obtained . . . in relation to the hours reasonably expended on the litigation." *Hensley* 461 U.S. at 435-436. The district court

---

[11] The court did not enjoin the tracking requirement found in §§ 7-5-310(b)(5) of the Arkansas Election Code, as well as the tracking requirement's criminal penalties. *Id.*

reviewed counsels' time entries and determined that Plaintiffs' challenge to the tracking requirement "was subsumed into their analysis of the six voter limit" and that "any billable hours solely attributable to the tracking requirement were *de minimis*." SAPP89, R. Doc. 199 at 6.

Where the successful and unsuccessful claims "involve a common core of facts" or are "based on related legal theories," it is inappropriate to view the litigation as "a series of discrete claims[.]" *Hensley*, 461 U.S. at 424. All of Plaintiffs' claims involved a common core of facts and are based on related legal theories. The Plaintiffs alleged in this litigation that the challenged provisions worked together to prohibit voters from choosing their own assister, which is preempted by Section 208.

The common core of facts included voters' need for assistance, the availability of individuals to assist voters, and the ways in which the challenged provisions either deterred or outright prohibited assisters from helping voters.

As the district court observed, Plaintiffs spent relatively little time on the § 7-5-310(b)(5) claim because Plaintiffs' evidence and argument were largely focused on the six-voter limit. Similarly, Plaintiffs' challenge to the criminal provisions, §§ 7-1-103(a)(19)(C) and 7-1-103(b)(1), was focused on the six-voter limit. The record supports the court's conclusion that Plaintiffs' challenge to § 7-5-310(b)(5) was incorporated into their six-voter limit challenge and that counsel's time on this claim was minimal. SAPP89, R. Doc. 199 at 6. Plaintiffs' few time entries related to the §

7-5-310(b)(5) challenge further support the court's conclusion, and does not, as the State erroneously argues, suggest Plaintiffs failed to maintain proper billing records. *Compare* Br. 39-40 *with* SAPP89, R. Doc. 199 at 6.

### D. The District Court did not Abuse its Discretion in Awarding Fees Related to the Preliminary Injunction

Plaintiffs' attorneys' work on the preliminary injunction, which was denied on technical grounds of timing, contributed to Plaintiffs' ultimate success on summary judgment. Therefore, the district court did not abuse its discretion by refusing to eliminate fees related to Plaintiffs' preliminary injunction motion. The court was not required to "deny fees for particular matters" simply because "plaintiff[s] did not prevail" on those specific matters, as the State suggests. *Emery*, 272 F.3d at 1042.

To challenge the district court's award, the State mischaracterizes Plaintiffs' motion and once again advances the wrong standard of review. *See* Br. 40-41. The State contends that Plaintiffs' motion was neither necessary nor useful because it was "calculated to do nothing more than create confusion at the polls." *Id*. Contrary to that assertion, Plaintiffs filed their preliminary injunction motion to ensure all voters would be allowed to vote with the assister of their choice, given the impending general election at the time of the initial complaint.

The district court did not abuse its discretion in granting fees for counsel's limited time spent on this motion. The district court found that Plaintiffs' motion

was necessary "given the effect that Plaintiffs expected the challenged statutes would have on their efforts to assist voters on Election Day." SAPP92, R. Doc. 199 at 9. The court reviewed counsels' time entries related to this motion and determined that counsel billed a reasonable number of hours. *Id*. The record supports the court's finding; Plaintiffs billed less than 20 hours on this motion.

The district court also carefully assessed "the outcome of the case as a whole, rather than by piecemeal assessment of how [Plaintiffs] fare[d] on each motion . . ." *Emery*, 272 F.3d at 1047–48 (*quoting Jenkins by Jenkins v. State of Mo.*, 127 F.3d 709, 714 (8th Cir. 1997)). Although the district court did not grant Plaintiffs' motion, it allowed the court to review the merits of the case at an early stage, which was useful to the parties in assessing their positions. More important, as discussed above, the court found that Plaintiffs obtained excellent overall results in this case.

### E. The District Court did not Abuse Its Discretion in Determining Plaintiff's Rates

The district court did not abuse its discretion in approving the following rates for Plaintiffs' counsel: $400/hour for Nina Perales; $350/hour for Griselda Vega-Samuel; and $175/hour for Susana Sandoval Vargas and Francisco Fernandez de Castillo. SAPP84, R. Doc. 199 at 7. The State fails to provide any legal authority or evidence to support the contrary. *See* Br. 41.

The district court, as permitted, "rel[ied] on [its] own experience and knowledge of prevailing market rates." SAPP90-91, R. Doc. 199 at 7-8; *Bryant v. Jeffery Sand Co.*, 919 F. 3d. 520, 529 (8th Cir. 2019). The district court considered "the prevailing market rate in [Arkansas] for similar services by lawyers of comparable skills, experience, and reputation." SAPP84, R. Doc. 199 at 7-8; *Libertarian Party of S. Dakota v. Krebs*, 2018 WL 4762966, at *2 (D.S.D. Oct. 2, 2018) (quotations omitted). As a result, the court approved rates for Vega Samuel, Sandoval Vargas, and Fernandez de Castillo, but reduced Perales' rate from $500/hour to $400/hour. SAPP90-91, R. Doc. 199 at 7-8.

The State cites several inapposite cases to assert that these rates are higher than rates typically approved in Arkansas. Br. 42. The cited cases provide rates for counsel experienced in employment litigation, not voting rights litigation. *Id*. The district court set Plaintiff's counsel's rates based on market rates for "similarly experienced counsel in [voting rights law]." SAPP84, R. Doc. 199 at 7-8.

Voting rights is a specialized area of law that not many attorneys practice. "An attorney specializing in civil rights cases may enjoy a higher rate for his expertise than others, providing his ability corresponds with his experience." *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 719 (5th Cir. 1974). In determining the reasonableness of rates, courts may consider the skill required to perform the legal service, as well as the experience, reputation and ability of the

attorneys. *Id.* at 717-19 (factors 3 and 9); *see also Moore v. City of Des Moines*, 766 F.2d 343, 346 (8th Cir. 1988). That is exactly what the district court did.

The district court carefully considered Plaintiffs' counsel's experience in granting rates. *See* SAPP91, R. Doc. 199 at 8. The court recognized that $400/hour was a higher rate than it typically awarded, but found that Perales' "wealth of experience in a specialized area of law *rarely* present before [the] [c]ourt" merited a higher rate. *Id.* (emphasis added).

The State does not dispute Plaintiff's counsel's experience in voting rights litigation. *See* Br. 42. The record demonstrates counsel routinely bring complex litigation cases in federal court, particularly voting rights cases. Plaintiffs' counsel's extensive expertise in voting rights litigation allowed them to litigate this case efficiently. Counsel here brought expertise with voting rights litigation that would be difficult to find in local attorneys.

Even if the rates granted to Plaintiffs' counsel were higher than local rates, which they are not, a court may look beyond the local market for the prevailing rate. *See Planned Parenthood, Sioux Falls Clinic v. Miller*, 70 F.3d 517, 519 (8th Cir. 1995) (finding Chicago market rates appropriate for attorneys in a South Dakota reproductive rights case).

> **F.** **The District Court's Award of Fees and Costs is not Excessive**

The district court did not abuse its discretion in granting Plaintiffs reasonable fees and costs. The State cannot provide any real support to the contrary. *See* Br. 43.

The State points to only two examples to argue that the court awarded excessive fees and costs: the manner in which plaintiffs served the complaint and Vega Samuel's fees. *See id*. The State contends that Plaintiffs unnecessarily incurred costs to serve the complaint because Plaintiffs could have "simply ask[ed] Defendants' counsel to accept service by email," and arbitrarily demands a complete elimination of Vega Samuel's fees. Br. 43.

First, the district court considered and found Plaintiffs' costs reasonable except for Plaintiffs' costs of $5,539.75 for cloud hosting. SAPP93, R. Doc. 199 at 10. The court reduced Plaintiffs' costs, accordingly, from $13,431.43 to $7,891.68. *Id*.

The district court correctly granted Plaintiff's process-server fees of $3,801.93. *Id.* Under Fed. R. Civ. P. 4(c), a plaintiff may request defendants to waive service, but the plaintiff must give the defendant at least 30 days to answer the request. Fed. R. Civ. P. 4(d)(2).

Plaintiffs moved for interim relief on the same day that they filed their lawsuit. At that early stage, Plaintiffs did not have email addresses or contact information for all defendants. Rather than risk delays in service by contacting the wrong person to accept service, Plaintiffs chose to go through ordinary means of effecting service.

In order to ensure that Defendants were properly served with the complaint and had notice of the motion for preliminary injunction, Plaintiffs elected to serve the complaint personally.[12]

Second, a complete elimination of Vega Samuel's time, as the State requests, is arbitrary and not supported by any case law. The State argues that Vega Samuel's fees should be eliminated because her time entries are "vague and cryptic," but the State does not point to any specific examples. *See* Br. 44. The district court reviewed Vega Samuel's time records and determined that some of Vega Samuels' entries were insufficiently detailed to be compensable. SAPP84, R. Doc. 199 at 8. As a result, the court reduced Vega Samuel's hours by 25 percent. *Id.*

The documentation of hours is adequate as long it "allows the Court to assess the reasonableness of this time." *Sheppard v. United States Dep't of Just.*, No. 4:17-CV-1037-NKL, 2022 WL 245480, at *4 (W.D. Mo. Jan. 25, 2022).

Plaintiffs' counsel's time entries allowed the district court to determine that the hours counsel expended on this case were "largely reasonable." SAPP91, R. Doc. 199 at 8. The court found that all of counsel's time entries were sufficiently detailed and reasonable, except for "some" of Vega Samuel's time entries. *Id.* at 8-9. The

---

[12] The record shows Plaintiffs were forced to make multiple attempts to serve Benton and Sebastian County Defendants.

court reduced Vega Samuel's time accordingly, and thus did not abuse its discretion by refusing to eliminate all of Vega Samuel's time.

### G. The District Court did not Abuse its Discretion in Refusing to Consider Impact on Public Services

The district court did not abuse its discretion in rejecting the State's argument that an across-the-board reduction was necessary because any award in this case would reduce public services to the people of Arkansas. *See* Br. 45. If accepted on the facts of this case, the State's argument would lead to the absurd result that prevailing parties would never be able to obtain reasonable attorney's fees and costs against a state. In addition, the State provides no evidence to support its argument. *See id*.

"State officials cannot show special circumstances sufficient to prevent an award of fees merely because… any award of attorneys' fees would ultimately be satisfied by the state taxpayers." *Riddell v. Nat'l Democratic Party*, 624 F.2d 539, 545 (5th Cir. 1980) (citing *Johnson v. State of Miss.*, 606 F.2d 635, 637 (5th Cir. 1979). Generally, it is simply not "relevant that the financial impact of paying the attorney's fees will ultimately fall on taxpayers who did not themselves participate in any discriminatory or otherwise unconstitutional act." *Connor v. Winter*, 519 F. Supp. 1337, 1344 (S.D. Miss. 1981) (citing *Aware Woman Clinic v. City of Cocoa Beach*, 629 F.2d 1146, 1150 (5th Cir. 1980)).

The State does not provide any evidence of which programs, if any, would suffer from diversion of funds, or that the fees award will actually divert funds. The State cites *Perdue* in support of its argument, but the holding in *Perdue* is not applicable to the present case. *See Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 559 (2010). In *Perdue*, the Supreme Court held that the enhancement of loadstar fees by 75%—an additional 4.5 million dollars—was arbitrary. *Id.* at 559. The Supreme Court considered, among several factors, that the fees would be paid by taxpayers. *Id*. The Supreme Court's holding in *Perdue* is not applicable here because Plaintiffs did not seek, and the district court did not grant, any fee enhancement.

### H.    Plaintiffs are Entitled to Fees and Costs for their Supremacy Clause Claim

The district court may grant fees for a non-fee bearing claim. *See St. Louis Effort for AIDS v. Lindley-Myers*, 877 F.3d 1069, 1072 (8th Cir. 2017) (holding that organizations were entitled to fees award after prevailing on non-fee-bearing claim). Even if this Court concludes that the district court should not have addressed Plaintiffs' Section 208 claim because of *Arkansas NAACP,* that claim remains substantial. Plaintiffs brought a Supremacy Clause claim for the same purpose as their direct VRA claim — to protect voter's rights under the VRA. Both claims arose from a common nucleus of operative facts related to the six-voter limit's restriction on voters' ability to choose assisters afforded to them by Section 208.

## CONCLUSION

For the foregoing reasons, appellees respectfully request that the Court affirm the judgments below.

Dated: August 21, 2024

Respectfully submitted,

*/s/ Nina Perales*
Nina Perales
TX State Bar No. 24005046
Mexican American Legal
Defense and Educational Fund
110 Broadway, Suite 300
San Antonio, TX 78205
(210) 224-5476
nperales@maldef.org

Susana Sandoval Vargas
IL State Bar No. 6333298
11 E. Adams, Suite 700
Chicago, IL 60603
(312) 427-0701
ssandovalvargas@maldef.org

Lawrence Walker
AR Bar No. 2012042
John W. Walker, P.A.
1723 Broadway
Little Rock, AR 72206
(501) 374-3758
lwalker@jwwlawfirm.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 26, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

*/s/ Nina Perales*
Nina Perales
Attorney for Appellees

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,905 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman font) using Microsoft Word (the same program used to calculate the word count).

I further certify that the PDF file was scanned for viruses, and no viruses were found on both the brief and the addendum.

*/s/ Nina Perales*
Nina Perales